ORIGINAL

FILED

APR 30 2008

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WASHINGTON MUTUAL, INC., AS )
SUCCESSOR IN INTEREST TO H.F. )
AHMANSON & CO. AND SUBSIDIARIES; )
WASHINGTON MUTUAL BANK, A FEDERAL )
ASSOCIATION, AS SUCCESSOR IN ) No. **08-321 T**
INTEREST TO HOME SAVINGS OF )
AMERICA; AND SAVINGS OF AMERICA, )
INC., AS SUBSTITUTE AGENT FOR H.F. )
AHMANSON & CO. AND SUBSIDIARIES, )
          **Plaintiffs,** )
  )
v. )

THE UNITED STATES of AMERICA,

          **Defendant.**

---

## COMPLAINT

Plaintiffs Washington Mutual, Inc. ("Washington Mutual"), Washington Mutual Bank, a Federal Association, and Savings of America, Inc., (collectively, "Plaintiffs") allege as follows:

## THE PARTIES

1.  Washington Mutual is a domestic corporation incorporated in the State of Washington, with its corporate headquarters at 1301 Second Avenue, Seattle, Washington, 98101. Washington Mutual's employer identification number ("EIN") is 91-1653725.

2.  H.F. Ahmanson & Co. ("Ahmanson") was a domestic corporation incorporated in Delaware. Until October 1, 1998, its corporate headquarters were at 4900 Rivergrade Road, Irwindale, California, 91706. Ahmanson's EIN is 95-0479700.

1

3.     Washington Mutual acquired Ahmanson on October 1, 1998.
Ahmanson merged into Washington Mutual and went out of existence on that date. Washington
Mutual is the successor in interest to the claims presented herein.

4.     For the tax years ending December 31, 1995 and October 1, 1998, Home Savings
of America ("Home") was a federally chartered savings and loan association, a wholly owned
subsidiary of Ahmanson, and a member of the affiliated group for which Ahmanson was the
common parent corporation.

5.     On October 1, 1998, Home was merged with and into Washington Mutual Bank, a
Federal Association (formerly known as Washington Mutual Bank, FA). Washington Mutual
Bank, a Federal Association, is a wholly owned subsidiary of Washington Mutual.

6.     For the tax years ending December 31, 1995 and October 1, 1998, Savings of
America, Inc. was a wholly owned subsidiary of Ahmanson and a member of the affiliated group
for which Ahmanson was the common parent corporation. Pursuant to section 8 of Rev. Proc.
2002-43 and Treas. Reg. § 1.1502-77A, Savings of America, Inc. has been designated the
substitute agent for Ahmanson. Savings of America, Inc. is a wholly owned subsidiary of
Washington Mutual.

7.     For the tax year ending December 31, 1995, 1905 Agency, Inc. ("1905 Agency")
was also a member of the affiliated group for which Ahmanson was the common parent
corporation.

8.     Defendant is the United States of America.

## JURISDICTION

9.     Plaintiffs bring this complaint in accordance with the requirements of section
7422 of the United States Internal Revenue Code (the "Code"), 26 U.S.C. § 7422, for recovery of

2

federal income taxes and related interest erroneously collected from Ahmanson for the tax years ending December 31, 1995 and October 1, 1998 (the "years at issue").

10.    This Court has jurisdiction over this action under 28 U.S.C. § 1491 and 28 U.S.C. § 1346(a).

11.    Plaintiffs are filing this complaint within the period of time specified in section 6532 of the Code.

## GENERAL ALLEGATIONS

12.    Plaintiffs seek to recover the sum of at least $133,035,661, together with interest as the law provides, which sum represents an overpayment by Ahmanson of federal income taxes for the years at issue.

13.    Ahmanson timely filed a federal income tax return for both of the years at issue with the Internal Revenue Service Center in Fresno, California.

14.    Ahmanson paid the full amount of income taxes shown on its federal income tax returns for both of the years at issue. Ahmanson's federal income tax returns for years at issue were examined by the Internal Revenue Service, and Ahmanson paid the additional amounts assessed in those examinations.

15.    This action arises out of the attached administrative claims for refund that Plaintiffs submitted for the years at issue. In those administrative claims for refund, Plaintiffs claimed deductions for amortization and abandonment losses with respect to the intangible assets that Home obtained pursuant to agreements with the Federal Savings and Loan Insurance Corporation ("FSLIC"), an agency of the United States government, and with the Federal Deposit Insurance Corporation ("FDIC"), an agency of the United States government. Under those agreements, Home also acquired insolvent savings and loan associations located in Missouri, Florida, New York, and Ohio. For the tax year 1995, Plaintiffs also claimed a reversal

3

of the income that the IRS erroneously required Home to include on the transfer of mortgage-backed securities and associated deferred loan fees to 1905 Agency.

16.      Prior to December 17, 1981, Home was a California-chartered savings and loan association engaged in the business of taking deposits and making home loans in California.

17.      From 1981 through 1989 (and before), FSLIC insured the customer deposit accounts of federal savings and loan associations, or "federal thrifts."

18.      In 1985 and before, FDIC insured the customer deposit accounts of federal savings banks.

19.      In the late 1970s and into the early 1980s, FSLIC faced a financial crisis. Interest rates increased during this period, requiring thrifts to pay higher rates to their depositors and other creditors. Federal thrifts also lost deposits to other financial intermediaries, such as money market mutual funds, during this period. The thrifts' income did not rise commensurately because their primary source of income was fixed-rate mortgages. Most thrifts incurred net losses during this period and many became insolvent.

20.      By late 1981 FSLIC determined that it lacked the funds necessary to cover its deposit insurance liabilities with respect to insolvent federal thrifts. FSLIC decided to offer assistance to healthy thrifts ("FSLIC Assistance") to induce them to take over insolvent federal thrifts in transactions known as "supervisory mergers." FSLIC Assistance took a variety of forms including cash, guarantees against loan losses, capital notes, loans and other favorable financing, the right to acquire, maintain, and establish branch offices ("branches") outside of the acquiring thrift's home state, and certain rights with regard to the Regulatory Accounting Principles ("RAP") that govern federal thrift accounting.

21.      From 1981 through 1989, the Federal Home Loan Bank Board ("FHLBB"), another agency of the United States government, was the federal agency that regulated federal

4

thrifts. FHLBB was the operating head of FSLIC. FHLBB's approval was required before FSLIC could consummate a supervisory merger.

22.     Prior to March 1981, FHLBB regulations generally prohibited a federal thrift from establishing branches in any state other than the state in which its home office was located. FHLBB amended its regulations in March and September 1981 to create an exception to this general prohibition that could be invoked only in supervisory mergers. That exception (1) allowed a federal thrift with its home office in one state to acquire through a supervisory merger one or more federal thrifts with home offices in a second state, and (2) allowed the acquiring thrift to establish additional branches in the state that it entered through the supervisory merger.

The Missouri-Florida Transaction

23.     In December 1981, Security Federal Savings and Loan Association ("Security"), a federal savings and loan association with its home office in Missouri, was insolvent.

24.     In December 1981, Hamiltonian Federal Savings and Loan Association ("Hamiltonian"), a federal savings and loan association with its home office in Missouri, was insolvent.

25.     In December 1981, Southern Federal Savings and Loan Association ("Southern"), a federal savings and loan association with its home office in Florida, was insolvent.

26.     On December 17, 1981, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Security, Hamiltonian, and Southern through a supervisory merger (the "Missouri-Florida Transaction").

27.     The Missouri-Florida Transaction was a two-step acquisition: Security and Hamiltonian merged into Southern, then Southern merged into Home. Prior to Southern's merger into Home, Home converted from a California-chartered savings and loan association to a federal savings and loan association.

5

28.     To induce Home to acquire Security, Hamiltonian, and Southern, FSLIC executed an Assistance Agreement (the "Assistance Agreement") with Home.

29.     The Assistance Agreement incorporated by reference a resolution and a letter in which the FHLBB approved the establishment by Home of branch offices in Missouri and Florida. The incorporation of this resolution and letter into the Assistance Agreement gave Home the contractual right to maintain branches and establish additional branches in Missouri ("Missouri Branching Rights") and Florida ("Florida Branching Rights"), subject to the requirement that Home apply for and obtain the FHLBB's approval before opening any new branch.

30.     The Assistance Agreement also incorporated an FHLBB resolution that approved Home's use of the "purchase method" of accounting for the supervisory merger. The incorporation of that resolution gave Home the contractual right (the "Missouri-Florida RAP Right") to treat the excess of the purchase price over the fair market value of the identifiable assets acquired from the Missouri and Florida thrifts as "supervisory goodwill," subject to amortization over 40 years, and to count the unamortized supervisory goodwill balance as an asset for purposes of meeting the FHLBB's regulatory capital requirements for federal thrifts. In this case, Home paid no cash for the acquired Missouri and Florida thrifts, and the purchase price was the assumption of the acquired thrifts' liabilities. Therefore, the Missouri-Florida RAP Right entitled Home to treat the excess of the fair market value of the acquired Missouri and Florida thrifts' liabilities over the fair market value of those thrifts' identifiable assets as supervisory goodwill, to amortize that supervisory goodwill over 40 years, and to count the unamortized supervisory goodwill balance toward meeting Home's regulatory capital requirements.

31.     In addition to the Missouri and Florida Branching Rights and the Missouri-Florida RAP Right, the Assistance Agreement provided Home with a small amount of cash, a guarantee to reimburse Home in the event it incurred losses in connection with certain real estate owned by the acquired thrifts, and certain regulatory forbearances.

6

32.     The Assistance Agreement also incorporated by reference resolutions in which the FHLBB made the findings necessary to qualify the merger of Security and Hamiltonian into Southern, and the merger of Southern into Home as tax-free reorganizations under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

33.     Home determined the excess of the fair market value of the failed Missouri thrifts' liabilities over the fair market value of their booked assets, and reduced the amount of the excess by the amount of cash received from FSLIC in connection with the failed Missouri thrifts. Of the remaining excess, a portion — $1,243,000 — was attributed to the core deposit base of the acquired Missouri thrifts. The remaining amount of $87,385,441 was treated as supervisory goodwill.

34.     Home determined the excess of the fair market value of Southern's liabilities over the fair market value of its booked assets, and reduced the amount of the excess by the amount of cash received from FSLIC in connection with Southern. Of the excess, a portion — $2,444,000 — was attributed to the core deposit base of Southern. The remaining amount of $180,118,478 was treated as supervisory goodwill.

35.     Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $121,444,000 (cost basis) or $133,100,000 (fair market value basis) in the Florida Branching Rights.

The Century Transaction

36.     In August 1984, Century Federal Savings and Loan Association ("Century"), a federal savings and loan association with its home office in New York, was insolvent.

37.     On August 10, 1984, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Century through a supervisory merger (the "Century Transaction").

38.     To induce Home to acquire Century, FSLIC executed an Assistance Agreement (the "Century Assistance Agreement") with Home.

7

39.     The Century Assistance Agreement incorporated by reference a resolution in which the FHLBB approved the establishment by Home of branch offices in New York. The incorporation of this resolution into the Century Assistance Agreement gave Home the contractual right to maintain branches and establish additional branches in New York ("New York Branching Rights"), subject to the requirement that Home apply for and obtain the FHLBB's approval before opening any new branch.

40.     The Century Assistance Agreement also incorporated an FHLBB resolution that approved Home's use of the "purchase method" of accounting for the supervisory merger. The incorporation of that resolution gave Home the contractual right (the "Century RAP Right") to treat the excess of the purchase price over the fair market value of Century's identifiable assets as "supervisory goodwill," subject to amortization over 40 years, and to count the unamortized supervisory goodwill balance as an asset for purposes of meeting the FHLBB's regulatory capital requirements for federal thrifts. In this case, Home paid no cash for Century, and the purchase price was the assumption of Century's liabilities. Therefore, the Century RAP Right entitled Home to treat the excess of the fair market value of Century's liabilities over the fair market value of Century's identifiable assets as supervisory goodwill, to amortize that supervisory goodwill over 40 years, and to count the unamortized supervisory goodwill balance toward meeting Home's regulatory capital requirements.

41.     In addition to the New York Branching Rights and the Century RAP Right, the Century Assistance Agreement provided Home with certain regulatory forbearances and favorable financing in the form of a $700 million loan at a below-market interest rate.

42.     The Century Assistance Agreement also incorporated by reference resolutions in which the FHLBB made the findings necessary to qualify the merger of Century into Home as a tax-free reorganization under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

8

43.     Home determined the excess of the fair market value of Century's liabilities over the fair market value of Century's booked assets. The excess of $126,745,842 was treated as supervisory goodwill.

44.     Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $126,745,842 in the New York Branching Rights.

45.     The New York Branching Rights that Home obtained in the transactions had an indefinite life and were not amortizable.

46.     In the mid-1990s, Home's management decided to terminate its branch banking operations in New York.

47.     In 1995, Home engaged in transactions in which Home exchanged, sold, or otherwise disposed of its branches in New York.

48.     With the disposition of its last New York branch in 1995, Home exited the New York branch-banking market with no intention of reestablishing branch offices in New York.


The Ohio Transaction

49.     In May 1985, Home Federal Savings and Loan Association ("Home Fed"), a federal savings and loan association with its home office in Ohio, was insolvent.

50.     In May 1985, Permanent Savings and Loan Association ("Permanent"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

51.     In May 1985, Oxford Savings and Loan Association ("Oxford"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

52.     In May 1985, American Savings Bank of Worthington ("American"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

9

53.     In June 1985, Savings One Association ("Savings One"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

54.     On May 22, 1985, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Home Fed, Permanent, Oxford, and American through a supervisory merger. On June 20, 1985, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Savings One through a supervisory merger. These two transactions are referred to collectively as the "Ohio Transaction."

55.     To induce Home to acquire Home Fed, Permanent, Oxford, American, and Savings One, FSLIC executed an Assistance Agreement (the "Ohio Assistance Agreement") with Home.

56.     The Ohio Assistance Agreement incorporated by reference a resolution in which the FHLBB approved the establishment by Home of branch offices in Ohio. The incorporation of this resolution into the Ohio Assistance Agreement gave Home the contractual right to maintain branches and establish additional branches in Ohio ("Ohio Branching Rights"), subject to the requirement that Home apply for and obtain the FHLBB's approval before opening any new branch.

57.     The Ohio Assistance Agreement also incorporated an FHLBB resolution that approved Home's use of the "purchase method" of accounting for the supervisory merger. The incorporation of that resolution gave Home the contractual right (the "Ohio RAP Right") to treat the excess of the purchase price over the fair market value of the identifiable thrift assets acquired as "supervisory goodwill," subject to amortization over 40 years, and to count the unamortized supervisory goodwill balance as an asset for purposes of meeting the FHLBB's regulatory capital requirements for federal thrifts. In this case, Home paid no cash for the acquired Ohio thrifts, and the purchase price was the assumption of the acquired Ohio thrifts' liabilities. Therefore, the Ohio RAP Right entitled Home to treat the excess of the fair market value of the acquired Ohio thrifts' liabilities over the fair market value of the Ohio thrifts'

identifiable assets as supervisory goodwill, to amortize that supervisory goodwill over 40 years, and to count the unamortized supervisory goodwill balance toward meeting Home's regulatory capital requirements.

58.     In addition to the Ohio Branching Rights and the Ohio RAP Right, the Ohio Assistance Agreement provided Home with certain regulatory forbearances and favorable financing in the form of a $200 million loan at a below-market interest rate.

59.     The Ohio Assistance Agreement also incorporated by reference resolutions in which the FHLBB made the findings necessary to qualify the merger of Home Fed, Permanent, Oxford, and American into Home, and the merger of Savings One into Home as tax-free reorganizations under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

60.     Home determined the excess of the fair market value of the failed Ohio thrifts' liabilities over the fair market value of their booked assets, and reduced the amount of the excess by the amount of cash received from FSLIC in connection with the failed Ohio thrifts. The remaining excess of $37,814,989 was treated as supervisory goodwill.

61.     Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $37,814,989 in the Ohio Branching Rights.

62.     The Ohio Branching Rights that Home obtained in the transactions had an indefinite life and were not amortizable.

63.     In the early 1990s, Home's management decided to terminate its branch banking operations in Ohio.

64.     In 1995, Home engaged in transactions in which Home exchanged, sold, or otherwise disposed of its branches in Ohio.

65.     With the disposition of its last Ohio branch in 1995, Home exited the Ohio branch-banking market with no intention of reestablishing branch offices in Ohio.

The Bowery Transaction

66.    In August 1985, The Bowery Savings Bank ("Old Bowery"), an FDIC-insured, New York-chartered mutual savings bank with its home office in New York, was insolvent.

67.    In or around August 1985, a group of private investors (the "Investors") formed a corporation ("New Bowery") for the purpose of acquiring Old Bowery.

68.    On August 7, 1985, New Bowery entered into an agreement with FDIC to acquire the assets and liabilities of Old Bowery through a supervisory merger (the "Bowery Transaction").

69.    To induce New Bowery to acquire Old Bowery, FDIC executed an Assistance Agreement, dated August 7, 1985, (the "Bowery Assistance Agreement") with New Bowery.

70.    The Bowery Assistance Agreement gave New Bowery the contractual right (the "Bowery RAP Right") to use the "purchase method" of accounting for the supervisory merger by treating the excess of the Old Bowery liabilities over the fair market value of the identifiable Old Bowery assets acquired as "goodwill," subject to amortization in accordance with Generally Accepted Accounting Principles ("GAAP"), and to count the unamortized goodwill balance as capital for purposes of meeting the FDIC's regulatory capital requirements.

71.    In addition to the Bowery RAP Right, the Bowery Assistance Agreement provided New Bowery with approximately $170 million in cash, credit protection against losses from loans and investment securities, a $100 million loan at a below-market interest rate (the "Bowery Favorable Financing Right"), and certain regulatory forbearances.

72.    On October 1, 1985, Old Bowery was converted from a mutual savings bank to a stock company and was merged into New Bowery in a tax-free reorganization under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

12

73.     New Bowery determined the excess of the fair market value of Old Bowery's liabilities over the fair market value of Old Bowery's booked assets. The excess of $635,166,000 was treated as goodwill for regulatory accounting purposes.

74.     Under Code section 1012 and Treasury Regulation § 1.1012-1(a), New Bowery had a total tax basis of $635,166,000 in the Bowery RAP Right and the Bowery Favorable Financing Right.

75.     On January 29, 1988, Home, through a wholly owned subsidiary, acquired all the outstanding capital stock of New Bowery for a purchase price of $200 million in cash. New Bowery retained the Bowery RAP Right pursuant to an amended assistance agreement with the FDIC. Home did not make a Code section 338 election to treat the stock acquisition as an asset acquisition. Therefore, New Bowery's assets retained their historical tax basis when Home acquired the stock of New Bowery. New Bowery became a member of Ahmanson's affiliated group.

76.     Until 1992, New Bowery's books were separate from Home's books. In 1992, Home and New Bowery merged in a tax-free reorganization. Home received carryover basis in New Bowery's assets and counted the remaining New Bowery goodwill toward its regulatory capital requirements.

1905 Agency

77.     For the 1995 tax year, 1905 Agency was a wholly owned subsidiary of Home and was responsible for the management of Home's investments.

78.     At all relevant times, Home was engaged in the savings and loan business. One of Home's primary functions was the origination of mortgage loans. In connection with the origination of mortgage loans, Home typically charged borrowers loan fees or points and treated such mortgage loans as having discounts associated with them.

13

79.     Home did not include the loan fees associated with these mortgage loans in its income for federal income tax purposes at the time of the origination of the loans, but rather deferred the income recognition on such loan fees in accordance with Revenue Procedure 94-29, 1994-1 C.B. 616, and Revenue Procedure 94-30, 1994-1 C.B. 621.  Specifically, Home used the principal reduction method pursuant to Revenue Procedure 94-29, 1994-1 C.B. 616, to amortize the deferred loan fees into income for loans originated on or after January 1, 1993, and used the revised loan liquidation method pursuant to Revenue Procedure 94-30, 1994-1 C.B. 621, to amortize the deferred loan fees into income for loans originated prior to January 1, 1993.

80.     Prior to 1995, Home routinely securitized a portion of its originated mortgage loans.  When the mortgage loans were securitized, the loan fees that were related to the securitized mortgage loans became discounts on the mortgage-backed securities for book purposes and were amortized accordingly.

81.     During 1995, Home transferred a total of $13,098,988,833 of its mortgage-backed securities and the deferred loan fees associated with such mortgage-backed securities to its wholly-owned subsidiary, 1905 Agency.  The total amount of such deferred loan fees transferred was $140,220,790.

82.     1905 Agency continued to use the principal reduction method to amortize the deferred loan fees into income for loans originated on or after January 1, 1993, and continued to use the revised loan liquidation method to amortize the deferred loan fees into income for loans originated prior to January 1, 1993.

General Claims

83.     Home is entitled to amortization deductions for 1995 and 1998 with respect to the Bowery Favorable Financing Right under Code section 167.

14

84.     Home is entitled to an abandonment loss in 1995 under Code section 165 with respect to its New York Branching Rights because Home suffered a loss for which Home was not covered by insurance or otherwise compensated.

85.     Home is entitled to an abandonment loss in 1995 under Code section 165 with respect to its Ohio Branching Rights because Home suffered a loss for which Home was not covered by insurance or otherwise compensated.

86.     Home is entitled to an abandonment loss in 1998 under Code section 165 with respect to its Florida Branching Rights because Home suffered a loss for which Home was not covered by insurance or otherwise compensated.

87.     Under Code section 351, Home is not required (nor is it permitted) to recognize any gain or income in 1995 on the transfer of the mortgage-backed securities and associated deferred loan fees to 1905 Agency.

88.     In addition, even if the transfer of the mortgage-backed securities and associated deferred loan fees gave rise to gain recognition under general tax principles, under Treasury Regulation section 1.1502-13(a)(2), as was in effect for the taxable year ending on December 31, 1995, the transfer qualified as a "deferred intercompany transaction" and, accordingly, under Treasury Regulation section 1.1502-13(c)(1), Home is not required (nor is it permitted) to recognize gain or income in 1995 on the transfer.

89.     To the extent that the Defendant contends that Home is required to recognize income in 1995 under Revenue Procedures 94-29, 1994-1 C.B. 616, and 94-30, 1994-1 C.B. 621, due to the decline in the principal balance of the loans underlying the mortgage-backed securities as a result of a transfer of those securities to Home's wholly owned subsidiary, 1905 Agency, such contention should be rejected because a transfer of such securities by one member of a consolidated group to another member of the group should not be treated as a decline in the principal of such loans.

15

90.    To the extent that the Defendant contends that Revenue Procedures 94-29, 1994-1 C.B. 616, and 94-30, 1994-1 C.B. 621, require Home to recognize income or gain in 1995 as a result of the transfer of the mortgage-backed securities and associated deferred loan fees to 1905 Agency, the Revenue Procedures are invalid because they are inconsistent with the Internal Revenue Code and the Treasury Regulations issued thereunder.

91.    Plaintiffs timely filed with the IRS claims for refund (attached) with respect to each of the tax years at issue. In those claims, Plaintiffs claimed (1) the abandonment loss and amortization deductions summarized above and set forth in the detailed counts below and (2) reversal of the income that the IRS erroneously required Home to include for 1995 on the transfer of the mortgage-backed securities and associated deferred loan fees to 1905 Agency.

92.    Plaintiffs are the sole owners of the claims for refund and have made no assignment or transfer of any part of these claims. There is no other suit or process by Plaintiffs pending in any other court on these claims. No action on the claims has been taken by the Congress of the United States or by any departments of the United States government, other than the action by the IRS on September 21, 2005 denying some of the claims in full.

## COUNT ONE – BRANCHING RIGHTS AND FAVORABLE FINANCING RIGHTS (1995 TAX YEAR)

93.    Plaintiffs incorporate herein by reference and reallege all allegations in paragraphs 1-76, 83-86, 91, and 92 of this Complaint.

94.    On or before September 15, 1996, Ahmanson timely filed a Form 1120 federal income tax return for its 1995 tax year with the IRS at Fresno, California, reporting total tax in the amount of $191,416,334. The name, address, and identification number appearing on that return were as follows:

> H.F. Ahmanson & Co. and Subsidiaries
> 4900 Rivergrade Road

16

Irwindale, California, 91706
EIN 95-0479700

95.     The IRS subsequently examined Ahmanson's federal income tax return, and

pursuant to that examination, Ahmanson paid an additional $19,040,519 of tax, $659,039 of

penalty, and $26,993,700 of interest.  Ahmanson paid its originally reported tax and those

subsequent assessments as follows:

a)   $289,883 of overpayment credit elect from prior year credited to the
Fresno, CA, Service Center on April 15, 1995;

b)   $81,500,000 of estimated tax paid to the Atlanta, GA, Service Center on
June 15, 1995;

c)   $91,288,000 of estimated tax paid to the Atlanta, GA, Service Center on
December 15, 1995;

d)   $27,441,000 of estimated tax paid to the Fresno, CA, Service Center on
March 15, 1996;

e)   $207,733 of advance payment of determined deficiency paid to the Ogden,
UT Service Center on April 14, 2005;

f)   $174,014 of designated payment of interest paid to the Ogden, UT Service
Center on April 14, 2005;

g)   $3,116 of subsequent payment on account paid to the Ogden, UT, Service
Center on July 7, 2005;

h)   $45,864,974 of subsequent payment on account paid to the Ogden, UT,
Service Center on January 31, 2006; and

i)   $443,421 of subsequent payment on account paid to the Ogden, UT,
Service Center on May 4, 2006.

96.    Home is entitled to an amortization deduction of $6,666,667 under section 167 for its 1995 tax year with respect to the Bowery Favorable Financing Right.

97.    Because Home made the affirmative decision to leave the New York market and it sold or otherwise divested itself of all of its remaining New York branches in 1995, Home suffered a loss of its New York Branching Rights for which Home was not covered by insurance or otherwise compensated. Home is entitled to an abandonment loss deduction of $126,745,842 for its 1995 tax year under Code section 165 with respect to the New York Branching Rights.

98.    Alternatively, to the extent Home is not entitled to recover the basis of the New York Branching Rights as a loss deduction under Code section 165 in 1995, such basis amount of $126,745,842 is includible in the adjusted basis of the New York branches sold or otherwise disposed of by Home, and Home is entitled – for its 1995 tax year – to a corresponding adjustment to the gain or loss recognized under Code section 1001 on the 1995 New York branch sales.

99.    Because Home made the affirmative decision to leave the Ohio market and it sold or otherwise divested itself of all of its remaining Ohio branches in 1995, Home suffered a loss of its Ohio Branching Rights for which Home was not covered by insurance or otherwise compensated. Home is entitled to an abandonment loss deduction of $37,814,989 for its 1995 tax year under Code section 165 with respect to the Ohio Branching Rights.

100.    Alternatively, to the extent Home is not entitled to recover the basis of the Ohio Branching Rights as a loss deduction under Code section 165 in 1994, such basis amount of $37,814,989 is includible in the adjusted basis of the Ohio branches sold or otherwise disposed of by Home, and Home is entitled – for its 1995 tax year – to a corresponding adjustment to the gain or loss recognized under Code section 1001 on the 1995 Ohio branch sales.

18

101.    On April 9, 2002, Washington Mutual timely filed an informal claim for refund with the IRS in Seattle, Washington, seeking a refund of tax for Ahmanson's 1995 tax year on the grounds that Home was entitled to abandonment loss deductions for its New York and Ohio Branching Rights.

102.    The IRS disallowed that claim in full on September 21, 2005.

103.    On June 30, 2006, Ahmanson timely filed three amended returns on Forms 1120X with the IRS in Seattle, Washington. The three amended returns were filed for Ahmanson by Washington Mutual as successor in interest to Ahmanson, by Washington Mutual Bank, FA, as successor in interest to Home, and by Savings of America, Inc. as the designated substitute agent for Ahmanson, and each contained identical claims. The amended returns seek a refund of tax for Ahmanson's 1995 tax year on the bases that (1) Home is entitled to the amortization deduction for the Bowery Favorable Financing Right as described in paragraph 96; and (2) Home is entitled to abandonment loss deductions for the New York and Ohio Branching Rights as described in paragraphs 97 and 99. Ahmanson also sought a refund of tax for its 1995 tax year on the alternative grounds that Home is entitled to adjustments to the gains or losses recognized on the sale or other disposition of the New York and Ohio branches under Code section 1001 as described in paragraphs 98 and 100. As of the date of the filing of this Complaint, the IRS has not taken action on those three amended returns.

104.    This complaint is timely because the IRS and Washington Mutual executed Form 907 agreements to extend the statute of limitations for filing suit on the informal claim (dated April 9, 2002) until April 30, 2008, and more than six months have passed since Plaintiffs filed the three amended returns on June 30, 2006.

105.    As a result of the claims described in paragraph 103, Ahmanson overpaid its federal income tax for the 1995 tax year and is entitled to a refund of at least $59,929,624, plus statutory interest as the law provides.

## COUNT TWO – 1905 AGENCY
## (1995 TAX YEAR)

106.    Plaintiffs incorporate herein by reference and reallege all allegations in paragraphs 1-15, 77-82, 87-92, and 94-95 of this Complaint.

107.    In 1995, the IRS erroneously required Home to recognize income on the transfer of the mortgage-backed securities and associated deferred loan fees to its wholly owned subsidiary, 1905 Agency, in the amount of $140,220,790.

108.    For the reasons described in paragraphs 87 through 90, Home is not required (nor is it permitted) to recognize any gain or income in 1995 on the transfer of mortgage-backed securities and associated deferred loan fees to 1905 Agency.

109.    On June 30, 2006, Ahmanson timely filed three amended returns on Forms 1120X with the IRS in Seattle, Washington, seeking a refund of tax for Ahmanson's 1995 tax year on the basis that Home is not required to recognize income on the transfer of the mortgage-backed securities and associated deferred loan fees to its wholly owned subsidiary, 1905 Agency, as described in paragraph 108. Those three amended returns were filed for Ahmanson by Washington Mutual as successor in interest to Ahmanson, by Washington Mutual Bank, FA, as successor in interest to Home, and by Savings of America, Inc. as the designated substitute agent for Ahmanson. As of the date of the filing of this Complaint, the IRS has not taken action on those three amended returns.

110.    This complaint is timely because more than six months have passed since Plaintiffs filed the three amended returns on June 30, 2006.

111.    As a result of the claim described in paragraph 109, Ahmanson overpaid its federal income tax for the 1995 tax year and is entitled to a refund of at least $28,267,303, plus statutory interest as the law provides. With Counts One and Two of this complaint, Plaintiffs claim a total refund of $88,196,927 for Ahmanson's 1995 tax year.

## COUNT THREE – BRANCHING RIGHTS AND FAVORABLE FINANCING RIGHTS (1998 TAX YEAR)

112.    Plaintiffs incorporate by reference and reallege all allegations in paragraphs 1-76, 83-86, 91, and 92 of this Complaint.

113.    On or before September 15, 1999, Ahmanson timely filed a Form 1120 federal income tax return for Ahmanson's tax year ending October 1, 1998 (the "1998 tax year") with the IRS at Fresno, California, reporting total tax in the amount of $244,062,022. The name, address, and identification number appearing on that return were as follows:

> H.F. Ahmanson & Co. and Subsidiaries
> 4900 Rivergrade Road
> Irwindale, California, 91706
> EIN 95-0479700

114.    The IRS subsequently examined Ahmanson's federal income tax return, and pursuant to that examination, Ahmanson paid an additional $1,085,788 of tax, $108,587 of penalty, and $842,336 of interest. Ahmanson paid its originally reported tax and those subsequent assessments to the Fresno, California Service Center (for the payments made before 2000) or the Ogden, Utah Service Center (for the payments made after 2000) as follows:

a) $28,879,000 of estimated tax paid on April 15, 1998;

b) $1,000,000 of estimated tax paid on April 15, 1998;

c) $27,538,638 of overpayment credit elect from prior year credited on April 15, 1998;

d) $56,641,000 of estimated tax paid on June 15, 1998;

e) $62,535,500 of estimated tax paid on September 15, 1998;

f) $62,535,500 of estimated tax paid on September 15, 1998;

g) $4,932,384 of estimated tax paid on March 16, 1999;

h) $91,043 of subsequent payment on account paid on August 2, 1999;

21

i) $874 of subsequent payment on account paid on August 11, 1999;

j) $1,085,788 of advance payment of determined deficiency paid on April 14, 2005;

k) $108,544 of subsequent payment on account paid on April 14, 2005; and

l) $750,461 of designated payment of interest paid on April 14, 2005.

115.  Home is entitled to an amortization deduction of $6,666,667 under section 167 for its 1998 tax year with respect to the Bowery Favorable Financing Right.

116.  Because Home made the affirmative decision to leave the Florida market and it sold or otherwise divested itself of all of its remaining Florida branches in 1998, Home suffered a loss of its Florida Branching Rights for which Home was not covered by insurance or otherwise compensated. Home is entitled to an abandonment loss deduction of $121,444,000 (cost basis) or $133,100,000 (fair market value basis) for its 1998 tax year under Code section 165 with respect to the Florida Branching Rights.

117.  Alternatively, to the extent Home is not entitled to recover the basis of the Florida Branching Rights as a loss deduction under Code section 165 in the 1998 tax year, such basis amount is includible in the adjusted basis of the Florida branches sold or otherwise disposed of by Home, and Home is entitled – for its 1998 tax year – to a corresponding adjustment to the gain or loss recognized under Code section 1001 on the 1998 Florida branch sales.

118.  On April 9, 2002, Ahmanson timely filed an informal claim for refund with the IRS in Seattle, Washington, seeking a refund of tax for Ahmanson's 1998 tax year on the grounds that Home was entitled to abandonment loss deductions for its Florida Branching Rights.

119.  The IRS disallowed that claim in full on September 21, 2005.

22

120.    On June 30, 2006, Ahmanson timely filed three amended returns on Forms 1120X with the IRS in Seattle, Washington. The amended returns were filed for Ahmanson by Washington Mutual as successor in interest to Ahmanson, by Washington Mutual Bank, FA, as successor in interest to Home, and by Savings of America, Inc. as the designated substitute agent for Ahmanson. The amended returns seek a refund of tax for Ahmanson's 1998 tax year, on the grounds that (1) Home is entitled to the amortization deduction for the Bowery Favorable Financing Right as described in paragraph 115 and (2) Home is entitled to an abandonment loss deduction for the Florida Branching Rights as described in paragraph 116. On those amended returns, Ahmanson also sought a refund of tax for its 1998 tax year on the alternative grounds that Home is entitled to an adjustment to the gain or loss recognized on the sale or other disposition of the Florida branches under Code section 1001 as described in paragraph 117. As of the date of the filing of this Complaint, the IRS has not taken action on those three amended returns.

121.    This complaint is timely because the IRS and Washington Mutual executed Form 907 agreements to extend the statute of limitations for filing suit on the informal claim (dated April 9, 2002) for the 1998 tax year until April 30, 2008, and more than six months have passed since Plaintiffs filed the three amended returns on June 30, 2006.

122.    As a result of the claims described in paragraph 120, Ahmanson overpaid its federal income tax for the 1998 tax year and is entitled to a refund of at least $44,838,733, plus statutory interest as the law provides.

123.    Depending on the outcome of the Plaintiffs' claim in Count Two of this complaint, Plaintiffs hereby put the Defendant on notice that Plaintiffs may make additional claims for 1998 in the nature of a correlative adjustment to the adjustment the IRS made requiring Home to include income for 1995 on the transfer of mortgage-backed securities and associated deferred loan fees to 1905 Agency.

23

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs pray for judgment against the United States of at least the sum of $133,035,661 representing overpayments in tax by Ahmanson, plus statutory interest as the law provides, and such costs and attorneys' fees as are available, and such other and further relief that this Court deems equitable and proper.

DATED: April 30, 2008

Signed: _____

Date: _April 30, 2008_

Thomas D. Johnston
Counsel of Record
c/o Shearman & Sterling LLP
801 Pennsylvania Avenue N.W.
Washington, DC 20004
Telephone: (202) 508-8022
Fax: (202) 508-8100

**OF COUNSEL**

**SHEARMAN & STERLING** LLP
Steven R. Dixon
801 Pennsylvania Ave., NW
Washington, D.C. 20004-2634
Telephone: (202) 508-8000
Fax: (202) 508-8100

**MILLER & CHEVALIER** Chartered
Maria O'Toole Jones
Trever K. Asam
655 15th St., NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 626-5800
Fax: (202) 626-0858

**GIBSON, DUNN & CRUTCHER,** LLP
Joel A. Feuer
Dora R. Arash
Julian W. Poon
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Fax: (213) 229-7520

## Appendix

June 2006 Claim for Tax Year 1995 (by Washington Mutual Bank) ....................... ........... ..1

June 2006 Claim for Tax Year 1995 (by Savings of America)............................................. 19

June 2006 Claim for Tax Year 1995 (by Washington Mutual, Inc.)..................................... 38

June 2006 Claim for Tax Year 1998 (by Washington Mutual Bank) ....................................57

June 2006 Claim for Tax Year 1998 (by Savings of America) ..............................................68

June 2006 Claim for Tax Year 1998 (by Washington Mutual, Inc.)......................................79

Informal Claim filed on April 9, 2002..................................................................................89

June 2006 Claim for Tax Year 1995

(by Washington Mutual Bank)

June 2006 Claim for Tax
Year 1995 (by Wash.
Mutual Bank)

Form **1120X**
(Rev. December 2004)
Department of the Treasury
Internal Revenue Service

## Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132

**For tax year ending**
▶ 12/1995
(Enter month and year.)

| Name | Employer identification number |
|---|---|
| **Please Type or Print** H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual Bank F.A. as successor* | 95-0479700 |
| Number, street, and room or suite no. (if a P.O. box, see instructions.)<br>c/o Washington Mutual, Inc.; PO Box 834, FIS 1520 | |
| City or town, state, and ZIP code<br>Seattle, WA 98111 | Telephone number (optional) |

Enter name and address used on original return (if same as above, write "Same.")

H.F. Ahmanson & Co. & Cons. Subs.; 4900 Rivergrade Road; Irwindale, CA 91706

Internal Revenue Service Center
where original return was filed ▶    Ogden, UT

### Fill in applicable items and use Part II on the back to explain any changes

| **Part I** Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) . . . | 1 | 5,668,846,310 | 0 | 5,668,846,310 |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) . . . . . | 2 | 5,061,672,262 | 803,248,059 | 5,864,920,321 |
| 3 Taxable income. Subtract line 2 from line 1 . . . . | 3 | 607,174,048 | -803,248,059 | -196,074,011 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) . | 4 | 210,456,853 | -208,947,650 | 1,509,203 |

**Payments and Credits (see instructions)**

| | | | | |
|---|---|---|---|---|
| 5 a Overpayment in prior year allowed as a credit . . . | 5a | 289,883 | 0 | 289,883 |
| b Estimated tax payments . . . . . . . . . . | 5b | 172,788,000 | 0 | 172,788,000 |
| c Refund applied for on Form 4466 . . . . . . . . | 5c | 0 | 0 | 0 |
| d Subtract line 5c from the sum of lines 5a and 5b . . | 5d | 173,077,883 | 0 | 173,077,883 |
| e Tax deposited with Form 7004 . . . . . . . . | 5e | 27,441,000 | 0 | 27,441,000 |
| f Credit from Form 2439 . . . . . . . . . . | 5f | 0 | 0 | 0 |
| g Credit for Federal tax on fuels . . . . . . . . | 5g | 0 | 0 | 0 |
| 6 Tax deposited or paid with (or after) the filing of the original return . . . . . . . . . . . . . | 6 | | | 0 |
| 7 Add lines 5d through 6, column (c) . . . . . . . . . JUN 3 0 2006 . . . | 7 | | | 200,518,883 |
| 8 Overpayment, if any, as shown on original return or as later adjusted | 8 | | | 57,004,694 |
| 9 Subtract line 8 from line 7 . . . . . . . . . . . . . . . . SEATTLE, WA | 9 | | | 143,514,189 |

**Tax Due or Overpayment (see instructions)**

| | | |
|---|---|---|
| 10 Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" . . . . . . . . . . . ▶ | 10 | 0 |
| 11 Overpayment. Subtract line 4, column (c), from line 9 . . . . . . . . . ▶ | 11 | 142,004,986 |
| 12 Enter the amount of line 11 you want: Credited to 20___ estimated tax ▶      Refunded ▶ | 12 | 142,004,986 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Signature of officer | Date 6/30/06 | Title |
|---|---|---|

| **Paid Preparer's Use Only** | Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code ▶ | | EIN | |
| | | | Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.
(HTA)

Form **1120X** (Rev. 12-2004)

2

Form 1120X (Rev. 12-2004)       H.F. Ahmanson & Co. & Cons. Subs., by Washington MI95-0479700                    Page **2**

| **Part II** | **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.) |

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see
**Carryback Claims** on page 3, and check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

BRANCHING RIGHTS ABANDONMENT LOSS - STATEMENT 1

RECOGNITION OF DEFERRED LOAN FEES - STATEMENT 2

*On October 1, 1998, Home Savings of America was merged with and into Washington Mutual Bank F.A.

Washington Mutual Bank F.A. is the successor in interest to Home Savings of America.

Form **1120X** (Rev. 12-2004)

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization and Loss Deductions
Relating to Bowery, a New York Federally Chartered Savings Bank

During 1995, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service erred by failing to allow Home amortization and loss deductions relating to rights acquired pursuant to Home's acquisition of The Bowery Savings Bank ("Bowery") and Bowery's conversion to a federally chartered savings bank. Details of the deductions in issue are set forth below.

### Background

1. <u>The Acquisition.</u> On October 5, 1987, Home signed an acquisition agreement to acquire all of the stock of The Bowery Savings Bank ("Bowery"), an FDIC-insured, New York-chartered, mutual savings bank. Before that agreement, private investors had purchased Bowery in a supervisory transaction. In that supervisory transaction, Bowery and the FDIC entered into an assistance agreement. Because of that assistance agreement, Home's stock purchase was not final until the FDIC and Home agreed to amendments to the assistance agreement. The assistance agreement was amended (the "Amended Assistance Agreement") -- and Home's stock purchase became final -- on January 29, 1988.

Upon consummation of the stock purchase, Bowery became a wholly owned indirect subsidiary of Home. Home's stock purchase resulted in $183,306,000 in goodwill, which Bowery could use for capital compliance purposes under the Amended Assistance Agreement. Until 1992, Bowery's books were separate from Home's books and Home accounted for that goodwill on Bowery's books.

In April 1992, Bowery's name was changed to Home Savings of America, The Bowery Division, SSB. On September 1, 1992, Bowery converted to a federally chartered savings bank, and changed its name to Home Savings of America, The Bowery Division, FSB. In connection with this conversion, Home counted -- under Regulatory Accounting Principles -- the remaining goodwill from the Bowery stock purchase toward Home's regulatory capital requirements. This right is referred to herein as the Regulatory Accounting Principles Right, or "RAP Right." Under the Amended Assistance Agreement, in addition to the RAP Right, Home acquired other rights ("Other Rights").

2. <u>Basis.</u> Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the

624911.1

H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual Bank F.A. as successor        95-0479700    Statement 1

4

amount paid for the property. Home purchased the RAP Right and Other Rights, giving Home a cost basis in the RAP Right and Other Rights of $183,306,000 under Code section 1012.

3. Abandonment. Home's management made the decision to terminate its branch banking operations in New York. In 1995, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in New York. At that time, Home left the New York branch banking market.

<div align="center">Claims</div>

1. Loss Deductions or Amortization Deductions for Other Rights Acquired.   Under the Amended Assistance Agreement, in addition to the RAP Right, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the New York branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1995. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1995 if such Other Rights were abandoned or became worthless in that year.

2. Reduction in the Gain on the Sale of the New York Branches. (Alternative Claim)  To the extent Home did not recover the basis of the assets relating to the New York branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the New York branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1995.

3. Correlative and Computational Adjustments.  In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

4. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

<div align="center">2</div>

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization and Loss Deductions
Relating to Century, a New York Thrift Institution


During 1995, Home Savings of America ("Home"), a federally chartered savings and
loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson")
and a member of the affiliated group for which Ahmanson was the common parent corporation.
Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service
erred by failing to allow Home amortization and loss deductions relating to rights acquired
pursuant to the acquisition of Century Federal Savings and Loan Association. Details of the
deductions in issue are set forth below.

### Background

1. The Acquisition. On August 10, 1984, Home acquired Century Federal Savings and
Loan Association ("Century"), a New York thrift institution. Home's acquisition of the New
York thrift qualified as a tax-free reorganization under section 368(a)(1)(G) of the Internal
Revenue Code ("Code"). The acquisition of Century was a supervisory merger arranged by the
Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home
Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the
savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds
necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC
Assistance") to induce healthy thrifts to take over failing thrifts. At the time Home acquired
Century, the New York thrift was insolvent. FSLIC determined that Century had no going
concern value, and that FSLIC Assistance was required to attract a buyer for the thrift.

FSLIC Assistance of one or more types was provided, including, but not limited to, the
right to establish branches in New York ("Branching Rights"), cash, the right to be compensated
for certain future losses of the thrifts, a loan evidenced by a term note, and certain forbearances
with respect to regulatory net worth requirements. Home also received the contractual right to
count the excess of the liabilities assumed over the fair market value of the identifiable assets
acquired toward regulatory capital requirements. In addition to the FSLIC Assistance
enumerated above, Home acquired other rights ("Other Rights").

As noted above, one form of FSLIC Assistance that Home sought and received in
connection with the acquisition of the New York thrift institution was Branching Rights. At the
time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or
establishing out-of-state branches, i.e., branches outside of its home state. In March 1981,
FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches
via supervisory mergers. In September 1981, FHLBB further amended its regulations to permit

673090.1

H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual Bank F.A. as successor      95-0479700    Statement 1

thrifts who acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. Basis. Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See, e.g., Crane v. Commissioner*, 331 U.S. 1 (1947). Home purchased the New York Branching Rights from FSLIC for an amount equal to the negative value of the thrift acquired, *i.e.*, the difference between the liabilities of the thrift and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the New York Branching Rights, giving Home a cost basis in the New York Branching Rights of $182,200,000 under Code section 1012.

Alternatively, if the New York Branching Rights are deemed, contrary to fact, to have been transferred to Century prior to the merger of the thrift into Home, Home received basis in the New York Branching Rights under Code section 362(b). The New York Branching Rights constituted property received by Century from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the New York Branching Rights was excludable from the income of the thrift under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. Century received basis in the New York Branching Rights equal to the fair market value of the New York Branching Rights on the date received. Home's adjusted basis in the New York Branching Rights received from Century was the same as the basis of that asset in the hands of the thrift immediately before the transfer. I.R.C. § 362(b).

3. Abandonment. Home's management made the decision to terminate its branch-banking operations in New York. In 1995, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in New York. At that time, Home left the New York branch banking market.

## Claims

1. Loss on Abandonment of Branching Rights. Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of its New York Branching Rights in 1995. Because Home made the affirmative decision to leave the New York market, sold or otherwise divested itself of all of the New York branches, and actually left that market in 1995, Home abandoned its New York Branching Rights in 1995. Home is therefore entitled to a deduction of $182,200,000 for the New York Branching Rights under section 165 in that year.

2. Loss Deductions or Amortization Deductions for Other Rights Acquired. Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the New York branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

7

623090.1

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1995. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1995 if such Other Rights were abandoned or became worthless in that year.

3. <u>Reduction in the Gain on the Sale of the New York Branches.</u> (Alternative Claim)  To the extent Home did not recover the basis of the assets relating to the New York branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the New York branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1995.

4. <u>Correlative and Computational Adjustments</u>.  In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. <u>Interest</u>.  Home requests a refund of assessed interest plus statutory interest as provided by law.

3

8

623090.1

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization Deductions
Relating to Missouri and Florida Thrift Institutions

During 1995, Home Savings of America ("Home"), a federally chartered savings and
loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson")
and a member of the affiliated group for which Ahmanson was the common parent corporation.
Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service
erred by failing to allow Home amortization deductions relating to rights acquired pursuant to the
acquisition of Missouri and Florida Thrift institutions. Details of the deductions in issue are set
forth below.

## Background

1. The Acquisition. On December 17, 1981, Home acquired Security Federal Savings
and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri
thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift
institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a
two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The
Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations
under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisition of the
Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings
and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board
("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan
industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to
liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to
induce healthy thrifts to take over failing thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the
right to establish branches in Missouri and Florida, cash, the right to be compensated for certain
future losses of the thrifts, and certain forbearances with respect to regulatory net worth
requirements. Home also received the contractual right to count the excess of the liabilities
assumed over the fair market value of the identifiable assets acquired toward regulatory capital
requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other
rights ("Other Rights").

2. Basis. Code section 1012 provides that the basis of property is equal to the cost of
that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property,
and the amount paid includes liabilities assumed by the buyer. *See, e.g., Crane v. Commissioner,*
331 U.S. 1 (1947). Home purchased the Other Rights from FSLIC for an amount equal to the
negative value of the Missouri and Florida thrifts acquired, *i.e.,* the difference between the

623085.1

liabilities of the Missouri and Florida thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Other Rights, giving Home a cost basis in the Other Rights of $267,503,919 under Code section 1012.

Alternatively, if the Other Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to their merger into Home, Home received basis in the Other Rights under Code section 362(b). The Other Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Other Rights was excludable from the income of the Missouri and Florida thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Missouri and Florida thrifts received basis in the Other Rights equal to the fair market value of the Other Rights on the date received, $267,503,919. Home's adjusted basis in the Other Rights received from the Missouri and Florida thrifts was the same as the basis of that asset in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

<div align="center">Claims</div>

1. _Amortization Deduction for Other Rights Acquired._ Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida thrifts before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for those Other Rights. Home is entitled to such amortization deductions under section 167 in 1995.

2. _Correlative and Computational Adjustments._ In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

3. _Interest._ Home requests a refund of assessed interest plus statutory interest as provided by law.

<div align="center">2</div>

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization and Loss Deductions
Relating to Ohio Thrift Institutions

During 1995, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service erred by failing to allow Home an abandonment loss and amortization deductions for rights acquired pursuant to the acquisition of Ohio thrift institutions. Details of the deductions in issue are set forth below.

### Background

1.  The Acquisition.  On May 22, 1985, Home acquired Permanent Savings and Loan, Oxford Savings Association, Home Federal Savings and Loan, and American Savings Bank, all Ohio thrift institutions. On June 20, 1985, Home acquired Savings One Association, also an Ohio thrift institution. Home's acquisitions of the Ohio thrifts qualified as tax-free reorganizations under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisitions of the Ohio thrifts were supervisory mergers arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisitions, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. At the time Home acquired the Ohio thrifts, the thrifts were insolvent. FSLIC determined that the Ohio thrifts had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in Ohio ("Branching Rights"), cash, the right to be compensated for certain future losses of the thrifts, a loan evidenced by a term note, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

As noted above, one form of FSLIC Assistance that Home sought and received in connection with the acquisition of the Ohio thrifts was Branching Rights. At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, i.e., branches outside of its home state. In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers. In September 1981, FHLBB further amended its regulations to permit thrifts who

623089.1

acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. Basis. Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See, e.g., Crane v. Commissioner,* 331 U.S. 1 (1947). Home purchased the Ohio Branching Rights from FSLIC for an amount equal to the negative value of the thrifts it acquired, *i.e.,* the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Ohio Branching Rights, giving Home a cost basis in the Ohio Branching Rights of $34,815,000 under Code section 1012.

Alternatively, if the Ohio Branching Rights are deemed, contrary to fact, to have been transferred to the Ohio thrifts prior to the merger of the thrifts into Home, Home received basis in the Ohio Branching Rights under Code section 362(b). The Ohio Branching Rights constituted property received by the Ohio thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Ohio Branching Rights was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Ohio thrifts received basis in the Ohio Branching Rights equal to the fair market value of the Ohio Branching Rights on the date received. Home's adjusted basis in the Ohio Branching Rights was the same as the basis of those assets in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

3. Abandonment. Home's management made the decision to terminate its branch-banking operations in Ohio. In 1994 and 1995, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in Ohio. At that time, Home left the Ohio branch banking market with no intention of reestablishing any other branches in Ohio. Home has not reentered the Ohio branch banking market since that time.

## Claims

1. Loss on Abandonment of Branching Rights. Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of its Ohio Branching Rights in 1995. Because Home made the affirmative decision to leave the Ohio market, sold or otherwise divested itself of all of the Ohio branches, and actually left that market in 1995, Home abandoned its Ohio Branching Rights in 1995. Home is therefore entitled to a deduction of $34,815,000 for the Ohio Branching Rights under section 165 in that year.

2. Loss Deductions or Amortization Deductions for Other Rights Acquired. Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Ohio branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

2

12

### Statement #2

### Recognition of Loan Fees on the Transfer of MBSs to 1905 Agency

I.    **Factual Background**

For the taxable years at issue, H.F. Ahmanson & Company was the common parent of an affiliated group of corporations that filed consolidated federal income tax returns. Home Savings of America, FSB ("Home") and 1905 Agency, Inc. ("1905 Agency") were members of the affiliated group that were included in those returns.

At all relevant times, Home was a federally chartered stock savings bank engaged in the banking business. One of Home's primary functions was the origination of mortgage loans. In connection with the origination of mortgage loans, Home typically charged borrowers loan fees or points and treated such mortgage loans as having discounts associated with them. For example, if Home made a $100,000 loan to a particular borrower and charged the borrower $4,000 of loans fees, it treated the transaction as a $96,000 loan to the borrower. Since Home was entitled to a payment of $100,000 upon maturity of the loan, it treated the loan as having a $4,000 discount associated with it. Home did not include the loan fees associated with these mortgage loans in its income for federal income tax purposes at the time of the origination of the loans, but rather deferred the income recognition on such loan fees in accordance with guidelines created by the Internal Revenue Service (the "Service").

Prior to 1994, Home used the "composite method" to amortize the loans fees into income for federal income tax purposes. Under this method, Home generally included the loan fees into income over a representative period of years. The representative period was generally determined based on statistical evidence regarding the balance and payment history on particular mortgage loans. During 1994, the Service issued Revenue Procedures 94-29, 1994-1 C.B. 616, and 94-30, 1994-1 C.B. 621, prohibiting taxpayers from continuing to use the composite method to account for loan fees. These revenue procedures were issued in response to the original issue discount regulations that were promulgated by the Treasury. These revenue procedures provided that, upon obtaining the permission of the Service, taxpayers could use either the "principal reduction method" or the "revised loan liquidation method" to account for loan fees. After the issuance of these revenue procedures, Home filed a Form 3115 with the Service requesting to change its method of accounting for loans fees to the principal reduction method for loans originated on or after January 1, 1993, and to the revised loan liquidation method for loans originated prior to that time. Home's request for such change was granted by the National Office of the Service.

Prior to 1995, Home routinely securitized a portion of its originated mortgage loans into mortgage backed securities. When the mortgage loans were securitized, the loan fees that were related to the securitized mortgage loans became discounts on the mortgage-backed securities for book purposes, and were amortized accordingly.

During 1995, 1905 Agency was a wholly-owned subsidiary of Home and was responsible for the management of Home's investments, including its mortgage-backed securities. During that year, Home transferred a total of $13,098,988,833 of its mortgage-backed securities ("MBSs") to 1905 Agency in a series of transactions under Section 351 of the Internal Revenue Code of 1986, as amended (the "Code").[1]

When the MBSs were transferred to 1905 Agency, Home also transferred the unamortized deferred loans fees associated with the MBSs (the "Deferred Loan Fees") to 1905 Agency. The Deferred Loan Fees were as follows:

| | |
|---|---|
| Pre-1993 Deferred Fees (Accounted for under the Revised Loan Liquidation Method) | $78,779,474 |
| Post-1992 Deferred Fees (Accounted for under the Principal Reduction Method) | $61,441,316 |
| Total Loan Fees | $140,220,790 |

After the transfer of the MBSs to 1905 Agency in 1995, 1905 Agency continued to use the same methods that Home used to amortize the Deferred Loan Fees into income, namely, the principal reduction method for loans originated on or after January 1, 1993, and the revised loan liquidation method for loans originated prior to that date. 1905 Agency continued to use those methods until 1998, when Washington Mutual acquired H.F. Ahmanson & Company. During the years 1995 through 1998, 1905 Agency recognized the following amounts of income as a result of the amortization of the Deferred Loan Fees into income:

| Year | Amount |
|---|---|
| 1995 | $4,797,650 |
| 1996 | $13,393,187 |
| 1997 | $13,092,158 |
| 1998 | $14,505,771 |
| Total | $45,788,766 |

At the time of the acquisition of H.F. Ahmanson & Company by Washington Mutual, the remaining $94 million of the Deferred Loan Fees was transferred to Washington Mutual.

II.   **Revenue Agent's Position**

At issue here is the impact of the transfer of the MBSs to 1905 Agency on the Deferred Loan Fees. In the Notices of Proposed Adjustment (011-0034 and 027-0004), the revenue agent

---

[1] Unless otherwise indicated, all Section references are to the Internal Revenue Code of 1986, as amended.

(a) takes the position that Home is required to include the entire amount of the Deferred Loan Fees in its income for 1995 as a result of the transfer of the MBSs to 1905 Agency and (b) makes a correlative adjustment to reduce the income of 1905 Agency for the years 1995 through 1998 by the amount of the Deferred Loan Fees that it included in its gross income for those years.

### III.   Taxpayer's Position

#### (A)   Home is Not Required to Recognize any Income on the Transfer of MBSs and the Associated Deferred Loan Fees to 1905 Agency Because this is a Transfer of Property in a Transaction to Which Section 351 Applies.

Section 351 provides that no gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control of the corporation.

There is no statutory, judicial or administrative authority that creates an exception to Section 351 because of the transferor's or the transferee's method of accounting for an item of property that is transferred to the transferee. The revenue agent report fails to discuss or make any reference to authorities that have considered and rejected similar arguments in the past.

One such authority is Hempt Bros., Inc. v. United States, 490 F.2d 1172 (3d Cir. 1974). In that case, a cash-basis partnership transferred its accounts receivable to a controlled corporation solely in exchange for stock of the corporation. The taxpayer initially argued that the transfer of receivables to a corporation by a cash method taxpayer does not qualify as a Section 351 transaction because receivables should not be treated as property for purposes of Section 351. The court rejected that argument, noting that "For section 351, courts have advocated a generous definition of 'property'". Id. at 1175 (quoting E.I. Du Pont de Nemours and Co. v. United States, 471 F.2d 1211 (Ct. Cl. 1973). The taxpayer then proceeded to argue that, notwithstanding the literal application of Section 351 to the transaction at issue, the assignment of income doctrine requires the partnership and not the transferee corporation to be taxed on the receipt of income upon the collection of the receivables. In essence, the taxpayer was contending that "the nonrecognition provision of Section 351 is in conflict with the assignment of income doctrine and that Section 351 should be subordinated thereto." The court acknowledged that, in the situation before it, the provisions of Section 351 produced results that were inconsistent with the assignment of income doctrine; however, it refused to carve out an exception to Section 351 for this doctrine, noting that "By its explicit terms Section 351 expresses the Congressional intent that transfers of property for stock or securities will not result in recognition."

The Service also considered a similar fact pattern in Revenue Ruling 80-198, 1980-2 C.B. 113 and reached the same conclusion as that reached by the court in Hempt.

The Hempt decision and Revenue Ruling 80-198 show that the courts and the Service are generally unwilling to carve out any exceptions to Section 351, including exceptions for a well-established judicial doctrine such as the assignment of income doctrine. In arguing that Home is required to recognize income on the transfer of the Deferred Loan Fees to 1905 Agency, the

05-0479700   Statement 2

revenue agent does not cite a single source of authority, but simply asserts that such income recognition is required because of Home's method of accounting for the Deferred Loan Fees. If a well-established judicial doctrine cannot be an exception to Section 351, certainly the revenue agent's bare assertions in this case cannot give rise to such an exception.

Since there is no exception to the application of Section 351 to the facts involved here, Home is not required to recognize any income on the transfer of the MBSs and the Deferred Loan Fees to 1905 Agency.

(B)   **Home is Not Required to Recognize any Income on the Transfer of the MBSs to 1905 Agency Because this is a Deferred Intercompany Transaction Under Treasury Regulation Section 1.1502-13.**

Since Home and 1905 Agency were members of the same consolidated group after Home's transfer of the MBSs and the Deferred Loan Fees to 1905 Agency, the tax consequences of this transfer must also be analyzed under the rules relating to intercompany transactions that are contained in Treasury Regulations Section 1.1502-13, as in effect for the taxable year at issue here.[2] Treas. Reg. § 1.1502-13(a)(1). The regulations specifically identify a sale or exchange of property by one member of a consolidated group to another member of the group as a "deferred intercompany transaction". Treas. Reg. § 1.1502-13(a)(2). They further provide that, to the extent that gain or loss on a deferred intercompany transaction is recognized under the Internal Revenue Code for a consolidated return year, such gain or loss shall be deferred to the selling member. Treas. Reg. § 1.1502-13(c)(1). Any deferred gain or loss resulting from such a transaction would be taken into account by the selling member upon the occurrence of a restoration event. Treas. Reg. § 1.1502-13(c)(1)(ii)(b).

Since the transfer of the MBSs and the Deferred Loan Fees by Home to 1905 Agency constitutes a Section 351 transaction, Home is not required to recognize any gain or loss as a result of that transfer. Therefore, this transaction does not even give rise to gain that is required to be deferred under the consolidated return rules. However, assuming arguendo that this transaction did give rise to gain recognition under the general tax principles, Home would not be required (nor would it be permitted) to recognize such gain based on the application of those rules.

(C)   **1905 Agency is Permitted to Use the Same Method as Home in Accounting for the Deferred Loan Fees Associated with the MBSs.**

The underlying reasons for the revenue agent's proposed increase in Home's income and a corresponding decrease in 1905 Agency's income is that 1905 Agency is not permitted to use the principal reduction method or the revised loan liquidation method to include the Deferred Loan

---

2   Since the transaction at issue here occurred during the taxpayer's taxable year beginning prior to July 12, 1995, the prior intercompany transaction rules contained in Treasury Regulation Section 1.1502-13 apply here.

Fees into income over time. The revenue agent argues that 1905 Agency is not permitted to use the principal reduction method because (a) Revenue Procedure 94-29, 1994-1 C.B. 616, provides that this method applies only to loans that, inter alia, are acquired by taxpayer at origination and (b) 1905 Agency did not satisfy that requirement. Although the revenue agent's argument with regard to 1905 Agency's ability to use the revised loan liquidation method is not altogether clear, he also appears to be arguing that this method is not available to 1905 Agency because none of the Deferred Loan Fees for which this method was being utilized related to mortgages originated by 1905 Agency prior to January 1, 1993 (the cut-off date contained in Home's request for change of accounting method). In advancing these arguments, however, the revenue agent overlooks key principles of the original issue discount ("OID") provisions of the Code.

Section 1272 generally applies to a debt instrument that has OID. A debt instrument is considered to have OID if its stated redemption price at maturity exceeds its issue price. § 1273(a). An instrument's stated redemption price at maturity is equal to all payments that are required to be made under the terms of the instrument other than "qualified stated interest". § 1273(a)(2). In the case of a non-publicly traded instrument that is issued for cash, the issue price of the instrument is the price paid by the first buyer of the debt instrument. § 1273(b)(2).

If a debt instrument is issued with OID, Section 1272(a)(1) requires the holder of the instrument to include the OID in income in accordance with the economic accrual method. Since Section 1272(a)(1) refers to the holder of an OID instrument without distinguishing between the original holder of the instrument or any subsequent transferee, a subsequent transferee must simply step into the shoes of the original holder and continue to include the remainder of the original issue discount in its income in the same manner as the original holder. This principle generally applies to a subsequent transferee of an instrument, except in two situations—namely, situations in which there is acquisition premium or market discount. § 1272(a)(7) and (d); § 1278. The existence of either of those items will cause a transferee's inclusion of OID with respect to a debt instrument to differ from that of the transferor. § 1272(a)(7) and (d); § 1278. However, neither the rules relating to acquisition premium nor the rules relating to market discount apply in a situation where a subsequent transferee of a debt instrument has acquired the instrument from the original holder in a Section 351 transaction (where the adjusted basis of the instrument in the hands of the transferee is determined with reference to the adjusted basis of the instrument in the hands of the original holder). Id. In these cases, the transferee steps into the shoes of the original holder and is treated as having acquired the instrument at original issue.

Since 1905 Agency acquired the MBSs from Home in a Section 351 transaction as distinguished from a purchase transaction, 1905 Agency will step into the shoes of Home and will be treated as having acquired the instrument at original issue. Therefore, 1905 Agency is entitled to continue to account for the Deferred Loan Fees or the discount with respect to the MBSs in the same manner as Home, namely, through the use of the principal reduction method or the revised loan liquidation method.

Even if 1905 Agency was not permitted to use such methods to account for the Deferred Loan Fees, this does not mean that Home would be required to recognize the Deferred Loan Fees into income on the transfer of the related MBSs to 1905 Agency in a Section 351 transaction. Rather, in such a situation, we would simply need to look to the OID provisions to determine the proper treatment of Deferred Loan Fees in the hands of 1905 Agency. Since the amount of OID

- - A Dana 'Quhe   hy Washington Mutual Bank F A   as successor                    95-0479700    Statement 2

created by the Deferred Loan Fees is de minimis in amount, 1905 Agency would not be required to include the Deferred Loan Fees in its income under the economic accrual concept. Rather, it would be required to include the Deferred Loan Fees in income as stated principal payments are made on the loan. Treas. Reg. § 1.1273-1(d)(5). This is precisely what 1905 Agency did when it used the principal reduction method and the revised loan liquidation method to account for the Deferred Loan Fees. See Rev. Proc. 94-29, 1994-1 C.B. 616, Rev. Proc. 94-30, 1994-1 C.B. 621. Therefore, no adjustments should be made to the income recognized by 1905 Agency as a result of the amortization of the Deferred Loan Fees.

## IV.    Conclusion

Based on the foregoing, Home is not required to recognize any income on the transfer of the MBSs and the Deferred Loan Fees to 1905 Agency based on the application of Section 351 and Treasury Regulation Section 1.1502-13. In addition, 1905 Agency is permitted to use the same method as that utilized by Home in accounting for the Deferred Loan Fees.

. . .  . . . . . . . .  & Co. & Cons. Subs.  by Washington Mutual Bank F.A. as successor          95-0479700    Statement 2

June 2006 Claim for Tax Year 1995

(by Savings of America)

June 2006 Claim for Tax
Year 1995 (by Savings of
America)

Form **1120X**
(Rev. December 2004)
Department of the Treasury
Internal Revenue Service

# Amended U.S. Corporation
# Income Tax Return

OMB No. 1545-0132

**For tax year ending**
▶ 12/1995
(Enter month and year.)

| | |
|---|---|
| Please Type or Print | Name H.F. Ahmanson & Co. & Cons. Subs., by Savings of America, Inc. as substitute agent* | Employer identification number 95-0479700 |

**Please Type or Print**

Name
H.F. Ahmanson & Co. & Cons. Subs., by Savings of America, Inc. as substitute agent*

Number, street, and room or suite no. (If a P.O. box, see instructions.)
c/o Washington Mutual, Inc.; PO Box 834, FIS 1520

City or town, state, and ZIP code
Seattle, WA  98111

Employer identification number
95-0479700

Telephone number (optional)

Enter name and address used on original return (if same as above, write "Same.")

H.F. Ahmanson & Co. & Cons. Subs.; 4900 Rivergrade Road; Irwindale, CA 91706

Internal Revenue Service Center
where original return was filed ▶ Ogden, UT

## Fill in applicable items and use Part II on the back to explain any changes

| Part I | Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|---|
| 1 | Total income (Form 1120 or 1120-A, line 11) . . . | 1 | 5,668,846,310 | 0 | 5,668,846,310 |
| 2 | Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) . . . . . | 2 | 5,061,672,262 | 803,248,059 | 5,864,920,321 |
| 3 | Taxable income. Subtract line 2 from line 1 . . . . | 3 | 607,174,048 | -803,248,059 | -196,074,011 |
| 4 | Tax (Form 1120, line 31, or Form 1120-A, line 27) . | 4 | 210,456,853 | -208,947,650 | 1,509,203 |

**Payments and Credits (see instructions)**

| | | | | | |
|---|---|---|---|---|---|
| 5 a | Overpayment in prior year allowed as a credit . . . | 5a | 289,883 | 0 | 289,883 |
| b | Estimated tax payments . . . . . . . . . . . | 5b | 172,788,000 | 0 | 172,788,000 |
| c | Refund applied for on Form 4466 . . . . . . . . | 5c | 0 | 0 | |
| d | Subtract line 5c from the sum of lines 5a and 5b . . | 5d | 173,077,883 | 0 | 173,077,883 |
| e | Tax deposited with Form 7004 . . . . . . . . . | 5e | 27,441,000 | 0 | 27,441,000 |
| f | Credit from Form 2439 . . . . . . . . . . . . | 5f | 0 | 0 | 0 |
| g | Credit for Federal tax on fuels . . . . . . . . . | 5g | 0 | 0 | 0 |
| 6 | Tax deposited or paid with (or after) the filing of the original return . . . . . . | 6 | | | 0 |
| 7 | Add lines 5d through 6, column (c) . . . . . . . . . . . . . . . . | 7 | | | 200,518,883 |
| 8 | Overpayment, if any, as shown on original return or as later adjusted . . . . | 8 | | | 57,004,694 |
| 9 | Subtract line 8 from line 7 . . . . . . . . . . . . . . . . . . . | 9 | | | 143,514,189 |

JUN 3 0 2006

SEATTLE, WA

**Tax Due or Overpayment (see instructions)**

| | | | | |
|---|---|---|---|---|
| 10 | Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" . . . . . . . . . . . . . . . . . . . . . . ▶ | 10 | | 0 |
| 11 | Overpayment. Subtract line 4, column (c), from line 9 . . . . . . . . . . ▶ | 11 | | 142,004,986 |
| 12 | Enter the amount of line 11 you want: Credited to 20____ estimated tax ▶ ____ Refunded ▶ | 12 | | 142,004,986 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer ____    Date 6/30/06    Title Sr. V.P

**Paid Preparer's Use Only**

| | | | | |
|---|---|---|---|---|
| Preparer's signature ▶ | | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
| Firm's name (or yours if self-employed), address, and ZIP code ▶ | | | EIN | |
| | | | Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.
(HTA)

Form **1120X** (Rev. 12-2004)

20

Form 1120X (Rev. 12-2004)          H.F. Ahmanson & Co. & Cons. Subs., by Savings of Am 95-0479700                    Page **2**

**Part II**     **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are
               changing, and give the reason for each change. Show any computation in detail. Also, **see What To Attach**
               on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see
**Carryback Claims** on page 3, and check here  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

BRANCHING RIGHTS ABANDONMENT LOSS - STATEMENT 1

RECOGNITION OF DEFERRED LOAN FEES - STATEMENT 2

*Savings of America, Inc. was a member of the H.F. Ahmanson consolidated group in 1995.

Pursuant to section 8 of Rev. Proc. 2002-43 and Treas. Reg. 1.1502-77A, Savings of America, Inc.

has been designated the substitute agent for H.F. Ahmanson & Co. & Consolidated Subsidiaries.

Form **1120X** (Rev. 12-2004)

Form 1120X (Rev. 12-2004)          H.F. Ahmanson & Co. & Cons. Subs., by Savings of Am 95-0479700                    Page **2**

**Part II**     **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are
changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach**
on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see
**Carryback Claims** on page 3, and check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

BRANCHING RIGHTS ABANDONMENT LOSS - STATEMENT 1 ...........................................................

RECOGNITION OF DEFERRED LOAN FEES - STATEMENT 2 ...........................................................

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

*Savings of America, Inc. was a member of the H.F. Ahmanson consolidated group in 1995.

Pursuant to section B of Rev. Proc. 2002-43 and Treas. Reg. 1.1502-77A, Savings of America, Inc.

has been designated the substitute agent for H.F. Ahmanson & Co. & Consolidated Subsidiaries.

----------------------------------------------------------------------

Form **1120X** (Rev. 12-2004)

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization and Loss Deductions
Relating to Bowery, a New York Federally Chartered Savings Bank


During 1995, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service erred by failing to allow Home amortization and loss deductions relating to rights acquired pursuant to Home's acquisition of The Bowery Savings Bank ("Bowery") and Bowery's conversion to a federally chartered savings bank. Details of the deductions in issue are set forth below.

### Background

1. The Acquisition. On October 5, 1987, Home signed an acquisition agreement to acquire all of the stock of The Bowery Savings Bank ("Bowery"), an FDIC-insured, New York-chartered, mutual savings bank. Before that agreement, private investors had purchased Bowery in a supervisory transaction. In that supervisory transaction, Bowery and the FDIC entered into an assistance agreement. Because of that assistance agreement, Home's stock purchase was not final until the FDIC and Home agreed to amendments to the assistance agreement. The assistance agreement was amended (the "Amended Assistance Agreement") -- and Home's stock purchase became final -- on January 29, 1988.

Upon consummation of the stock purchase, Bowery became a wholly owned indirect subsidiary of Home. Home's stock purchase resulted in $183,306,000 in goodwill, which Bowery could use for capital compliance purposes under the Amended Assistance Agreement. Until 1992, Bowery's books were separate from Home's books and Home accounted for that goodwill on Bowery's books.

In April 1992, Bowery's name was changed to Home Savings of America, The Bowery Division, SSB. On September 1, 1992, Bowery converted to a federally chartered savings bank, and changed its name to Home Savings of America, The Bowery Division, FSB. In connection with this conversion, Home counted -- under Regulatory Accounting Principles -- the remaining goodwill from the Bowery stock purchase toward Home's regulatory capital requirements. This right is referred to herein as the Regulatory Accounting Principles Right, or "RAP Right." Under the Amended Assistance Agreement, in addition to the RAP Right, Home acquired other rights ("Other Rights").

2. Basis. Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the

824011.1

amount paid for the property. Home purchased the RAP Right and Other Rights, giving Home a cost basis in the RAP Right and Other Rights of $183,306,000 under Code section 1012.

3. Abandonment. Home's management made the decision to terminate its branch banking operations in New York. In 1995, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in New York. At that time, Home left the New York branch banking market.

<div align="center">Claims</div>

1. Loss Deductions or Amortization Deductions for Other Rights Acquired.   Under the Amended Assistance Agreement, in addition to the RAP Right, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the New York branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1995. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1995 if such Other Rights were abandoned or became worthless in that year.

2. Reduction in the Gain on the Sale of the New York Branches.   (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the New York branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the New York branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1995.

3. Correlative and Computational Adjustments.  In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

4. Interest.  Home requests a refund of assessed interest plus statutory interest as provided by law.

<div align="center">2</div>

· P   n Corp Subs  by Savings of America, Inc  as substitute agent        95-0479700    Statement 1

624911.1

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization and Loss Deductions
Relating to Century, a New York Thrift Institution


During 1995, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service erred by failing to allow Home amortization and loss deductions relating to rights acquired pursuant to the acquisition of Century Federal Savings and Loan Association. Details of the deductions in issue are set forth below.

### Background

1. **The Acquisition.** On August 10, 1984, Home acquired Century Federal Savings and Loan Association ("Century"), a New York thrift institution. Home's acquisition of the New York thrift qualified as a tax-free reorganization under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisition of Century was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. At the time Home acquired Century, the New York thrift was insolvent. FSLIC determined that Century had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrift.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in New York ("Branching Rights"), cash, the right to be compensated for certain future losses of the thrifts, a loan evidenced by a term note, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

As noted above, one form of FSLIC Assistance that Home sought and received in connection with the acquisition of the New York thrift institution was Branching Rights. At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, i.e., branches outside of its home state. In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers. In September 1981, FHLBB further amended its regulations to permit

623090.1

thrifts who acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. Basis. Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. See, e.g., Crane v. Commissioner, 331 U.S. 1 (1947). Home purchased the New York Branching Rights from FSLIC for an amount equal to the negative value of the thrift acquired, i.e., the difference between the liabilities of the thrift and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the New York Branching Rights, giving Home a cost basis in the New York Branching Rights of $182,200,000 under Code section 1012.

Alternatively, if the New York Branching Rights are deemed, contrary to fact, to have been transferred to Century prior to the merger of the thrift into Home, Home received basis in the New York Branching Rights under Code section 362(b). The New York Branching Rights constituted property received by Century from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the New York Branching Rights was excludable from the income of the thrift under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. Century received basis in the New York Branching Rights equal to the fair market value of the New York Branching Rights on the date received. Home's adjusted basis in the New York Branching Rights received from Century was the same as the basis of that asset in the hands of the thrift immediately before the transfer. I.R.C. § 362(b).

3. Abandonment. Home's management made the decision to terminate its branch-banking operations in New York. In 1995, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in New York. At that time, Home left the New York branch banking market.

## Claims

1. Loss on Abandonment of Branching Rights. Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of its New York Branching Rights in 1995. Because Home made the affirmative decision to leave the New York market, sold or otherwise divested itself of all of the New York branches, and actually left that market in 1995, Home abandoned its New York Branching Rights in 1995. Home is therefore entitled to a deduction of $182,200,000 for the New York Branching Rights under section 165 in that year.

2. Loss Deductions or Amortization Deductions for Other Rights Acquired. Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the New York branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

2

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1995. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1995 if such Other Rights were abandoned or became worthless in that year.

3. <u>Reduction in the Gain on the Sale of the New York Branches.</u> (Alternative Claim)  To the extent Home did not recover the basis of the assets relating to the New York branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the New York branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1995.

4. <u>Correlative and Computational Adjustments.</u>  In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. <u>Interest.</u>  Home requests a refund of assessed interest plus statutory interest as provided by law.

3

621090.1

... .Abraham & Co. & Cone, Subs. by Savings of America, Inc. as substitute agent          95-0479700   Statement 1

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization Deductions
Relating to Missouri and Florida Thrift Institutions

During 1995, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service erred by failing to allow Home amortization deductions relating to rights acquired pursuant to the acquisition of Missouri and Florida Thrift institutions. Details of the deductions in issue are set forth below.

## Background

1. **The Acquisition.** On December 17, 1981, Home acquired Security Federal Savings and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisition of the Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in Missouri and Florida, cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

2. **Basis.** Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See, e.g., Crane v. Commissioner,* 331 U.S. 1 (1947). Home purchased the Other Rights from FSLIC for an amount equal to the negative value of the Missouri and Florida thrifts acquired, *i.e.,* the difference between the

623084.1

27

liabilities of the Missouri and Florida thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Other Rights, giving Home a cost basis in the Other Rights of $267,503,919 under Code section 1012.

Alternatively, if the Other Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to their merger into Home, Home received basis in the Other Rights under Code section 362(b). The Other Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Other Rights was excludable from the income of the Missouri and Florida thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Missouri and Florida thrifts received basis in the Other Rights equal to the fair market value of the Other Rights on the date received, $267,503,919. Home's adjusted basis in the Other Rights received from the Missouri and Florida thrifts was the same as the basis of that asset in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

<u>Claims</u>

1. <u>Amortization Deduction for Other Rights Acquired.</u> Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida thrifts before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for those Other Rights. Home is entitled to such amortization deductions under section 167 in 1995.

2. <u>Correlative and Computational Adjustments.</u> In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

3. <u>Interest.</u> Home requests a refund of assessed interest plus statutory interest as provided by law.

28

95-0479700   Statement 1

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization and Loss Deductions
Relating to Ohio Thrift Institutions


During 1995, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service erred by failing to allow Home an abandonment loss and amortization deductions for rights acquired pursuant to the acquisition of Ohio thrift institutions. Details of the deductions in issue are set forth below.

## Background

1. The Acquisition. On May 22, 1985, Home acquired Permanent Savings and Loan, Oxford Savings Association, Home Federal Savings and Loan, and American Savings Bank, all Ohio thrift institutions. On June 20, 1985, Home acquired Savings One Association, also an Ohio thrift institution. Home's acquisitions of the Ohio thrifts qualified as tax-free reorganizations under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisitions of the Ohio thrifts were supervisory mergers arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisitions, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. At the time Home acquired the Ohio thrifts, the thrifts were insolvent. FSLIC determined that the Ohio thrifts had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in Ohio ("Branching Rights"), cash, the right to be compensated for certain future losses of the thrifts, a loan evidenced by a term note, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

As noted above, one form of FSLIC Assistance that Home sought and received in connection with the acquisition of the Ohio thrifts was Branching Rights. At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, i.e., branches outside of its home state. In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers. In September 1981, FHLBB further amended its regulations to permit thrifts who

423089.1

acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. Basis. Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. See, e.g., Crane v. Commissioner, 331 U.S. 1 (1947). Home purchased the Ohio Branching Rights from FSLIC for an amount equal to the negative value of the thrifts it acquired, i.e., the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Ohio Branching Rights, giving Home a cost basis in the Ohio Branching Rights of $34,815,000 under Code section 1012.

Alternatively, if the Ohio Branching Rights are deemed, contrary to fact, to have been transferred to the Ohio thrifts prior to the merger of the thrifts into Home, Home received basis in the Ohio Branching Rights under Code section 362(b). The Ohio Branching Rights constituted property received by the Ohio thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Ohio Branching Rights was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Ohio thrifts received basis in the Ohio Branching Rights equal to the fair market value of the Ohio Branching Rights on the date received. Home's adjusted basis in the Ohio Branching Rights was the same as the basis of those assets in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

3. Abandonment. Home's management made the decision to terminate its branch-banking operations in Ohio. In 1994 and 1995, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in Ohio. At that time, Home left the Ohio branch banking market with no intention of reestablishing any other branches in Ohio. Home has not reentered the Ohio branch banking market since that time.

## Claims

1. Loss on Abandonment of Branching Rights. Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of its Ohio Branching Rights in 1995. Because Home made the affirmative decision to leave the Ohio market, sold or otherwise divested itself of all of the Ohio branches, and actually left that market in 1995, Home abandoned its Ohio Branching Rights in 1995. Home is therefore entitled to a deduction of $34,815,000 for the Ohio Branching Rights under section 165 in that year.

2. Loss Deductions or Amortization Deductions for Other Rights Acquired. Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Ohio branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

s23089.1

30

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1995. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1995 if such Other Rights were abandoned or became worthless in that year.

3. _Reduction in the Gain on the Sale of the Ohio Branches._ (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the Ohio branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the Ohio branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1995.

4. _Correlative and Computational Adjustments._ In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. _Interest._ Home requests a refund of assessed interest plus statutory interest as provided by law.

823089.1

R St. A Cone Subs. by Savings of America, Inc. as substitute agent        95-0479700     Statement 1

## Statement #2

## Recognition of Loan Fees on the Transfer of MBSs to 1905 Agency

### I.    Factual Background

For the taxable years at issue, H.F. Ahmanson & Company was the common parent of an affiliated group of corporations that filed consolidated federal income tax returns. Home Savings of America, FSB ("Home") and 1905 Agency, Inc. ("1905 Agency") were members of the affiliated group that were included in those returns.

At all relevant times, Home was a federally chartered stock savings bank engaged in the banking business. One of Home's primary functions was the origination of mortgage loans. In connection with the origination of mortgage loans, Home typically charged borrowers loan fees or points and treated such mortgage loans as having discounts associated with them. For example, if Home made a $100,000 loan to a particular borrower and charged the borrower $4,000 of loans fees, it treated the transaction as a $96,000 loan to the borrower. Since Home was entitled to a payment of $100,000 upon maturity of the loan, it treated the loan as having a $4,000 discount associated with it. Home did not include the loan fees associated with these mortgage loans in its income for federal income tax purposes at the time of the origination of the loans, but rather deferred the income recognition on such loan fees in accordance with guidelines created by the Internal Revenue Service (the "Service").

Prior to 1994, Home used the "composite method" to amortize the loans fees into income for federal income tax purposes. Under this method, Home generally included the loan fees into income over a representative period of years. The representative period was generally determined based on statistical evidence regarding the balance and payment history on particular mortgage loans. During 1994, the Service issued Revenue Procedures 94-29, 1994-1 C.B. 616, and 94-30, 1994-1 C.B. 621, prohibiting taxpayers from continuing to use the composite method to account for loan fees. These revenue procedures were issued in response to the original issue discount regulations that were promulgated by the Treasury. These revenue procedures provided that, upon obtaining the permission of the Service, taxpayers could use either the "principal reduction method" or the "revised loan liquidation method" to account for loan fees. After the issuance of these revenue procedures, Home filed a Form 3115 with the Service requesting to change its method of accounting for loans fees to the principal reduction method for loans originated on or after January 1, 1993, and to the revised loan liquidation method for loans originated prior to that time. Home's request for such change was granted by the National Office of the Service.

Prior to 1995, Home routinely securitized a portion of its originated mortgage loans into mortgage backed securities. When the mortgage loans were securitized, the loan fees that were related to the securitized mortgage loans became discounts on the mortgage-backed securities for book purposes, and were amortized accordingly.

During 1995, 1905 Agency was a wholly-owned subsidiary of Home and was responsible for the management of Home's investments, including its mortgage-backed securities. During that year, Home transferred a total of $13,098,988,833 of its mortgage-backed securities ("MBSs") to 1905 Agency in a series of transactions under Section 351 of the Internal Revenue Code of 1986, as amended (the "Code").[1]

When the MBSs were transferred to 1905 Agency, Home also transferred the unamortized deferred loans fees associated with the MBSs (the " Deferred Loan Fees") to 1905 Agency. The Deferred Loan Fees were as follows:

| | |
|---|---|
| Pre-1993 Deferred Fees (Accounted for under the Revised Loan Liquidation Method) | $78,779,474 |
| Post-1992 Deferred Fees (Accounted for under the Principal Reduction Method) | $61,441,316 |
| Total Loan Fees | $140,220,790 |

After the transfer of the MBSs to 1905 Agency in 1995, 1905 Agency continued to use the same methods that Home used to amortize the Deferred Loan Fees into income, namely, the principal reduction method for loans originated on or after January 1, 1993, and the revised loan liquidation method for loans originated prior to that date. 1905 Agency continued to use those methods until 1998, when Washington Mutual acquired H.F. Ahmanson & Company. During the years 1995 through 1998, 1905 Agency recognized the following amounts of income as a result of the amortization of the Deferred Loan Fees into income:

| Year | Amount |
|---|---|
| 1995 | $4,797,650 |
| 1996 | $13,393,187 |
| 1997 | $13,092,158 |
| 1998 | $14,505,771 |
| Total | $45,788,766 |

At the time of the acquisition of H.F. Ahmanson & Company by Washington Mutual, the remaining $94 million of the Deferred Loan Fees was transferred to Washington Mutual.

## II.   Revenue Agent's Position

At issue here is the impact of the transfer of the MBSs to 1905 Agency on the Deferred Loan Fees. In the Notices of Proposed Adjustment (011-0034 and 027-0004), the revenue agent

---

[1]  Unless otherwise indicated, all Section references are to the Internal Revenue Code of 1986, as amended.

H.F. Ahmanson & Co. & Cons. Subs., by Savings of America, Inc. as substitute agent        95-0479700    Statement 2

(a) takes the position that Home is required to include the entire amount of the Deferred Loan Fees in its income for 1995 as a result of the transfer of the MBSs to 1905 Agency and (b) makes a correlative adjustment to reduce the income of 1905 Agency for the years 1995 through 1998 by the amount of the Deferred Loan Fees that it included in its gross income for those years.

III.    Taxpayer's Position

(A)    Home is Not Required to Recognize any Income on the Transfer of MBSs and the Associated Deferred Loan Fees to 1905 Agency Because this is a Transfer of Property in a Transaction to Which Section 351 Applies.

Section 351 provides that no gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control of the corporation.

There is no statutory, judicial or administrative authority that creates an exception to Section 351 because of the transferor's or the transferee's method of accounting for an item of property that is transferred to the transferee. The revenue agent report fails to discuss or make any reference to authorities that have considered and rejected similar arguments in the past.

One such authority is Hempt Bros., Inc. v. United States, 490 F.2d 1172 (3d Cir. 1974). In that case, a cash-basis partnership transferred its accounts receivable to a controlled corporation solely in exchange for stock of the corporation. The taxpayer initially argued that the transfer of receivables to a corporation by a cash method taxpayer does not qualify as a Section 351 transaction because receivables should not be treated as property for purposes of Section 351. The court rejected that argument, noting that "For section 351, courts have advocated a generous definition of 'property'". Id. at 1175 (quoting E.I. Du Pont de Nemours and Co. v. United States, 471 F.2d 1211 (Ct. Cl. 1973). The taxpayer then proceeded to argue that, notwithstanding the literal application of Section 351 to the transaction at issue, the assignment of income doctrine requires the partnership and not the transferee corporation to be taxed on the receipt of income upon the collection of the receivables. In essence, the taxpayer was contending that "the nonrecognition provision of Section 351 is in conflict with the assignment of income doctrine and that Section 351 should be subordinated thereto." The court acknowledged that, in the situation before it, the provisions of Section 351 produced results that were inconsistent with the assignment of income doctrine; however, it refused to carve out an exception to Section 351 for this doctrine, noting that "By its explicit terms Section 351 expresses the Congressional intent that transfers of property for stock or securities will not result in recognition."

The Service also considered a similar fact pattern in Revenue Ruling 80-198, 1980-2 C.B. 113 and reached the same conclusion as that reached by the court in Hempt.

The Hempt decision and Revenue Ruling 80-198 show that the courts and the Service are generally unwilling to carve out any exceptions to Section 351, including exceptions for a well-established judicial doctrine such as the assignment of income doctrine. In arguing that Home is required to recognize income on the transfer of the Deferred Loan Fees to 1905 Agency, the

3

H.F. Ahmanson & Co. & Cons. Subs., by Savings of America, Inc. as substitute agent          95-0479700    Statement 2

revenue agent does not cite a single source of authority, but simply asserts that such income recognition is required because of Home's method of accounting for the Deferred Loan Fees. If a well-established judicial doctrine cannot be an exception to Section 351, certainly the revenue agent's bare assertions in this case cannot give rise to such an exception.

Since there is no exception to the application of Section 351 to the facts involved here, Home is not required to recognize any income on the transfer of the MBSs and the Deferred Loan Fees to 1905 Agency.

(B)   **Home is Not Required to Recognize any Income on the Transfer of the MBSs to 1905 Agency Because this is a Deferred Intercompany Transaction Under Treasury Regulation Section 1.1502-13.**

Since Home and 1905 Agency were members of the same consolidated group after Home's transfer of the MBSs and the Deferred Loan Fees to 1905 Agency, the tax consequences of this transfer must also be analyzed under the rules relating to intercompany transactions that are contained in Treasury Regulations Section 1.1502-13, as in effect for the taxable year at issue here.[2]  Treas. Reg. § 1.1502-13(a)(1).  The regulations specifically identify a sale or exchange of property by one member of a consolidated group to another member of the group as a "deferred intercompany transaction".  Treas. Reg. § 1.1502-13(a)(2).  They further provide that, to the extent that gain or loss on a deferred intercompany transaction is recognized under the Internal Revenue Code for a consolidated return year, such gain or loss shall be deferred to the selling member.  Treas. Reg. § 1.1502-13(c)(1).  Any deferred gain or loss resulting from such a transaction would be taken into account by the selling member upon the occurrence of a restoration event.  Treas. Reg. § 1.1502-13(c)(1)(ii)(b).

Since the transfer of the MBSs and the Deferred Loan Fees by Home to 1905 Agency constitutes a Section 351 transaction, Home is not required to recognize any gain or loss as a result of that transfer.  Therefore, this transaction does not even give rise to gain that is required to be deferred under the consolidated return rules.  However, assuming arguendo that this transaction did give rise to gain recognition under the general tax principles, Home would not be required (nor would it be permitted) to recognize such gain based on the application of those rules.

(C)   **1905 Agency is Permitted to Use the Same Method as Home in Accounting for the Deferred Loan Fees Associated with the MBSs.**

The underlying reasons for the revenue agent's proposed increase in Home's income and a corresponding decrease in 1905 Agency's income is that 1905 Agency is not permitted to use the principal reduction method or the revised loan liquidation method to include the Deferred Loan

---

[2]  Since the transaction at issue here occurred during the taxpayer's taxable year beginning prior to July 12, 1995, the prior intercompany transaction rules contained in Treasury Regulation Section 1.1502-13 apply here.

35

4

Fees into income over time. The revenue agent argues that 1905 Agency is not permitted to use the principal reduction method because (a) Revenue Procedure 94-29, 1994-1 C.B. 616, provides that this method applies only to loans that, inter alia, are acquired by taxpayer at origination and (b) 1905 Agency did not satisfy that requirement. Although the revenue agent's argument with regard to 1905 Agency's ability to use the revised loan liquidation method is not altogether clear, he also appears to be arguing that this method is not available to 1905 Agency because none of the Deferred Loan Fees for which this method was being utilized related to mortgages originated by 1905 Agency prior to January 1, 1993 (the cut-off date contained in Home's request for change of accounting method). In advancing these arguments, however, the revenue agent overlooks key principles of the original issue discount ("OID") provisions of the Code.

Section 1272 generally applies to a debt instrument that has OID. A debt instrument is considered to have OID if its stated redemption price at maturity exceeds its issue price. § 1273(a). An instrument's stated redemption price at maturity is equal to all payments that are required to be made under the terms of the instrument other than "qualified stated interest". § 1273(a)(2). In the case of a non-publicly traded instrument that is issued for cash, the issue price of the instrument is the price paid by the first buyer of the debt instrument. § 1273(b)(2).

If a debt instrument is issued with OID, Section 1272(a)(1) requires the holder of the instrument to include the OID in income in accordance with the economic accrual method. Since Section 1272(a)(1) refers to the holder of an OID instrument without distinguishing between the original holder of the instrument or any subsequent transferee, a subsequent transferee must simply step into the shoes of the original holder and continue to include the remainder of the original issue discount in its income in the same manner as the original holder. This principle generally applies to a subsequent transferee of an instrument, except in two situations—namely, situations in which there is acquisition premium or market discount. § 1272(a)(7) and (d); § 1278. The existence of either of those items will cause a transferee's inclusion of OID with respect to a debt instrument to differ from that of the transferor. § 1272(a)(7) and (d); § 1278. However, neither the rules relating to acquisition premium nor the rules relating to market discount apply in a situation where a subsequent transferee of a debt instrument has acquired the instrument from the original holder in a Section 351 transaction (where the adjusted basis of the instrument in the hands of the transferee is determined with reference to the adjusted basis of the instrument in the hands of the original holder). Id. In these cases, the transferee steps into the shoes of the original holder and is treated as having acquired the instrument at original issue.

Since 1905 Agency acquired the MBSs from Home in a Section 351 transaction as distinguished from a purchase transaction, 1905 Agency will step into the shoes of Home and will be treated as having acquired the instrument at original issue. Therefore, 1905 Agency is entitled to continue to account for the Deferred Loan Fees or the discount with respect to the MBSs in the same manner as Home, namely, through the use of the principal reduction method or the revised loan liquidation method.

Even if 1905 Agency was not permitted to use such methods to account for the Deferred Loan Fees, this does not mean that Home would be required to recognize the Deferred Loan Fees into income on the transfer of the related MBSs to 1905 Agency in a Section 351 transaction. Rather, in such a situation, we would simply need to look to the OID provisions to determine the proper treatment of Deferred Loan Fees in the hands of 1905 Agency. Since the amount of OID

36

created by the Deferred Loan Fees is de minimis in amount, 1905 Agency would not be required to include the Deferred Loan Fees in its income under the economic accrual concept. Rather, it would be required to include the Deferred Loan Fees in income as stated principal payments are made on the loan. Treas. Reg. § 1.1273-1(d)(5). This is precisely what 1905 Agency did when it used the principal reduction method and the revised loan liquidation method to account for the Deferred Loan Fees. See Rev. Proc. 94-29, 1994-1 C.B. 616, Rev. Proc. 94-30, 1994-1 C.B. 621. Therefore, no adjustments should be made to the income recognized by 1905 Agency as a result of the amortization of the Deferred Loan Fees.

## IV.    Conclusion

Based on the foregoing, Home is not required to recognize any income on the transfer of the MBSs and the Deferred Loan Fees to 1905 Agency based on the application of Section 351 and Treasury Regulation Section 1.1502-13. In addition, 1905 Agency is permitted to use the same method as that utilized by Home in accounting for the Deferred Loan Fees.

June 2006 Claim for Tax Year 1995

(by Washington Mutual. Inc.)

June 2006 Claim for Tax
Year 1995 (by Wash.
Mutual. Inc.)

| Form **1120X** | | Amended U.S. Corporation | OMB No. 1545-0132 | |
|---|---|---|---|---|
| (Rev. December 2004) | | Income Tax Return | For tax year ending | |
| Department of the Treasury Internal Revenue Service | | | ▶ .......... 12/1995 .......... (Enter month and year.) | |

| Please Type or Print | Name H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual, Inc. as successor* | | Employer identification number 95-0479700 | |
|---|---|---|---|---|
| | Number, street, and room or suite no. (if a P.O. box, see instructions.) c/o Washington Mutual, Inc.; PO Box 834, FIS 1520 | | | |
| | City or town, state, and ZIP code Seattle, WA 98111 | | Telephone number (optional) | |

Enter name and address used on original return (if same as above, write "Same.")

H.F. Ahmanson & Co. & Cons. Subs.; 4900 Rivergrade Road; Irwindale, CA 91706

Internal Revenue Service Center
where original return was filed ▶   Ogden, UT

## Fill in applicable items and use Part II on the back to explain any changes

| **Part I**   Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change— increase or (decrease)— explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 | Total income (Form 1120 or 1120-A, line 11) . . . | **1** | 5,658,646,310 | 0 | 5,658,646,310 |
| 2 | Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) . . . . . | **2** | 5,051,672,262 | 803,248,059 | 5,854,920,321 |
| 3 | Taxable income. Subtract line 2 from line 1 . . . . | **3** | 607,174,048 | -803,248,059 | -196,074,011 |
| 4 | Tax (Form 1120, line 31, or Form 1120-A, line 27) . | **4** | 210,456,853 | -208,947,650 | 1,509,203 |

**Payments and Credits** (see instructions)

| 5 a | Overpayment in prior year allowed as a credit . . . | **5a** | 269,683 | 0 | 269,683 |
|---|---|---|---|---|---|
| b | Estimated tax payments . . . . . . . . . . . | **5b** | 172,768,000 | 0 | 172,768,000 |
| c | Refund applied for on Form 4466 . . . . . . . . | **5c** | 0 | 0 | 0 |
| d | Subtract line 5c from the sum of lines 5a and 5b . . | **5d** | 173,077,683 | 0 | 173,077,683 |
| e | Tax deposited with Form 7004 . . . . . . . . . | **5e** | 27,441,000 | 0 | 27,441,000 |
| f | Credit from Form 2439 . . . . . . . . . . . . | **5f** | 0 | 0 | 0 |
| g | Credit for Federal tax on fuels . . . . . . . . . | **5g** | 0 | 0 | 0 |
| 6 | Tax deposited or paid with (or after) the filing of the original return | **6** | INTERNAL REVENUE SERVICE-FA RECEIVED | | 0 |
| 7 | Add lines 5d through 6, column (c) . . . . . . . . . . . . . . . . . | **7** | JUN 3 0 2006 | | 200,518,683 |
| 8 | Overpayment, if any, as shown on original return or as later adjusted . . | **8** | SEATTLE, WA | | 57,004,694 |
| 9 | Subtract line 8 from line 7 . . . . . . . . . . . . . . . . . . . . | **9** | | | 143,514,189 |

**Tax Due or Overpayment** (see instructions)

| 10 | Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | **10** | 0 |
|---|---|---|---|
| 11 | Overpayment. Subtract line 4, column (c), from line 9 . . . . . . . . . . . . . | **11** | 142,004,986 |
| 12 | Enter the amount of line 11 you want: Credited to 20___ estimated tax ▶ Refunded ▶ | **12** | 142,004,986 |

| Sign Here | Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. | | |
|---|---|---|---|
| | ▶ Signature of officer | Date 6/30/06 | ▶ Title Sr. V.P. |

| Paid Preparer's Use Only | Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code ▶ | | EIN Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.
(PTN)

Form **1120X** (Rev. 12-2004)

Form 1120X (Rev. 12-2004)          H.F. Ahmanson & Co. & Cons. Subs., by Washington Mu 95-0479700          Page **2**

**Part II**   Explanation of Changes to Items in Part I (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see What To Attach on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see Carryback Claims on page 3, and check here . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

BRANCHING RIGHTS ABANDONMENT LOSS - STATEMENT 1

RECOGNITION OF DEFERRED LOAN FEES - STATEMENT 2

On October 1, 1998, H.F. Ahmanson was merged with and into Washington Mutual, Inc.

Washington Mutual, Inc. is the successor in interest to H.F. Ahmanson.

Form **1120X** (Rev. 12-2004)

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization and Loss Deductions
Relating to Bowery, a New York Federally Chartered Savings Bank

During 1995, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service erred by failing to allow Home amortization and loss deductions relating to rights acquired pursuant to Home's acquisition of The Bowery Savings Bank ("Bowery") and Bowery's conversion to a federally chartered savings bank. Details of the deductions in issue are set forth below.

## Background

1. <u>The Acquisition.</u> On October 5, 1987, Home signed an acquisition agreement to acquire all of the stock of The Bowery Savings Bank ("Bowery"), an FDIC-insured, New York-chartered, mutual savings bank. Before that agreement, private investors had purchased Bowery in a supervisory transaction. In that supervisory transaction, Bowery and the FDIC entered into an assistance agreement. Because of that assistance agreement, Home's stock purchase was not final until the FDIC and Home agreed to amendments to the assistance agreement. The assistance agreement was amended (the "Amended Assistance Agreement") -- and Home's stock purchase became final -- on January 29, 1988.

Upon consummation of the stock purchase, Bowery became a wholly owned indirect subsidiary of Home. Home's stock purchase resulted in $183,306,000 in goodwill, which Bowery could use for capital compliance purposes under the Amended Assistance Agreement. Until 1992, Bowery's books were separate from Home's books and Home accounted for that goodwill on Bowery's books.

In April 1992, Bowery's name was changed to Home Savings of America, The Bowery Division, SSB. On September 1, 1992, Bowery converted to a federally chartered savings bank, and changed its name to Home Savings of America, The Bowery Division, FSB. In connection with this conversion, Home counted -- under Regulatory Accounting Principles -- the remaining goodwill from the Bowery stock purchase toward Home's regulatory capital requirements. This right is referred to herein as the Regulatory Accounting Principles Right, or "RAP Right." Under the Amended Assistance Agreement, in addition to the RAP Right, Home acquired other rights ("Other Rights").

2. <u>Basis.</u> Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the

amount paid for the property. Home purchased the RAP Right and Other Rights, giving Home a cost basis in the RAP Right and Other Rights of $183,306,000 under Code section 1012.

3. Abandonment. Home's management made the decision to terminate its branch banking operations in New York. In 1995, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in New York. At that time, Home left the New York branch banking market.

### Claims

1. Loss Deductions or Amortization Deductions for Other Rights Acquired. Under the Amended Assistance Agreement, in addition to the RAP Right, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the New York branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1995. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1995 if such Other Rights were abandoned or became worthless in that year.

2. Reduction in the Gain on the Sale of the New York Branches. (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the New York branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the New York branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1995.

3. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

4. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization and Loss Deductions
Relating to Century, a New York Thrift Institution

During 1995, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service erred by failing to allow Home amortization and loss deductions relating to rights acquired pursuant to the acquisition of Century Federal Savings and Loan Association. Details of the deductions in issue are set forth below.

<u>Background</u>

1. <u>The Acquisition</u>. On August 10, 1984, Home acquired Century Federal Savings and Loan Association ("Century"), a New York thrift institution. Home's acquisition of the New York thrift qualified as a tax-free reorganization under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisition of Century was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. At the time Home acquired Century, the New York thrift was insolvent. FSLIC determined that Century had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrift.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in New York ("Branching Rights"), cash, the right to be compensated for certain future losses of the thrifts, a loan evidenced by a term note, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

As noted above, one form of FSLIC Assistance that Home sought and received in connection with the acquisition of the New York thrift institution was Branching Rights. At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, i.e., branches outside of its home state. In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers. In September 1981, FHLBB further amended its regulations to permit

thrifts who acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. <u>Basis.</u> Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See, e.g., Crane v. Commissioner,* 331 U.S. 1 (1947). Home purchased the New York Branching Rights from FSLIC for an amount equal to the negative value of the thrift acquired, *i.e.,* the difference between the liabilities of the thrift and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the New York Branching Rights, giving Home a cost basis in the New York Branching Rights of $182,200,000 under Code section 1012.

Alternatively, if the New York Branching Rights are deemed, contrary to fact, to have been transferred to Century prior to the merger of the thrift into Home, Home received basis in the New York Branching Rights under Code section 362(b). The New York Branching Rights constituted property received by Century from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the New York Branching Rights was excludable from the income of the thrift under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. Century received basis in the New York Branching Rights equal to the fair market value of the New York Branching Rights on the date received. Home's adjusted basis in the New York Branching Rights received from Century was the same as the basis of that asset in the hands of the thrift immediately before the transfer. I.R.C. § 362(b).

3. <u>Abandonment.</u> Home's management made the decision to terminate its branch-banking operations in New York. In 1995, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in New York. At that time, Home left the New York branch banking market.

<div align="center">Claims</div>

1. <u>Loss on Abandonment of Branching Rights.</u> Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of its New York Branching Rights in 1995. Because Home made the affirmative decision to leave the New York market, sold or otherwise divested itself of all of the New York branches, and actually left that market in 1995, Home abandoned its New York Branching Rights in 1995. Home is therefore entitled to a deduction of $182,200,000 for the New York Branching Rights under section 165 in that year.

2. <u>Loss Deductions or Amortization Deductions for Other Rights Acquired.</u> Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the New York branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

<div align="center">2</div>

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1995. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1995 if such Other Rights were abandoned or became worthless in that year.

3. <u>Reduction in the Gain on the Sale of the New York Branches.</u> (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the New York branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the New York branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1995.

4. <u>Correlative and Computational Adjustments.</u> In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. <u>Interest.</u> Home requests a refund of assessed interest plus statutory interest as provided by law.

3

623690.1

Order by Washington Mutual, Inc. on successor B5-0478700 Statement 1

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization Deductions
Relating to Missouri and Florida Thrift Institutions

During 1995, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service erred by failing to allow Home amortization deductions relating to rights acquired pursuant to the acquisition of Missouri and Florida Thrift institutions. Details of the deductions in issue are set forth below.

### Background

1. <u>The Acquisition</u>. On December 17, 1981, Home acquired Security Federal Savings and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisition of the Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in Missouri and Florida, cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

2. <u>Basis</u>. Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See, e.g., Crane v. Commissioner,* 331 U.S. 1 (1947). Home purchased the Other Rights from FSLIC for an amount equal to the negative value of the Missouri and Florida thrifts acquired, *i.e.*, the difference between the

6130615

95-DL70700   Statement 5

liabilities of the Missouri and Florida thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Other Rights, giving Home a cost basis in the Other Rights of $267,503,919 under Code section 1012.

Alternatively, if the Other Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to their merger into Home, Home received basis in the Other Rights under Code section 362(b). The Other Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Other Rights was excludable from the income of the Missouri and Florida thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Missouri and Florida thrifts received basis in the Other Rights equal to the fair market value of the Other Rights on the date received, $267,503,919. Home's adjusted basis in the Other Rights received from the Missouri and Florida thrifts was the same as the basis of that asset in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

### Claims

1. _Amortization Deduction for Other Rights Acquired._ Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida thrifts before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for those Other Rights. Home is entitled to such amortization deductions under section 167 in 1995.

2. _Correlative and Computational Adjustments._ In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

3. _Interest._ Home requests a refund of assessed interest plus statutory interest as provided by law.

2

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1995
Amortization and Loss Deductions
Relating to Ohio Thrift Institutions

During 1995, Home Savings of America ("Home"), a federally chartered savings and
loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson")
and a member of the affiliated group for which Ahmanson was the common parent corporation.
Home is entitled to a refund for overpayment of 1995 taxes because the Internal Revenue Service
erred by failing to allow Home an abandonment loss and amortization deductions for rights
acquired pursuant to the acquisition of Ohio thrift institutions. Details of the deductions in issue
are set forth below.

## Background

1. The Acquisition. On May 22, 1985, Home acquired Permanent Savings and Loan,
Oxford Savings Association, Home Federal Savings and Loan, and American Savings Bank, all
Ohio thrift institutions. On June 20, 1985, Home acquired Savings One Association, also an
Ohio thrift institution. Home's acquisitions of the Ohio thrifts qualified as tax-free
reorganizations under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The
acquisitions of the Ohio thrifts were supervisory mergers arranged by the Federal Savings and
Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board
("FHLBB"). At the time of the acquisitions, there was a financial crisis in the savings and loan
industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to
liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to
induce healthy thrifts to take over failing thrifts. At the time Home acquired the Ohio thrifts, the
thrifts were insolvent. FSLIC determined that the Ohio thrifts had no going concern value, and
that FSLIC Assistance was required to attract a buyer for the thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the
right to establish branches in Ohio ("Branching Rights"), cash, the right to be compensated for
certain future losses of the thrifts, a loan evidenced by a term note, and certain forbearances with
respect to regulatory net worth requirements. Home also received the contractual right to count
the excess of the liabilities assumed over the fair market value of the identifiable assets acquired
toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above,
Home acquired other rights ("Other Rights").

As noted above, one form of FSLIC Assistance that Home sought and received in
connection with its acquisition of the Ohio thrifts was Branching Rights. At the time of the
acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-
state branches, i.e., branches outside of its home state. In March 1981, FHLBB created an
exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory
mergers. In September 1981, FHLBB further amended its regulations to permit thrifts who

acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. <u>Basis.</u> Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See, e.g., Crane v. Commissioner,* 331 U.S. 1 (1947). Home purchased the Ohio Branching Rights from FSLIC for an amount equal to the negative value of the thrifts it acquired, *i.e.,* the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Ohio Branching Rights, giving Home a cost basis in the Ohio Branching Rights of $34,815,000 under Code section 1012.

Alternatively, if the Ohio Branching Rights are deemed, contrary to fact, to have been transferred to the Ohio thrifts prior to the merger of the thrifts into Home, Home received basis in the Ohio Branching Rights under Code section 362(b). The Ohio Branching Rights constituted property received by the Ohio thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Ohio Branching Rights was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Ohio thrifts received basis in the Ohio Branching Rights equal to the fair market value of the Ohio Branching Rights on the date received. Home's adjusted basis in the Ohio Branching Rights was the same as the basis of those assets in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

3. <u>Abandonment.</u> Home's management made the decision to terminate its branch-banking operations in Ohio. In 1994 and 1995, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in Ohio. At that time, Home left the Ohio branch banking market with no intention of reestablishing any other branches in Ohio. Home has not reentered the Ohio branch banking market since that time.

### Claims

1. <u>Loss on Abandonment of Branching Rights.</u> Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of its Ohio Branching Rights in 1995. Because Home made the affirmative decision to leave the Ohio market, sold or otherwise divested itself of all of the Ohio branches, and actually left that market in 1995, Home abandoned its Ohio Branching Rights in 1995. Home is therefore entitled to a deduction of $34,815,000 for the Ohio Branching Rights under section 165 in that year.

2. <u>Loss Deductions or Amortization Deductions for Other Rights Acquired.</u> Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Ohio branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

2

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1995. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1995 if such Other Rights were abandoned or became worthless in that year.

3. <u>Reduction in the Gain on the Sale of the Ohio Branches.</u> (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the Ohio branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the Ohio branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1995.

4. <u>Correlative and Computational Adjustments.</u> In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. <u>Interest.</u> Home requests a refund of assessed interest plus statutory interest as provided by law.

3

Statement #2

Recognition of Loan Fees on the Transfer of MBSs to 1905 Agency

## I.   Factual Background

For the taxable years at issue, H.F. Ahmanson & Company was the common parent of an affiliated group of corporations that filed consolidated federal income tax returns. Home Savings of America, FSB ("Home") and 1905 Agency, Inc. ("1905 Agency") were members of the affiliated group that were included in those returns.

At all relevant times, Home was a federally chartered stock savings bank engaged in the banking business. One of Home's primary functions was the origination of mortgage loans. In connection with the origination of mortgage loans, Home typically charged borrowers loan fees or points and treated such mortgage loans as having discounts associated with them. For example, if Home made a $100,000 loan to a particular borrower and charged the borrower $4,000 of loans fees, it treated the transaction as a $96,000 loan to the borrower. Since Home was entitled to a payment of $100,000 upon maturity of the loan, it treated the loan as having a $4,000 discount associated with it. Home did not include the loan fees associated with these mortgage loans in its income for federal income tax purposes at the time of the origination of the loans, but rather deferred the income recognition on such loan fees in accordance with guidelines created by the Internal Revenue Service (the "Service").

Prior to 1994, Home used the "composite method" to amortize the loans fees into income for federal income tax purposes. Under this method, Home generally included the loan fees into income over a representative period of years. The representative period was generally determined based on statistical evidence regarding the balance and payment history on particular mortgage loans. During 1994, the Service issued Revenue Procedures 94-29, 1994-1 C.B. 616, and 94-30, 1994-1 C.B. 621, prohibiting taxpayers from continuing to use the composite method to account for loan fees. These revenue procedures were issued in response to the original issue discount regulations that were promulgated by the Treasury. These revenue procedures provided that, upon obtaining the permission of the Service, taxpayers could use either the "principal reduction method" or the "revised loan liquidation method" to account for loan fees. After the issuance of these revenue procedures, Home filed a Form 3115 with the Service requesting to change its method of accounting for loans fees to the principal reduction method for loans originated on or after January 1, 1993, and to the revised loan liquidation method for loans originated prior to that time. Home's request for such change was granted by the National Office of the Service.

Prior to 1995, Home routinely securitized a portion of its originated mortgage loans into mortgage backed securities. When the mortgage loans were securitized, the loan fees that were related to the securitized mortgage loans became discounts on the mortgage-backed securities for book purposes, and were amortized accordingly.

During 1995, 1905 Agency was a wholly-owned subsidiary of Home and was responsible for the management of Home's investments, including its mortgage-backed securities. During that year, Home transferred a total of $13,098,988,833 of its mortgage-backed securities ("MBSs") to 1905 Agency in a series of transactions under Section 351 of the Internal Revenue Code of 1986, as amended (the "Code").[1]

When the MBSs were transferred to 1905 Agency, Home also transferred the unamortized deferred loans fees associated with the MBSs (the "Deferred Loan Fees") to 1905 Agency. The Deferred Loan Fees were as follows:

| | |
|---|---|
| Pre-1993 Deferred Fees (Accounted for under the Revised Loan Liquidation Method) | $78,779,474 |
| Post-1992 Deferred Fees (Accounted for under the Principal Reduction Method) | $61,441,316 |
| Total Loan Fees | $140,220,790 |

After the transfer of the MBSs to 1905 Agency in 1995, 1905 Agency continued to use the same methods that Home used to amortize the Deferred Loan Fees into income, namely, the principal reduction method for loans originated on or after January 1, 1993, and the revised loan liquidation method for loans originated prior to that date. 1905 Agency continued to use those methods until 1998, when Washington Mutual acquired H.F. Ahmanson & Company. During the years 1995 through 1998, 1905 Agency recognized the following amounts of income as a result of the amortization of the Deferred Loan Fees into income:

| Year | Amount |
|---|---|
| 1995 | $4,797,650 |
| 1996 | $13,393,187 |
| 1997 | $13,092,158 |
| 1998 | $14,505,771 |
| Total | $45,788,766 |

At the time of the acquisition of H.F. Ahmanson & Company by Washington Mutual, the remaining $94 million of the Deferred Loan Fees was transferred to Washington Mutual.

## II.    Revenue Agent's Position

At issue here is the impact of the transfer of the MBSs to 1905 Agency on the Deferred Loan Fees. In the Notices of Proposed Adjustment (011-0034 and 027-0004), the revenue agent

---

[1] Unless otherwise indicated, all Section references are to the Internal Revenue Code of 1986, as amended.

2

H.F. Ahmanson & Co. & Cons. Subs. by Washington Mutual, Inc. as successor        95-0479700    Statement 0

52

(a) takes the position that Home is required to include the entire amount of the Deferred Loan Fees in its income for 1995 as a result of the transfer of the MBSs to 1905 Agency and (b) makes a correlative adjustment to reduce the income of 1905 Agency for the years 1995 through 1998 by the amount of the Deferred Loan Fees that it included in its gross income for those years.

### III.    Taxpayer's Position

(A)    Home is Not Required to Recognize any Income on the Transfer of MBSs and the Associated Deferred Loan Fees to 1905 Agency Because this is a Transfer of Property in a Transaction to Which Section 351 Applies.

Section 351 provides that no gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control of the corporation.

There is no statutory, judicial or administrative authority that creates an exception to Section 351 because of the transferor's or the transferee's method of accounting for an item of property that is transferred to the transferee. The revenue agent report fails to discuss or make any reference to authorities that have considered and rejected similar arguments in the past.

One such authority is Hempt Bros., Inc. v. United States, 490 F.2d 1172 (3d Cir. 1974). In that case, a cash-basis partnership transferred its accounts receivable to a controlled corporation solely in exchange for stock of the corporation. The taxpayer initially argued that the transfer of receivables to a corporation by a cash method taxpayer does not qualify as a Section 351 transaction because receivables should not be treated as property for purposes of Section 351. The court rejected that argument, noting that "For section 351, courts have advocated a generous definition of 'property'". Id. at 1175 (quoting E.I. Du Pont de Nemours and Co. v. United States, 471 F.2d 1211 (Ct. Cl. 1973). The taxpayer then proceeded to argue that, notwithstanding the literal application of Section 351 to the transaction at issue, the assignment of income doctrine requires the partnership and not the transferee corporation to be taxed on the receipt of income upon the collection of the receivables. In essence, the taxpayer was contending that "the nonrecognition provision of Section 351 is in conflict with the assignment of income doctrine and that Section 351 should be subordinated thereto." The court acknowledged that, in the situation before it, the provisions of Section 351 produced results that were inconsistent with the assignment of income doctrine; however, it refused to carve out an exception to Section 351 for this doctrine, noting that "By its explicit terms Section 351 expresses the Congressional intent that transfers of property for stock or securities will not result in recognition."

The Service also considered a similar fact pattern in Revenue Ruling 80-198, 1980-2 C.B. 113 and reached the same conclusion as that reached by the court in Hempt.

The Hempt decision and Revenue Ruling 80-198 show that that the courts and the Service are generally unwilling to carve out any exceptions to Section 351, including exceptions for a well-established judicial doctrine such as the assignment of income doctrine. In arguing that Home is required to recognize income on the transfer of the Deferred Loan Fees to 1905 Agency, the

H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual, Inc. as successor    95-0479700    Statement 2

53


revenue agent does not cite a single source of authority, but simply asserts that such income recognition is required because of Home's method of accounting for the Deferred Loan Fees. If a well-established judicial doctrine cannot be an exception to Section 351, certainly the revenue agent's bare assertions in this case cannot give rise to such an exception.

Since there is no exception to the application of Section 351 to the facts involved here, Home is not required to recognize any income on the transfer of the MBSs and the Deferred Loan Fees to 1905 Agency.

**(B) Home is Not Required to Recognize any Income on the Transfer of the MBSs to 1905 Agency Because this is a Deferred Intercompany Transaction Under Treasury Regulation Section 1.1502-13.**

Since Home and 1905 Agency were members of the same consolidated group after Home's transfer of the MBSs and the Deferred Loan Fees to 1905 Agency, the tax consequences of this transfer must also be analyzed under the rules relating to intercompany transactions that are contained in Treasury Regulations Section 1.1502-13, as in effect for the taxable year at issue here.[2] Treas. Reg. § 1.1502-13(a)(1). The regulations specifically identify a sale or exchange of property by one member of a consolidated group to another member of the group as a "deferred intercompany transaction". Treas. Reg. § 1.1502-13(a)(2). They further provide that, to the extent that gain or loss on a deferred intercompany transaction is recognized under the Internal Revenue Code for a consolidated return year, such gain or loss shall be deferred to the selling member. Treas. Reg. § 1.1502-13(c)(1). Any deferred gain or loss resulting from such a transaction would be taken into account by the selling member upon the occurrence of a restoration event. Treas. Reg. § 1.1502-13(c)(1)(ii)(b).

Since the transfer of the MBSs and the Deferred Loan Fees by Home to 1905 Agency constitutes a Section 351 transaction, Home is not required to recognize any gain or loss as a result of that transfer. Therefore, this transaction does not even give rise to gain that is required to be deferred under the consolidated return rules. However, assuming arguendo that this transaction did give rise to gain recognition under the general tax principles, Home would not be required (nor would it be permitted) to recognize such gain based on the application of those rules.

**(C) 1905 Agency is Permitted to Use the Same Method as Home in Accounting for the Deferred Loan Fees Associated with the MBSs.**

The underlying reasons for the revenue agent's proposed increase in Home's income and a corresponding decrease in 1905 Agency's income is that 1905 Agency is not permitted to use the principal reduction method or the revised loan liquidation method to include the Deferred Loan

---

[2] Since the transaction at issue here occurred during the taxpayer's taxable year beginning prior to July 12, 1995, the prior intercompany transaction rules contained in Treasury Regulation Section 1.1502-13 apply here.

Fees into income over time. The revenue agent argues that 1905 Agency is not permitted to use the principal reduction method because (a) Revenue Procedure 94-29, 1994-1 C.B. 616, provides that this method applies only to loans that, inter alia, are acquired by taxpayer at origination and (b) 1905 Agency did not satisfy that requirement. Although the revenue agent's argument with regard to 1905 Agency's ability to use the revised loan liquidation method is not altogether clear, he also appears to be arguing that this method is not available to 1905 Agency because none of the Deferred Loan Fees for which this method was being utilized related to mortgages originated by 1905 Agency prior to January 1, 1993 (the cut-off date contained in Home's request for change of accounting method). In advancing these arguments, however, the revenue agent overlooks key principles of the original issue discount ("OID") provisions of the Code.

Section 1272 generally applies to a debt instrument that has OID. A debt instrument is considered to have OID if its stated redemption price at maturity exceeds its issue price. § 1273(a). An instrument's stated redemption price at maturity is equal to all payments that are required to be made under the terms of the instrument other than "qualified stated interest". § 1273(a)(2). In the case of a non-publicly traded instrument that is issued for cash, the issue price of the instrument is the price paid by the first buyer of the debt instrument. § 1273(b)(2).

If a debt instrument is issued with OID, Section 1272(a)(1) requires the holder of the instrument to include the OID in income in accordance with the economic accrual method. Since Section 1272(a)(1) refers to the holder of an OID instrument without distinguishing between the original holder of the instrument or any subsequent transferee, a subsequent transferee must simply step into the shoes of the original holder and continue to include the remainder of the original issue discount in its income in the same manner as the original holder. This principle generally applies to a subsequent transferee of an instrument, except in two situations—namely, situations in which there is acquisition premium or market discount. § 1272(a)(7) and (d); § 1278. The existence of either of those items will cause a transferee's inclusion of OID with respect to a debt instrument to differ from that of the transferor. § 1272(a)(7) and (d); § 1278. However, neither the rules relating to acquisition premium nor the rules relating to market discount apply in a situation where a subsequent transferee of a debt instrument has acquired the instrument from the original holder in a Section 351 transaction (where the adjusted basis of the instrument in the hands of the transferee is determined with reference to the adjusted basis of the instrument in the hands of the original holder). Id. In these cases, the transferee steps into the shoes of the original holder and is treated as having acquired the instrument at original issue.

Since 1905 Agency acquired the MBSs from Home in a Section 351 transaction as distinguished from a purchase transaction, 1905 Agency will step into the shoes of Home and will be treated as having acquired the instrument at original issue. Therefore, 1905 Agency is entitled to continue to account for the Deferred Loan Fees or the discount with respect to the MBSs in the same manner as Home, namely, through the use of the principal reduction method or the revised loan liquidation method.

Even if 1905 Agency was not permitted to use such methods to account for the Deferred Loan Fees, this does not mean that Home would be required to recognize the Deferred Loan Fees into income on the transfer of the related MBSs to 1905 Agency in a Section 351 transaction. Rather, in such a situation, we would simply need to look to the OID provisions to determine the proper treatment of Deferred Loan Fees in the hands of 1905 Agency. Since the amount of OID

H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual, Inc., as successor                    95-0479700   Statement 2

5

55

created by the Deferred Loan Fees is de minimis in amount, 1905 Agency would not be required to include the Deferred Loan Fees in its income under the economic accrual concept. Rather, it would be required to include the Deferred Loan Fees in income as stated principal payments are made on the loan. Treas. Reg. § 1.1273-1(d)(5). This is precisely what 1905 Agency did when it used the principal reduction method and the revised loan liquidation method to account for the Deferred Loan Fees. See Rev. Proc. 94-29, 1994-1 C.B. 616, Rev. Proc. 94-30, 1994-1 C.B. 621. Therefore, no adjustments should be made to the income recognized by 1905 Agency as a result of the amortization of the Deferred Loan Fees.

## IV.    Conclusion

Based on the foregoing, Home is not required to recognize any income on the transfer of the MBSs and the Deferred Loan Fees to 1905 Agency based on the application of Section 351 and Treasury Regulation Section 1.1502-13. In addition, 1905 Agency is permitted to use the same method as that utilized by Home in accounting for the Deferred Loan Fees.

June 2006 Claim for Tax Year 1998

(by Washington Mutual Bank)

June 2006 Claim for Tax
Year 1998 (by Wash.
Mutual Bank)

Form **1120X**

(Rev. December 2004)
Department of the Treasury
Internal Revenue Service

## Amended U.S. Corporation
## Income Tax Return

OMB No. 1545-0132

**For tax year ending**
▶ ........9/1996........
(Enter month and year.)

| Please Type or Print | Name H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual Bank F.A. as successor* | Employer identification number 95-0479700 |
|---|---|---|
| | Number, street, and room or suite no. (If a P.O. box, see instructions.) c/o Washington Mutual, Inc.; PO Box 834, FIS 1520 | |
| | City or town, state, and ZIP code Seattle, WA 98111 | Telephone number (optional) |

Enter name and address on original return (if same as above, write "Same.")

H.F. Ahmanson & Co. & Cons. Subs.; 4900 Rivergrade Road; Irwindale, CA 91706

Internal Revenue Service Center
where original return was filed    ▶ Ogden, UT

### Fill in applicable items and use Part II on the back to explain any changes

| Part I   Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change— increase or (decrease)— explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 | Total income (Form 1120 or 1120-A, line 11) . . . | 1 | 4,338,552,206 | 0 | 4,338,552,206 |
| 2 | Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) . . . | 2 | 3,638,121,821 | 371,068,147 | 4,009,189,968 |
| 3 | Taxable income. Subtract line 2 from line 1 . . . . | 3 | 700,430,385 | -371,068,147 | 329,362,238 |
| 4 | Tax (Form 1120, line 31, or Form 1120-A, line 27) . | 4 | 245,147,810 | -129,871,027 | 115,276,785 |

**Payments and Credits (see instructions)**

| | | | | |
|---|---|---|---|---|
| 5a | Overpayment in prior year allowed as a credit . . | 5a | 27,538,638 | 0 | 27,538,638 |
| b | Estimated tax payments . . . . . . . . . . | 5b | 211,591,000 | 0 | 211,591,000 |
| c | Refund applied for on Form 4466 . . . . . . . | 5c | 0 | 0 | 0 |
| d | Subtract line 5c from the sum of lines 5a and 5b . | 5d | 239,129,638 | 0 | 239,129,638 |
| e | Tax deposited with Form 7004 . . . . . . . . | 5e | 0 | 0 | 0 |
| f | Credit from Form 2439 . . . . . . . . . . | 5f | 0 | 0 | 0 |
| g | Credit for Federal tax on fuels . . . . . . . . | 5g | 0 | 0 | 0 |

INTERNAL REVENUE SERVICE-FA
RECEIVED
JUN. 3 0 2006
SEATTLE, WA

| 6 | Tax deposited or paid with (or after) the filing of the original return . . . . . | 6 | 4,832,384 |
|---|---|---|---|
| 7 | Add lines 5d through 6, column (c) . . . . . . . . . . . . . . . . . | 7 | 244,062,022 |
| 8 | Overpayment, if any, as shown on original return or as later adjusted . . . . . . . . . . . | 8 | 0 |
| 9 | Subtract line 8 from line 7 . . . . . . . . . . . . . . . . . . . . | 9 | 244,062,022 |

**Tax Due or Overpayment (see instructions)**

| 10 | Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" . . . . . . . . . . . . . . . . . ▶ | 10 | 0 |
|---|---|---|---|
| 11 | Overpayment. Subtract line 4, column (c), from line 9 . . . . . . . . . . . . ▶ | 11 | 128,785,239 |
| 12 | Enter the amount of line 11 you want: Credited to 20___ estimated tax ▶ ___ Refunded ▶ | 12 | 128,785,239 |

| Sign Here | Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. | | |
|---|---|---|---|
| | ▶ [Signature] Signature of officer | Date 6/30/06 | ▶ Sr. V.P. Title |

| Paid Preparer's Use Only | Preparer's signature ▶ | | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code | ▶ | | EIN | |
| | | | | Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.
(HTA)

Form **1120X** (Rev. 12-2004)

Form 1120X (Rev. 12-2004)          H.F. Ahmanson & Co. & Cons. Subs., by Washington Mu 95-0479700          Page 2

**Part II    Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, **see What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, **see Carryback Claims** on page 3, and check here  . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

BRANCHING RIGHTS ABANDONMENT LOSS - STATEMENT 1

NOL CARRYFORWARD FROM 1998 - STATEMENT 2

*On October 1, 1998, Home Savings of America was merged with and into Washington Mutual Bank F.A.

Washington Mutual Bank F.A. is the successor in interest to Home Savings of America.

Form **1120X** (Rev. 12-2004)

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending September 30, 1998
Abandonment Loss and Amortization Deductions
Relating to Missouri and Florida Thrift Institutions

During 1998, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1998 taxes because the Internal Revenue Service erred by failing to allow Home an abandonment loss and amortization deductions for rights acquired pursuant to the acquisition of Missouri and Florida thrift institutions. Details of the deductions in issue are set forth below.

### Background

1. <u>The Acquisition.</u> On December 17, 1981, Home acquired Security Federal Savings and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisition of the Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. At the time Home acquired the Missouri and Florida thrift institutions, each of the three was insolvent. FSLIC determined that the Missouri and Florida thrift institutions had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in Missouri and Florida, cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

The principal form of FSLIC Assistance that Home sought and received in connection with the acquisition of the Missouri and Florida thrifts was the right to establish branches in

624922.1

Missouri ("Missouri Branching Rights") and Florida ("Florida Branching Rights"). At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, *i.e.*, branches outside of its home state. In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers. In September 1981, FHLBB further amended its regulations to permit thrifts who acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. *Basis.* Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See, e.g., Crane v. Commissioner,* 331 U.S. 1 (1947). Home purchased the Missouri and Florida Branching Rights from FSLIC for an amount equal to the negative value of the thrifts it acquired, *i.e.*, the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Missouri and Florida Branching Rights, giving Home a cost basis in the Missouri and Florida Branching Rights of $267,503,919 under Code section 1012.

Alternatively, if the Missouri and Florida Branching Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to the merger of the thrifts into Home, Home received basis in these rights under Code section 362(b). The Missouri and Florida Branching Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Missouri and Florida Branching Rights was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Missouri and Florida thrifts received basis in the Missouri and Florida Branching Rights equal to the fair market value of these rights on the date received, $267,503,919. Home's adjusted basis in the Missouri and Florida Branching Rights received from the Missouri and Florida thrifts was the same as the basis of those assets in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

3. *Abandonment.* In 1998, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in Florida. The last branches were sold during 1998 and Home abandoned its Florida Branching Rights in 1998. At that time, Home left the Florida branch banking market with no intention of reestablishing any other branches in Florida. Home previously left the Missouri branch banking market in 1993.

## Claims

1. *Loss on Abandonment of Branching Rights.* Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of its Florida Branching Rights in 1998. Because Home made the affirmative decision to leave the Florida market, sold or otherwise divested itself of all of the Florida branches, and actually left that market in 1998, Home abandoned its Florida Branching Rights in 1998. Home is therefore entitled to a deduction of $267,503,919 for the Florida Branching Rights under section 165 in that year.

2

924922.1

2. Loss Deductions or Amortization Deductions for Other Rights Acquired. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1998. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1998 if such Other Rights were abandoned or became worthless in that year.

3. Reduction in the Gain on the Sale of the Florida Branches. (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the Florida branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the Florida branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1998.

4. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

3

62

& Co., & Cons. Subs., by Washington Mutual Bank F.A. as successor

624922.1

95-0479700   Statement 1

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1998
Net Operating Loss ("NOL") Carryforward

During 1998, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Ahmanson is entitled to a refund for overpayment of 1998 taxes as a result of an NOL carryforward from 1996. The NOL arises from amortization and abandonment loss deductions the Internal Revenue Service ("IRS") failed to allow Home for the 1996 tax year, including the loss from the abandonment of Missouri and Florida Branching Rights. Details of the deductions are set forth in the refund claims for the year ended December 31, 1996, which are attached as Exhibit 1. This claim is an additional claim to the Form 1120X for 1998 filed with the IRS on June 30, 2006.

In addition, Ahmanson requests a refund of assessed interest plus statutory interest as provided by law.

H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual Bank F.A. as successor
95-0479700  Statement 2

| Form **1120X** | **Amended U.S. Corporation** | OMB No. 1545-0132 |
|---|---|---|
| (Rev. December 2004)<br>Department of the Treasury<br>Internal Revenue Service | **Income Tax Return** | **For tax year ending**<br>▶ .......... 12/1996 ..........<br>(Enter month and year.) |

| | Name | Employer identification number |
|---|---|---|
| Please<br>Type<br>or<br>Print | H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual Bank F.A. as successor" | 95-0479700 |
| | Number, street, and room or suite no. (if a P.O. box, see instructions.) | |
| | c/o Washington Mutual, Inc.; PO Box 834, FIS 1520 | |
| | City or town, state, and ZIP code | Telephone number (optional) |
| | Seattle, WA 98111 | |

Enter name and address used on original return (if same as above, write "Same.")

H.F. Ahmanson & Co. & Cons. Subs.; 4900 Rivergrade Road; Irwindale, CA 91706

Internal Revenue Service Center
where original return was filed ▶ Ogden, UT

### Fill in applicable items and use Part II on the back to explain any changes

| **Part I** Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) . . . | 1 | 4,535,652,519 | 0 | 4,535,652,519 |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) . . . . . | 2 | 4,683,490,960 | 267,503,919 | 4,950,994,879 |
| 3 Taxable income. Subtract line 2 from line 1 . . . . | 3 | -147,838,441 | -267,503,919 | -415,342,360 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) . | 4 | 0 | 0 | 0 |

**Payments and Credits (see instructions)**

| | | | | |
|---|---|---|---|---|
| 5 a Overpayment in prior year allowed as a credit . . . | 5a | 9,102,549 | 0 | 9,102,549 |
| b Estimated tax payments . . . . . . . . . . . | 5b | 2,293,000 | 0 | 2,293,000 |
| c Refund applied for on Form 4466 . . . . . . . | 5c | 11,395,549 | 0 | 11,395,549 |
| d Subtract line 5c from the sum of lines 5a and 5b . | 5d | 0 | 0 | 0 |
| e Tax deposited with Form 7004 . . . . . . . . | 5e | 0 | 0 | 0 |
| f Credit from Form 2439 . . . . . . . . . . . | 5f | 0 | 0 | 0 |
| g Credit for Federal tax on fuels . . . . . . . . | 5g | 0 | 0 | 0 |
| 6 Tax deposited or paid with (or after) the filing of the original return . . . . . . . . . . . . . . . | 6 | | | 0 |
| 7 Add lines 5d through 6, column (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | | | 0 |
| 8 Overpayment, if any, as shown on original return or as later adjusted . . . . . . . . . . . . . | 8 | | | |
| 9 Subtract line 8 from line 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | | | 0 |

**Tax Due or Overpayment (see instructions)**

| | | | | |
|---|---|---|---|---|
| 10 Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | 10 | | | 0 |
| 11 Overpayment. Subtract line 4, column (c), from line 9 . . . . . . . . . . . . . . . ▶ | 11 | | | 0 |
| 12 Enter the amount of line 11 you want: Credited to 20 ___ estimated tax ▶ _____ Refunded ▶ | 12 | | | 0 |

| Sign Here | Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. | | |
|---|---|---|---|
| | Signature of officer | Date | Title |

| Paid Preparer's Use Only | Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code ▶ | | EIN | |
| | | | Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.
(HTA)

Form **1120X** (Rev. 12-2004)

Form 1120X (Rev. 12-2004)          H.F. Ahmanson & Co. & Cons. Subs., by Washington M 95-0479700                    Page **2**

**Part II**   **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

BRANCHING RIGHTS ABANDONMENT LOSS - STATEMENT 1

*On October 1, 1998, Home Savings of America was merged with and into Washington Mutual Bank F.A.

Washington Mutual Bank F.A. is the successor in interest to Home Savings of America.

Form **1120X** (Rev. 12-2004)

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1996
Amortization Deductions
Relating to Missouri and Florida Thrift Institutions

During 1996, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1996 taxes because the Internal Revenue Service erred by failing to allow Home amortization deductions relating to rights acquired pursuant to the acquisition of Missouri and Florida Thrift institutions. Details of the deductions in issue are set forth below.

### Background

1. <u>The Acquisition</u>. On December 17, 1981, Home acquired Security Federal Savings and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisition of the Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in Missouri and Florida, cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

2. <u>Basis</u>. Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. See, e.g., Crane v. Commissioner, 331 U.S. 1 (1947). Home purchased the Other Rights from FSLIC for an amount equal to the negative value of the Missouri and Florida thrifts acquired, i.e., the difference between the

liabilities of the Missouri and Florida thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Other Rights, giving Home a cost basis in the Other Rights of $267,503,919 under Code section 1012.

Alternatively, if the Other Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to their merger into Home, Home received basis in the Other Rights under Code section 362(b). The Other Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Other Rights was excludable from the income of the Missouri and Florida thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Missouri and Florida thrifts received basis in the Other Rights equal to the fair market value of the Other Rights on the date received, $267,503,919. Home's adjusted basis in the Other Rights received from the Missouri and Florida thrifts was the same as the basis of that asset in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

## Claims

1. *Amortization Deduction for Other Rights Acquired.* Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida thrifts before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for those Other Rights. Home is entitled to such amortization deductions under section 167 in 1996.

2. *Correlative and Computational Adjustments.* In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

3. *Interest.* Home requests a refund of assessed interest plus statutory interest as provided by law.

624900.1

June 2006 Claim for Tax Year 1998

(by Savings of America)

June 2006 Claim for Tax
Year 1998 (by Savings of
America)

Form **1120X**

(Rev. December 2004)

Department of the Treasury
Internal Revenue Service

## Amended U.S. Corporation
## Income Tax Return

OMB No. 1545-0132

**For tax year ending**

▶ _____ 9/1998 _____

(Enter month and year.)

| | |
|---|---|
| Please Type or Print | **Name**<br>H.F. Ahmanson & Co. & Cons. Subs., by Savings of America, Inc. as substitute agent* | **Employer identification number**<br>95-0479700 |

**Number, street, and room or suite no. (if a P.O. box, see instructions.)**
c/o Washington Mutual, Inc.; PO Box 834, FIS 1520

**City or town, state, and ZIP code**
Seattle, WA 98111

Telephone number (optional)

Enter name and address used on original return (if same as above, write "Same.")

H.F. Ahmanson & Co. & Cons. Subs.; 4900 Rivergrade Road; Irwindale, CA 91706

Internal Revenue Service Center
where original return was filed ▶   Ogden, UT

## Fill in applicable items and use Part II on the back to explain any changes

| **Part I** Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change— increase or (decrease)— explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) . . . | 1 | 4,338,552,206 | 0 | 4,338,552,206 |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or line 23 and 25c, Form 1120-A) . . . . . | 2 | 3,638,121,821 | 371,068,147 | 4,009,189,968 |
| 3 Taxable income. Subtract line 2 from line 1 . . . | 3 | 700,430,385 | -371,068,147 | 329,362,238 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) . | 4 | 245,147,810 | -129,871,027 | 115,276,783 |

**Payments and Credits (see instructions)**

| | | | | |
|---|---|---|---|---|
| 5 a Overpayment in prior year allowed as a credit . . . | 5a | 27,538,638 | 0 | 27,538,638 |
| b Estimated tax payments . . . . . . . . . | 5b | 211,591,000 | 0 | 211,591,000 |
| c Refund applied for on Form 4466 . . . . . . . | 5c | 0 | | 0 |
| d Subtract line 5c from the sum of lines 5a and 5b . | 5d | 239,129,638 | 0 | 239,129,638 |
| e Tax deposited with Form 7004 . . . . . . . . | 5e | 0 | | 0 |
| f Credit from Form 2439 . . . . . . . . . . | 5f | 0 | 0 | 0 |
| g Credit for Federal tax on fuels . . . . . . . | 5g | 0 | 0 | 0 |
| 6 Tax deposited or paid with (or after) the filing of the original return . . . . . . | 6 | | | 4,932,384 |
| 7 Add lines 5d through 6, column (c) . . . . . . | 7 | | | 244,062,022 |
| 8 Overpayment, if any, as shown on original return or as later adjusted . . . . . . . | 8 | | | 0 |
| 9 Subtract line 8 from line 7 . . . . . . . . . | 9 | | | 244,062,022 |

INTERNAL ~~REVENUE SERVICE-PA~~
~~RECEIVED~~

JUN 3 0 2006

SEATTLE, WA

**Tax Due or Overpayment (see instructions)**

| | | | |
|---|---|---|---|
| 10 Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" . . . . . . . . . . . . . . . . . . . . . . ▶ | 10 | | 0 |
| 11 Overpayment. Subtract line 4, column (c), from line 9 . . . . . . . . . . . . ▶ | 11 | | 128,785,239 |
| 12 Enter the amount of line 11 you want: Credited to 20 ___ estimated tax ▶ ___ Refunded ▶ | 12 | | 128,785,239 |

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

**Sign Here**

| Signature of officer | Date 6/30/06 | Title Sr. V.P. |
|---|---|---|

**Paid Preparer's Use Only**

| Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code ▶ | | EIN | |
| | | Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.

(HTA)

Form **1120X** (Rev. 12-2004)

Form 1120X (Rev. 12-2004)          H.F. Ahmanson & Co. & Cons. Subs., by Savings of Am#95-0479700                    Page **2**

**Part II**    **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

BRANCHING RIGHTS ABANDONMENT LOSS - STATEMENT 1

NOL CARRYFORWARD FROM 1996 - STATEMENT 2

\*Savings of America, Inc. was a member of the H.F. Ahmanson consolidated group in 1998.

Pursuant to section 8 of Rev. Proc. 2002-43 and Treas. Reg. 1.1502-77A, Savings of America, Inc.

has been designated the substitute agent for H.F. Ahmanson & Co. & Consolidated Subsidiaries.

Form **1120X** (Rev. 12-2004)

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending September 30, 1998
Abandonment Loss and Amortization Deductions
Relating to Missouri and Florida Thrift Institutions


During 1998, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1998 taxes because the Internal Revenue Service erred by failing to allow Home an abandonment loss and amortization deductions for rights acquired pursuant to the acquisition of Missouri and Florida thrift institutions. Details of the deductions in issue are set forth below.

<u>Background</u>

1. <u>The Acquisition.</u> On December 17, 1981, Home acquired Security Federal Savings and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisition of the Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. At the time Home acquired the Missouri and Florida thrift institutions, each of the three was insolvent. FSLIC determined that the Missouri and Florida thrift institutions had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in Missouri and Florida, cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

The principal form of FSLIC Assistance that Home sought and received in connection with the acquisition of the Missouri and Florida thrifts was the right to establish branches in

624822.1

H.F. Ahmanson & Co. & Cons. Subs. by Savings of America, Inc. as substitute agent        95-0478700    Statement 1

Missouri ("Missouri Branching Rights") and Florida ("Florida Branching Rights").  At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, *i.e.*, branches outside of its home state.  In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers.  In September 1981, FHLBB further amended its regulations to permit thrifts who acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. Basis.  Code section 1012 provides that the basis of property is equal to the cost of that property.  Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer.  *See, e.g., Crane v. Commissioner,* 331 U.S. 1 (1947).  Home purchased the Missouri and Florida Branching Rights from FSLIC for an amount equal to the negative value of the thrifts it acquired, *i.e.*, the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Missouri and Florida Branching Rights, giving Home a cost basis in the Missouri and Florida Branching Rights of $267,503,919 under Code section 1012.

Alternatively, if the Missouri and Florida Branching Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to the merger of the thrifts into Home, Home received basis in these rights under Code section 362(b).  The Missouri and Florida Branching Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f).  The receipt of the Missouri and Florida Branching Rights was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362.  The Missouri and Florida thrifts received basis in the Missouri and Florida Branching Rights equal to the fair market value of these rights on the date received, $267,503,919.  Home's adjusted basis in the Missouri and Florida Branching Rights received from the Missouri and Florida thrifts was the same as the basis of those assets in the hands of the thrifts immediately before the transfer.  I.R.C. § 362(b).

3. Abandonment.  In 1998, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in Florida.  The last branches were sold during 1998 and Home abandoned its Florida Branching Rights in 1998.  At that time, Home left the Florida branch banking market with no intention of reestablishing any other branches in Florida.  Home previously left the Missouri branch banking market in 1993.

### Claims

1. Loss on Abandonment of Branching Rights.  Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of its Florida Branching Rights in 1998.  Because Home made the affirmative decision to leave the Florida market, sold or otherwise divested itself of all of the Florida branches, and actually left that market in 1998, Home abandoned its Florida Branching Rights in 1998.  Home is therefore entitled to a deduction of $267,503,919 for the Florida Branching Rights under section 165 in that year.

624922.1

2. <u>Loss Deductions or Amortization Deductions for Other Rights Acquired.</u> To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1998. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1998 if such Other Rights were abandoned or became worthless in that year.

3. <u>Reduction in the Gain on the Sale of the Florida Branches.</u> (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the Florida branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the Florida branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1998.

4. <u>Correlative and Computational Adjustments.</u> In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. <u>Interest.</u> Home requests a refund of assessed interest plus statutory interest as provided by law.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1998
Net Operating Loss ("NOL") Carryforward

During 1998, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Ahmanson is entitled to a refund for overpayment of 1998 taxes as a result of an NOL carryforward from 1996. The NOL arises from amortization and abandonment loss deductions the Internal Revenue Service ("IRS") failed to allow Home for the 1996 tax year, including the loss from the abandonment of Missouri and Florida Branching Rights. Details of the deductions are set forth in the refund claims for the year ended December 31, 1996, which are attached as Exhibit 1. This claim is an additional claim to the Form 1120X for 1998 filed with the IRS on June 30, 2006.

In addition, Ahmanson requests a refund of assessed interest plus statutory interest as provided by law.

H.F. Ahmanson & Co. & Cons. Subs., by Savings of America, Inc. as substitute agent
95-0479700  Statement 2

| Form **1120X**<br>(Rev. December 2004)<br>Department of the Treasury<br>Internal Revenue Service | **Amended U.S. Corporation<br>Income Tax Return** | OMB No. 1545-0132<br>**For tax year ending**<br>▶ ........12/1996........<br>(Enter month and year.) |
|---|---|---|

| Please<br>Type<br>or<br>Print | Name<br>H.F. Ahmanson & Co. & Cons. Subs., by Savings of America, Inc. as substitute agent* | Employer identification number<br>95-0479700 |
|---|---|---|
| | Number, street, and room or suite no. (If a P.O. box, see instructions.)<br>c/o Washington Mutual, Inc.; PO Box 834, FIS 1520 | |
| | City or town, state, and ZIP code<br>Seattle, WA 98111 | Telephone number (optional) |

Enter name and address used on original return (if same as above, write "Same.")

H.F. Ahmanson & Co. & Cons. Subs.; 4900 Rivergrade Road; Irwindale, CA 91706

Internal Revenue Service Center
where original return was filed   ▶   Ogden, UT

### Fill in applicable items and use Part II on the back to explain any changes

| **Part I** Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) . . . | 1 | 4,535,652,519 | 0 | 4,535,652,519 |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) . . . . . | 2 | 4,683,490,960 | 267,503,919 | 4,950,994,879 |
| 3 Taxable income. Subtract line 2 from line 1 . . . . | 3 | -147,838,441 | -267,503,919 | -415,342,360 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) . | 4 | 0 | 0 | 0 |

**Payments and Credits (see instructions)**

| | | | | |
|---|---|---|---|---|
| 5 a Overpayment in prior year allowed as a credit . . . | 5a | 269,883 | 0 | 269,883 |
| b Estimated tax payments . . . . . . . . . . . | 5b | 172,788,000 | 0 | 172,788,000 |
| c Refund applied for on Form 4466 . . . . . . . . | 5c | 0 | 0 | 0 |
| d Subtract line 5c from the sum of lines 5a and 5b . . | 5d | 173,077,883 | 0 | 173,077,883 |
| e Tax deposited with Form 7004 . . . . . . . . . | 5e | 0 | 0 | 0 |
| f Credit from Form 2439 . . . . . . . . . . . . | 5f | 0 | 0 | 0 |
| g Credit for Federal tax on fuels . . . . . . . . . | 5g | 0 | 0 | 0 |
| 6 Tax deposited or paid with (or after) the filing of the original return . . . . . . . . . . . . . . . | 6 | | | 0 |
| 7 Add lines 5d through 6, column (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | | | 173,077,883 |
| 8 Overpayment, if any, as shown on original return or as later adjusted . . . . . . . . . . . . . . . | 8 | | | 9,102,549 |
| 9 Subtract line 8 from line 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | | | 163,975,334 |

**Tax Due or Overpayment (see instructions)**

| | | | | |
|---|---|---|---|---|
| 10 Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | 10 | | | 0 |
| 11 Overpayment. Subtract line 4, column (c), from line 9 . . . . . . . . . . . . . . . . . . . . ▶ | 11 | | | 163,975,334 |
| 12 Enter the amount of line 11 you want: Credited to 20___ estimated tax ▶ ___ Refunded ▶ | 12 | | | 163,975,334 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| ▶ | | |
|---|---|---|
| Signature of officer | Date | Title |

| **Paid Preparer's Use Only** | Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code ▶ | | EIN | |
| | | | Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.
(HTA)

Form **1120X** (Rev. 12-2004)

Form 1120X (Rev. 12-2004)          H.F. Ahmanson & Co. & Cons. Subs., by Savings of Am 95-0479700                    Page 2

**Part II**   **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

BRANCHING RIGHTS ABANDONMENT LOSS - STATEMENT 1

\*Savings of America, Inc. was a member of the H.F. Ahmanson consolidated group in 1994.

Pursuant to section 8 of Rev. Proc. 2002-43 and Treas. Reg. 1.1502-77A, Savings of America, Inc.

has been designated the substitute agent for H.F. Ahmanson & Co. & Consolidated Subsidiaries.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1996
Amortization Deductions
Relating to Missouri and Florida Thrift Institutions

During 1996, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1996 taxes because the Internal Revenue Service erred by failing to allow Home amortization deductions relating to rights acquired pursuant to the acquisition of Missouri and Florida Thrift institutions. Details of the deductions in issue are set forth below.

### Background

1. The Acquisition. On December 17, 1981, Home acquired Security Federal Savings and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisition of the Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in Missouri and Florida, cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

2. Basis. Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See, e.g., Crane v. Commissioner,* 331 U.S. 1 (1947). Home purchased the Other Rights from FSLIC for an amount equal to the negative value of the Missouri and Florida thrifts acquired, *i.e.,* the difference between the

77

624900.1

liabilities of the Missouri and Florida thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Other Rights, giving Home a cost basis in the Other Rights of $267,503,919 under Code section 1012.

Alternatively, if the Other Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to their merger into Home, Home received basis in the Other Rights under Code section 362(b). The Other Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Other Rights was excludable from the income of the Missouri and Florida thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Missouri and Florida thrifts received basis in the Other Rights equal to the fair market value of the Other Rights on the date received, $267,503,919. Home's adjusted basis in the Other Rights received from the Missouri and Florida thrifts was the same as the basis of that asset in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

## Claims

1. _Amortization Deduction for Other Rights Acquired._ Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida thrifts before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for those Other Rights. Home is entitled to such amortization deductions under section 167 in 1996.

2. _Correlative and Computational Adjustments._ In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

3. _Interest._ Home requests a refund of assessed interest plus statutory interest as provided by law.

634900.1

June 2006 Claim for Tax Year 1998

(by Washington Mutual, Inc.)

June 2006 Claim for Tax
Year 1998 (by Wash.
Mutual, Inc.)

| Form **1120X** | Amended U.S. Corporation Income Tax Return | OMB No. 1545-0132 |
|---|---|---|
| (Rev. December 2004)<br>Department of the Treasury<br>Internal Revenue Service | | **For tax year ending**<br>▶ 9/1998<br>(Enter month and year.) |

| Please Type or Print | Name<br>H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual, Inc. as successor* | Employer identification number<br>95-0479700 |
|---|---|---|
| | Number, street, and room or suite no. (If a P.O. box, see instructions.)<br>c/o Washington Mutual, Inc.; PO Box 834, FIS 1520 | |
| | City or town, state, and ZIP code<br>Seattle, WA 98111 | Telephone number (optional) |

Enter name and address used on original return (if same as above, write "Same.")

H.F. Ahmanson & Co. & Cons. Subs.; 4900 Rivergrade Road; Irwindale, CA 91706

Internal Revenue Service Center
where original return was filed        Ogden, UT

### Fill in applicable items and use Part II on the back to explain any changes

| **Part I** Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) . . . | 1 | 4,338,552,206 | 0 | 4,338,552,206 |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) . . . . . | 2 | 3,638,121,821 | 371,068,147 | 4,009,189,968 |
| 3 Taxable income. Subtract line 2 from line 1 . . . | 3 | 700,430,385 | -371,068,147 | 329,362,238 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) . | 4 | 245,147,810 | -129,871,027 | 115,276,783 |

**Payments and Credits (see instructions)**

| | | | | |
|---|---|---|---|---|
| 5 a Overpayment in prior year allowed as a credit . . . | 5a | 27,538,638 | 0 | 27,538,638 |
| b Estimated tax payments . . . . . . . . . . | 5b | 211,591,000 | 0 | 211,591,000 |
| c Refund applied for on Form 4466 . . . . . . . | 5c | 0 | 0 | 0 |
| d Subtract line 5c from the sum of lines 5a and 5b . | 5d | 239,129,638 | 0 | 239,129,638 |
| e Tax deposited with Form 7004 . . . . . . . . | 5e | 0 | 0 | 0 |
| f Credit from Form 2439 . . . . . . . . . . | 5f | 0 | 0 | 0 |
| g Credit for Federal tax on fuels . . . . . . . . | 5g | | 0 | 0 |
| 6 Tax deposited or paid with (or after) the filing of the original return . . . . . . . . . . . . | 6 | | | 4,932,384 |
| 7 Add lines 5d through 6, column (c) . . . . . . . . . . . . . . . . . . . . . . . | 7 | | | 244,062,022 |
| 8 Overpayment, if any, as shown on original return or as later adjusted . . . . . . . . . . . | 8 | | | 0 |
| 9 Subtract line 8 from line 7 . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | | | 244,062,022 |

INTERNAL REVENUE SERVICE TA
RECEIVED
JUN 30 2006
SEATTLE, WA

**Tax Due or Overpayment (see instructions)**

| | | |
|---|---|---|
| 10 Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | 10 | 0 |
| 11 Overpayment. Subtract line 4, column (c), from line 9 . . . . . . . . . . . . . . ▶ | 11 | 128,785,239 |
| 12 Enter the amount of line 11 you want: Credited to 20___ estimated tax ▶        Refunded ▶ | 12 | 128,785,239 |

| Sign Here | Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. | | |
|---|---|---|---|
| | Signature of officer | Date  6/30/06 | Title  S.V.P. |

| Paid Preparer's Use Only | Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code ▶ | | EIN | |
| | | | Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.        Form **1120X** (Rev. 12-2004)
(HTA)

80

Form 1120X (Rev. 12-2004)         H.F. Ahmanson & Co. & Cons. Subs., by Washington Mi95-0479700                Page **2**

**Part II**   **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

BRANCHING RIGHTS ABANDONMENT LOSS - STATEMENT 1

NOL CARRYFORWARD FROM 1995 - STATEMENT 2

*On October 1, 1998, H.F. Ahmanson was merged with and into Washington Mutual, Inc.

Washington Mutual, Inc. is the successor in interest to H.F. Ahmanson.

Form **1120X** (Rev. 12-2004)

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending September 30, 1998
Abandonment Loss and Amortization Deductions
Relating to Missouri and Florida Thrift Institutions

During 1998, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1998 taxes because the Internal Revenue Service erred by failing to allow Home an abandonment loss and amortization deductions for rights acquired pursuant to the acquisition of Missouri and Florida thrift institutions. Details of the deductions in issue are set forth below.

### Background

1. The Acquisition. On December 17, 1981, Home acquired Security Federal Savings and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisition of the Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. At the time Home acquired the Missouri and Florida thrift institutions, each of the three was insolvent. FSLIC determined that the Missouri and Florida thrift institutions had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in Missouri and Florida, cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

The principal form of FSLIC Assistance that Home sought and received in connection with the acquisition of the Missouri and Florida thrifts was the right to establish branches in

624922.1

H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual, Inc. as successor          95-0479700    Statement 1

82.

Missouri ("Missouri Branching Rights") and Florida ("Florida Branching Rights").  At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, *i.e.*, branches outside of its home state.  In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers.  In September 1981, FHLBB further amended its regulations to permit thrifts who acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. Basis.  Code section 1012 provides that the basis of property is equal to the cost of that property.  Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer.  *See, e.g., Crane v. Commissioner*, 331 U.S. 1 (1947).  Home purchased the Missouri and Florida Branching Rights from FSLIC for an amount equal to the negative value of the thrifts it acquired, *i.e.*, the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Missouri and Florida Branching Rights, giving Home a cost basis in the Missouri and Florida Branching Rights of $267,503,919 under Code section 1012.

Alternatively, if the Missouri and Florida Branching Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to the merger of the thrifts into Home, Home received basis in these rights under Code section 362(b).  The Missouri and Florida Branching Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f).  The receipt of the Missouri and Florida Branching Rights was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362.  The Missouri and Florida thrifts received basis in the Missouri and Florida Branching Rights equal to the fair market value of these rights on the date received, $267,503,919.  Home's adjusted basis in the Missouri and Florida Branching Rights received from the Missouri and Florida thrifts was the same as the basis of those assets in the hands of the thrifts immediately before the transfer.  I.R.C. § 362(b).

3. Abandonment.  In 1998, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in Florida.  The last branches were sold during 1998 and Home abandoned its Florida Branching Rights in 1998.  At that time, Home left the Florida branch banking market with no intention of reestablishing any other branches in Florida.  Home previously left the Missouri branch banking market in 1993.

### Claims

1. *Loss on Abandonment of Branching Rights*.  Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of its Florida Branching Rights in 1998.  Because Home made the affirmative decision to leave the Florida market, sold or otherwise divested itself of all of the Florida branches, and actually left that market in 1998, Home abandoned its Florida Branching Rights in 1998.  Home is therefore entitled to a deduction of $267,503,919 for the Florida Branching Rights under section 165 in that year.

624922.1

95-0478700   Statement 1

2. <u>Loss Deductions or Amortization Deductions for Other Rights Acquired.</u> To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1998. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1998 if such Other Rights were abandoned or became worthless in that year.

3. <u>Reduction in the Gain on the Sale of the Florida Branches.</u> (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the Florida branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the Florida branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1998.

4. <u>Correlative and Computational Adjustments.</u> In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. <u>Interest.</u> Home requests a refund of assessed interest plus statutory interest as provided by law.

624922.1

R5-0478700    Statement 1

| Form **1120X** | | | | | OMB No. 1545-0132 |
| :--- | :--- | :--- | :--- | :--- | :--- |

**Form 1120X**
(Rev. December 2004)
Department of the Treasury
Internal Revenue Service

**Amended U.S. Corporation Income Tax Return**

OMB No. 1545-0132

**For tax year ending**
▶ ........ 12/1998 ........
(Enter month and year.)

Please Type or Print

Name
H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual, Inc. as successor*

Employer identification number
95-0479700

Number, street, and room or suite no. (if a P.O. box, see instructions.)
c/o Washington Mutual, Inc.; PO Box 834, FIS 1520

City or town, state, and ZIP code
Seattle, WA 98111

Telephone number (optional)

Enter name and address used on original return (if same as above, write "Same.")
H.F. Ahmanson & Co. & Cons. Subs.; 4900 Rivergrade Road; Irwindale, CA 91706

Internal Revenue Service Center
where original return was filed ▶ Ogden, UT

### Fill in applicable items and use Part II on the back to explain any changes

| **Part I** Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change— increase or (decrease)— explain in Part II | (c) Correct amount |
| :--- | :--- | ---: | ---: | ---: |
| 1 Total income (Form 1120 or 1120-A, line 11) . . . | 1 | 4,535,652,519 | 0 | 4,535,652,519 |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) . . . . . | 2 | 4,683,490,960 | 267,503,919 | 4,950,994,879 |
| 3 Taxable income. Subtract line 2 from line 1 . . . . | 3 | -147,838,441 | -267,503,919 | -415,342,360 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) . | 4 | 0 | | 0 |

**Payments and Credits (see instructions)**

| | | | | |
| :--- | :--- | ---: | ---: | ---: |
| 5 a Overpayment in prior year allowed as a credit . . . | 5a | 9,102,549 | 0 | 9,102,549 |
| b Estimated tax payments . . . . . . . . . . | 5b | 2,293,000 | 0 | 2,293,000 |
| c Refund applied for on Form 4466 . . . . . . . . | 5c | 11,395,549 | 0 | 11,395,549 |
| d Subtract line 5c from the sum of lines 5a and 5b . . | 5d | 0 | 0 | 0 |
| e Tax deposited with Form 7004 . . . . . . . . . | 5e | 0 | 0 | 0 |
| f Credit from Form 2439 . . . . . . . . . . . | 5f | 0 | 0 | 0 |
| g Credit for Federal tax on fuels . . . . . . . . | 5g | 0 | 0 | 0 |

| | | | |
| :--- | :--- | :--- | ---: |
| 6 Tax deposited or paid with (or after) the filing of the original return . . . . . . . . . . . . . | 6 | | 0 |
| 7 Add lines 5d through 6, column (c) . . . . . . . . . . . . . . . . . . . . . . . . | 7 | | 0 |
| 8 Overpayment, if any, as shown on original return or as later adjusted . . . . . . . . . . . | 8 | | |
| 9 Subtract line 8 from line 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | | 0 |

**Tax Due or Overpayment (see instructions)**

| | | | |
| :--- | :--- | :--- | ---: |
| 10 Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | 10 | | 0 |
| 11 Overpayment. Subtract line 4, column (c), from line 9 . . . . . . . . . . . . . . . ▶ | 11 | | 0 |
| 12 Enter the amount of line 11 you want: Credited to 20 ___ estimated tax ▶ _____ Refunded ▶ | 12 | | 0 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Signature of officer | | Date | Title |
| :--- | :--- | :--- | :--- |

**Paid Preparer's Use Only**

| Preparer's signature ▶ | | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
| :--- | :--- | :--- | :--- | :--- |
| Firm's name (or yours if self-employed), address, and ZIP code ▶ | | | EIN | |
| | | | Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.
(HTA)

Form **1120X** (Rev. 12-2004)

Form 1120X (Rev. 12-2004)      H.F. Ahmanson & Co. & Cons. Subs., by Washington Mi 95-0479700                    Page **2**

**Part II**   Explanation of Changes to Items in Part I (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here  . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

BRANCHING RIGHTS ABANDONMENT LOSS - STATEMENT 1

*On October 1, 1998, H.F. Ahmanson was merged with and into Washington Mutual, Inc.

Washington Mutual, Inc. is the successor in interest to H.F. Ahmanson.

Form **1120X** (Rev. 12-2004)

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1996
Amortization Deductions
Relating to Missouri and Florida Thrift Institutions

During 1996, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1996 taxes because the Internal Revenue Service erred by failing to allow Home amortization deductions relating to rights acquired pursuant to the acquisition of Missouri and Florida Thrift institutions. Details of the deductions in issue are set forth below.

## Background

1. The Acquisition. On December 17, 1981, Home acquired Security Federal Savings and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations under section 368(a)(1)(G) of the Internal Revenue Code ("Code"). The acquisition of the Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts.

FSLIC Assistance of one or more types was provided, including, but not limited to, the right to establish branches in Missouri and Florida, cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired toward regulatory capital requirements. In addition to the FSLIC Assistance enumerated above, Home acquired other rights ("Other Rights").

2. Basis. Code section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. See, e.g., Crane v. Commissioner, 331 U.S. 1 (1947). Home purchased the Other Rights from FSLIC for an amount equal to the negative value of the Missouri and Florida thrifts acquired, i.e., the difference between the

liabilities of the Missouri and Florida thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Other Rights, giving Home a cost basis in the Other Rights of $267,503,919 under Code section 1012.

Alternatively, if the Other Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to their merger into Home, Home received basis in the Other Rights under Code section 362(b). The Other Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Other Rights was excludable from the income of the Missouri and Florida thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Missouri and Florida thrifts received basis in the Other Rights equal to the fair market value of the Other Rights on the date received, $267,503,919. Home's adjusted basis in the Other Rights received from the Missouri and Florida thrifts was the same as the basis of that asset in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

## Claims

1. <u>Amortization Deduction for Other Rights Acquired.</u> Under the Assistance Agreement, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida thrifts before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for those Other Rights. Home is entitled to such amortization deductions under section 167 in 1996.

2. <u>Correlative and Computational Adjustments.</u> In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

3. <u>Interest.</u> Home requests a refund of assessed interest plus statutory interest as provided by law.

**2**

434900.1

Informal Claim filed on April 9, 2002

Informal Claim filed on
April 9, 2002

NPA 11-42          April 9, 2002

# MEMORANDUM

TO:      Cheryl Crane, Internal Revenue Service

FROM:   Randy J. Churchill, Washington Mutual

RE:      Abandonment of Interstate Branching Rights

---

This memorandum sets forth the factual background and the legal analysis relating to the entitlement of Home Savings of America ("Home") to deductions under Section 165 of the Internal Revenue Code (the "Code")[1] for the losses that it sustained when it abandoned its right to establish branches in Illinois during 1994, New York during 1995, Ohio during 1995, and Florida during 1998.

## I.      FACTUAL BACKGROUND

Home, a wholly-owned subsidiary of H.F. Ahmanson & Company, was at all relevant times a federally charted savings and loan association headquartered in southern California. Home acquired the following institutions during the years indicated below:

1.      During 1981, Home acquired Southern Federal Savings and Loan Association, a federally chartered mutual savings and loan association headquartered in Pompano Beach, Florida (the "Florida Institution").

2.      During 1982, Home acquired Hyde Park Federal Savings and Loan Association, a federally chartered mutual savings and loan association headquartered in Chicago, Illinois (the "Illinois Institution").

3.      During 1984, Home acquired Century Federal Savings and Loan Association of Long Island (f/k/a Lawrence-Cedarhurst), a federally chartered mutual savings and loan association headquartered in Long Island (Cedarhurst), New York (the "New York Institution").

---

[1] Unless otherwise indicated, all Section references are to the Internal Revenue Code as in effect for the period in question.

284 of 481

NPA 11-42

4.     During 1985, Home acquired Permanent Savings and Loan Association, a federally chartered mutual savings and loan association headquartered in Hamilton, Ohio (the "Ohio Institution").[2]

### A.     The S&L Crisis—In general

Home's acquisition of the Institutions (the "Acquisitions") occurred during the midst of the financial crisis that faced the thrift industry during the early 1980's. During this period, an unprecedented number of thrifts approached insolvency. The Federal Savings and Loan Insurance Corporation (the "FSLIC") was the federal agency that was responsible for insuring thrift deposits, as well as regulating all federally insured thrifts. The Federal Home Loan Bank Board ("FHLBB") was the agency that was the operating head of the FSLIC. The FSLIC and the FHLBB determined that the FSLIC lacked the funds necessary to liquidate all failing thrifts. They thus attempted to mitigate the FSLIC's insurance liability by encouraging healthy thrifts to take over failing thrift institutions. However, because the fair market value of the liabilities of the failing thrift institutions far outstripped the fair market value of their assets, such transactions were not intrinsically attractive to the healthy thrift institutions.

In order to encourage the healthy thrift institutions to take over the failing thrift institutions, the FSLIC, acting pursuant to its authority under section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f) (1976 ed. Supp. V) (repealed 1989), provided financial assistance ("FSLIC Assistance") to those institutions. Although such assistance often included cash, the FSLIC did not have sufficient cash to facilitate such transactions with cash subsidies alone. Accordingly, it turned to financial assistance in the form of cash substitutes in order to facilitate such transactions. Starting as of March 30, 1981, a principal form of such assistance was interstate branching rights.

### B.     Home's Acquisition of the Institutions

Because each Institution was insolvent at the time it was acquired by Home, its acquisition by Home was a supervisory merger within the meaning of section 402(j) of the National Housing Act, as amended, 12 U.S.C. 1725(j). As set forth in the table below, each of the Institutions had a negative net worth at the time that it was acquired by Home.

---

2  The Illinois Institution, New York Institution, Ohio Institution, and Florida Institution will sometimes collectively be referred to as the "Institutions".

285 of 481

NPA 11-42

| | Illinois Institution | New York Institution | Ohio Institutions | Florida Institution |
|---|---|---|---|---|
| Total Assets | $209,261,739 | $501,733,000 | $405,061,000 | $436,024,975 |
| Total Liabilities | $301,401,842 | $643,425,000 | $437,730,000 | $615,085,534 |
| Negative Net Worth | <$92,140,103> | <$141,692,000> | <$32,669,000> | <$179,060,559> |

Since at the time of each Acquisition the total liabilities of each Institution acquired exceeded the fair market value of its assets ("Excess Liabilities"), Financial Assistance was a necessity to Home's acquisition of the Institutions. The principal form of Financial Assistance that Home negotiated for, and received, in connection with the Acquisition of (a) the Illinois Institution was the right to establish branches in the State of Illinois (the "Illinois Branching Rights"), (b) the Acquisition of the New York Institution was the right to establish branches in the State of New York (the "New York Branching Rights"), (c) the Acquisition of the Ohio Institution was the right to establish branches in the State of Ohio ("Ohio Branching Rights"), and (d) the Acquisition of the Florida Institution was the right to establish branches in the State of Florida (the "Florida Branching Rights") (these branching rights will collectively be referred to as the "Branching Rights"). At the time of each of the Acquisitions, the ability of a savings and loan association to establish branches across state lines was limited by regulatory policies that prohibited interstate branching. In 1981, in response to the financial crisis facing the thrift industry, the regulations were amended to permit the FSLIC to provide interstate branching rights in the context of supervisory mergers. Accordingly, at the time of each Acquisition, interstate branching rights was a valuable asset that could only be obtained in the context of a supervisory merger. Had Home not agreed to the receipt of the Branching Rights as a form of Financial Assistance in connection with the Acquisition of each of the Institutions, the FSLIC would have been required to provide additional cash to Home in the amount of the Excess Liabilities of each Institution in order to induce it to acquire the Institution.

C.    Home's Abandonment of the Branching Rights

During the years 1994 through 1998, Home sold all of the branches that it had acquired in connection with the Acquisitions. Specifically, Home sold the (a) Illinois branches during 1994, (b) New York branches during 1995, (c) Ohio branches during 1995, and (d) Florida branches during 1998. At the time of the disposition of those branches, Home intended to cease and did cease to conduct business in those states. Home has not conducted any business in those states since the sale of those branches.

286 of 431

NPA 11-42

## II.   TAXPAYER'S POSITION

It is the taxpayer's position that Home is entitled to an ordinary loss deduction under Section 165 (a) for 1994 in the amount of $92,140,103 for the abandonment of its Illinois Branching, (b) for 1995 in the amount of $141,692,000 for the abandonment of the New York Branching Rights, (c) for 1998 in the amount of $32,669,000 for the abandonment of the Ohio Branching Rights, and (d) for 1998 in the amount of $179,060,559 for the abandonment of the Florida Branching Rights.

## III.   LEGAL FRAMEWORK AND ANALYSIS

Section 165(a) provides that a taxpayer is allowed to deduct any uncompensated losses that it sustains during the taxable year. Treasury Regulation Section 1.165-2 provides that loss realized from the abandonment of property is an ordinary loss. In the case of a loss resulting from the abandonment of property, the loss realized by the taxpayer will be equal to its tax basis in the abandoned property. To establish the abandonment of property, a taxpayer must show that it had the intent to abandon the property and overtly acted to abandon the property. United States v. White Dental Manufacturing, 274 U.S. 398 (1927); Kraft, Inc. v. United States, 30 Fed. Cl. 739 (1994); Pramclee Transportation Company v. United States, 351 F.2d 619 (Ct. Cl. 1965); UFE, Inc. v. Commissioner, 92 T.C. 1314 (1989). Home abandoned its Illinois, New York, Ohio, and Florida Branching Rights during the year in which it disposed of its branches in each of those states with the intention of ceasing to conduct business in those states.

At the time of the abandonment of the Branching Rights, Home had a tax basis in its Branching Rights in the following amounts:

| Branching Rights | Year Abandoned | Tax Basis |
|---|---|---|
| Illinois | 1994 | $ 92,140,103 |
| New York | 1995 | $141,692,000 |
| Ohio | 1995 | $ 32,669,000 |
| Florida | 1998 | $179,060,559 |

Home's position with regard to its basis in the Branching Rights is based on one of the following two alternative reasons. First, it is Home's position that the receipt of the Branching Rights constituted property received from FSLIC pursuant to Section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f) and thus the receipt of that right was excludable from Home's income under Section 597(a) and the right had a basis in Home's hand equal to its fair market

4

287 of 481

NP 11-42

value. Intangible rights have been considered "property" in a wide variety of contexts for tax federal income tax purposes. See, e.g., Stafford v. Commissioner, 727 F.2d 1043 (11th Cir. 1984) (legally unenforceable letter of intent and loan commitment); KFOX, Inc. v. United States, 510 F.2d 1365, 1378 (Ct. Cl. 1975) (contracts for personal services); Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240 (5th Cir. 1973) (subscription lists); Computer & Software, Inc. v. Commissioner, 64 T.C. 233 (1975) (credit information files). Moreover, commercial privileges granted by federal, state, and local governments have been treated as valuable property rights for federal income tax purposes. See Oak Harbor Freigh Lines Inc. v. Commissioner, T.C. Memo. 1999-291. The Branching Rights granted to Home represented a valuable right to conduct business and establish and maintain branches in Illinois, New York, Ohio, and Florida. Accordingly, those rights constitute property for federal income tax purposes. In addition, the grant of those rights to Home qualified as FSLIC Assistance in the form of a cash substitute. See United States v. Winstar Corp., 116 S. Ct. 2432, 2462-63 (1996). The fair market value of the Illinois, New York, Ohio and Florida Branching Rights at the time of each Acquisition was equal to the Excess Liabilities at that time of the Illinois, New York, Ohio, and Florida Institutions, respectively. Accordingly, Home had a basis of $92,140,103, $141,692,000, $32,669,000, and $179,060,559 in those rights, respectively.

Even assuming that the Branching Rights did not constitute FSLIC Assistance and thus was not covered by Section 597, Home nonetheless had a tax basis in Branching Rights. It is clear that the liabilities assumed by Home in connection with the Acquisition of each of the Institutions exceeded the fair market value of the Institution's assets... FSLIC was the beneficiary of Home's assumption of such Excess Liabilities since FSLIC was primarily liable for this amount as a result of the insolvency of those institutions. In exchange for its assumption of the Excess Liabilities of each Institution, Home received the right to establish branches in the state in which the Institution was located. It is a well-established principle of tax law that liabilities incurred by a taxpayer in connection with the acquisition of property is includible in the cost and thus the basis of the property for federal income tax purposes. See § 1012, Crane v. Commissioner, 331 U.S. 1 (1947). Accordingly, Home had a tax basis in the Illinois, New York, Ohio, and Florida Branching Rights of $92,140,103, $141,692,000, $32,669,000, and $179,060,559, respectively.

288 of 481