# In the United States Court of Federal Claims

Nos. 08-321T, 08-211T
Filed February 21, 2017

| | |
|---|---|
| ) | |
| WASHINGTON MUTUAL, INC., as ) | |
| successor in interest to H. F. ) | |
| AHMANSON & CO. and ) | Tax Refund Claim; Cost Basis; |
| SUBSIDIARIES, et al., ) | Fair Market Valuation; |
| ) | Abandonment Loss Deduction; |
| Plaintiffs, ) | Amortization Deduction; Trial. |
| ) | |
| v. ) | |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ) | |

*Maria O'Toole Jones,* Washington, DC, for Washington Mutual, Inc., as Successor in Interest to H. F. Ahmanson & Co. and Subsidiaries.

*Tamara Shepard*, Washington, DC, for Washington Mutual Bank, a Federal Association, as Successor in Interest to Home Savings of America.

*Thomas David Johnston*, Washington, DC, for Savings of America, Inc., as Substitute Agent for H. F. Ahmanson & Co. and Subsidiaries.

*Jennifer Dover Spriggs,* Attorney of Record, *Caroline D. Ciraolo,* Acting Assistant Attorney General, *David I. Pincus,* Chief, *G. Robson Stewart*, Assistant Chief, *Benjamin C. King*, Of Counsel, *Courtney M. Hutson*, Of Counsel, *Brian J. Sullivan*, Of Counsel, Tax Division, Court of Federal Claims Section, United States Department of Justice, Washington, DC, for defendant.

## **MEMORANDUM OPINION AND ORDER**

GRIGGSBY, Judge

## I.     INTRODUCTION

Plaintiffs, Washington Mutual, Inc., Washington Mutual Bank, and Savings of America, Inc., seek a refund of certain federal taxes paid by H.F. Ahmanson & Co. ("Ahmanson") as the parent company of an affiliated group of corporations including Home Savings of America  ("Home"), during tax years 1991, 1994, 1995 and 1998, based upon the abandonment loss and amortization deductions under the Internal Revenue Code.  During the

1980s, Home acquired several savings and loan institutions with the assistance of the Federal Savings and Loan Insurance Corporation ("FSLIC"). In addition, in 1988, Home acquired the Bowery Savings Bank in a merger with the assistance of the Federal Deposit Insurance Corporation ("FDIC"). At issue in this case is whether plaintiffs can establish Home's cost basis in the intangible assets that were included in the government assistance provided in these transactions and, thereby, establish the amount of the tax refunds to which they are allegedly entitled.

The Court held a trial on these issues, after which the parties submitted post-trial briefs. For the reasons set forth below, the Court concludes that plaintiffs have not established Home's cost basis in the relevant assets to a reasonable degree of certainty. Consequently, plaintiffs have not established the amount of the tax refund to which they are entitled. And so, the Court **DISMISSES** plaintiffs' tax refund claims.

## II.   FINDINGS OF FACT

This section contains the Court's findings of fact as required by Rule 52(a)(1) of the Rules of the United States Court of Federal Claims.[1]

### A.   Overview

Plaintiff Washington Mutual Inc. is a successor in interest to H.F. Ahmanson & Co. Am. Compl. at ¶ 3; 2d Am. Compl. at ¶ 3.[2] Home was a California-chartered savings and loan

---

[1] The Court derives some of these facts from the parties' Amended Joint Stipulation of Facts ("Jt. Stip."), allegations admitted by defendant (from case no. 08-211, "2d Am. Compl."; and from case no. 08-321, "Am. Compl."), and pertinent statutes and regulations. The remaining facts are derived from the transcript of testimony elicited at trial ("Tr.") and the exhibits admitted into evidence during trial ("PX," "DX," or "JX"). Citations to the trial transcript will be to the page and line numbers of the transcript and the last name of the testifying witness.

[2] During the period relevant to this litigation, Ahmanson owned 100 percent of Home. Deihl Tr. vol. 1, 83:22-23. The other plaintiffs in this matter, Washington Mutual, Inc. and Savings of America, Inc., are the successor in interest to Ahmanson and its subsidiaries, and the substitute agent for Ahmanson and its subsidiaries, respectively. Am. Compl. at ¶ 3; 2d Am. Compl. at ¶ 3. At the time plaintiffs commenced this action, Washington Mutual Bank was a wholly owned subsidiary of Washington Mutual, Inc. Am. Compl. at ¶ 5. On October 1, 1998, Washington Mutual, Inc. acquired Ahmanson, and Home merged into Washington Mutual Bank. *Id.* at ¶ 3. In 2008, the FDIC seized Washington Mutual Bank, and Washington Mutual, Inc. subsequently went into bankruptcy. Brouwer Tr. vol. 7, 1357: 5-10. Washington Mutual, Inc. emerged from bankruptcy in 2012, and a liquidating trust known as WMI Liquidating Trust was formed for the unresolved items. *Id.* at 1357:11-14. Washington Mutual, Inc.,

institution, or thrift, based in Los Angeles, California, that became a federally-chartered thrift in 1981.  Jt. Stip. at ¶ 3; Antoci Tr. vol. 2, 291:11; Deihl Tr. vol. 1, 110:6-9.  During the 1970s and 1980s, Home was one of the largest thrifts in the United States.  Deihl Tr. vol. 1, 84:8-10.

During the period 1981 to 1985, Home engaged in four mergers to acquire several failing thrifts with the assistance of the FSLIC (the "FSLIC Mergers").  Am. Compl. at ¶¶ 26, 37, 54; 2d Am. Compl. at ¶¶ 25, 41, 58, 71.  In 1988, Home also acquired the Bowery Savings Bank through a merger with the assistance of the FDIC (the "Bowery Merger") (the FSLIC Mergers and the Bowery Merger are collectively referred to herein as the "Supervisory Mergers").  Am. Compl. at ¶ 75; 2d Am. Compl. at ¶ 88.  In the amended complaints, plaintiffs allege that Home acquired several intangible assets through the government assistance provided in these Supervisory Mergers, to include the right to open deposit-taking branches in certain states other than California (the "Branching Rights") and the contractual approval to treat goodwill created by the transactions as an asset for regulatory accounting purposes (the "RAP Right").  Am. Compl. at ¶¶ 29-30, 39-40, 56-57, 71; 2d Am. Compl. at ¶¶ 28-29, 44-45, 60-61, 73-74, 84, 88.

In this tax refund action, plaintiffs allege that Home obtained a cost basis in the assets acquired through the Supervisory Mergers−including the Branching Rights and the RAP Rights−pursuant to section 1012 of the Internal Revenue Code.  I.R.C. § 1012; Am. Compl. at ¶¶ 35, 44, 61, 74; 2d Am. Compl. at ¶¶ 34, 50-52, 65, 78, 87.  Plaintiffs also allege that Home later abandoned the New York, Florida, Ohio and Illinois Branching Rights that it acquired in the FSLIC Mergers and, as a result, Home was entitled to take an abandonment loss deduction in the amount of Home's cost basis in these rights under section 165 of the Internal Revenue Code.  I.R.C. § 165; Am. Compl. at ¶¶ 84-85, 87, 99, 101, 128; 2d Am. Compl. at ¶ 101.  In addition, plaintiffs allege that Home was also entitled to take certain amortization deductions for a portion of Home's cost basis in the RAP Right acquired in each of the Supervisory Mergers and in certain other intangible assets, pursuant to section 167(a) of the Internal Revenue Code.[3]  2d Am. Compl. at ¶¶ 90, 96, 107-08, 118-19, 121-22, 124-25, 127-28, 130-31.

---

Washington Mutual Bank and WMI Liquidating Trust are collectively referred to herein as "Washington Mutual."

[3] Plaintiffs seek: (1) an amortization deduction for the Florida-Missouri RAP Right in the amount of $6,148,038 for tax years 1991 and 1994; (2) an amortization deduction for the Illinois-Texas RAP Right in the amount of $4,833,675 for tax year 1994; (3) an amortization deduction for the Century RAP Right

### B.       The Savings And Loan Industry And Interest Rate Crisis

Historically, the savings and loan industry had two primary functions.  First, savings and loan institutions collected customer deposits, which were maintained in interest bearing savings accounts.  Deihl Tr. vol. 1, 84:14-16; Antoci Tr. vol. 2, 267:25-268:9.  Second, these thrifts originated and serviced mortgage loans funded by the customer deposits.  Deihl Tr. vol. 1, 84:14-16; Antoci Tr. vol. 2, 267:25-268:9.

During the late 1970s and early 1980s, interest rates reached historic highs due to an attempt by the Federal Reserve to control inflation.  Beesley Tr. vol. 3, 455:8-17; Grabowski Tr. vol. 3, 573:1-24, 578:4-25; PX001 at I-3.  Interest rates peaked in 1981.  PX594 at 189; Grabowski Tr. vol. 3, 581:3-8.  The high interest rates had a devastating effect on the savings and loan industry.  Beesley Tr. vol. 3, 455:14-22; Deihl Tr. vol. 1, 90:6-15; Antoci Tr. vol. 2, 271:6-272:13.  At the time, most savings and loan institutions held primarily 30-year fixed-rate mortgage loans that had been originated when interest rates were low.  Beesley Tr. vol. 3, 455:22-24.  Thrifts were unable to raise the interest rates on these mortgage loans due to the loans' fixed-rate nature.  *Id*.  But, rising interest rates required thrifts to raise the rates that thrifts paid on deposit accounts in order to maintain their customers. Grabowski Tr. vol. 3, 574:5-21, 579:15-23; *cf.* Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. 96-221, 94 Stat 132 (phasing out, from 1981 to 1986, requirements under 12 C.F.R. § 217, also known as Regulation Q, which imposed interest rate ceilings on deposits).

The resulting spread between the interest that thrifts collected on outstanding mortgage loans and the amount of interest that thrifts paid on customer deposits became negative.[4]

---

in the amount of $3,862,146 for tax year 1994; (4) an amortization deduction for the Ohio RAP Right in the amount of $580,500 for tax year 1994; (5) an amortization deduction for the Bowery RAP Right in the amount of $50,677,519 for tax year 1994; (6) an amortization deduction for the Bowery Credit Protection in the amount of $1,000,000, and for the Bowery Favorable Financing in the amount of $133,333 for tax years 1994 and 1995; (7) an abandonment deduction for the Illinois Branching Right in the amount of $56,432,000 for tax year 1994; (8) an abandonment deduction for the Ohio Branching Right in the amount of $19,996,000 for tax year 1995; (9) an abandonment deduction for the New York Branching Right in the amount of $101,966,000 for tax year 1995; and (10) an abandonment deduction for the Florida Branching Right in the amount of $142,886,000 for tax year 1998.  Pl. Post-Trial Br. at 151.

[4] Spread is the difference between the interest rates on new mortgages and new deposit accounts. Grabowski Tr. vol. 3, 585:14-586:10.  Margin is the difference between the interest rates on mortgages and deposit accounts for a thrift's entire portfolio.  *Id.*

Beesley Tr. vol. 3, 455:25-456:1, 456:17-22; Antoci Tr. vol. 2, 271:17-272:4, 272:23-273:9. Along with the so-called "negative spread" caused by high interest rates, the savings and loan industry also suffered during this period from disintermediation—whereby savings and loan customers removed their deposits from savings and loans in favor of alternative investment opportunities paying a higher interest rate. Beesley Tr. vol. 3, 456:6-10; Antoci Tr. vol. 2, 312:8-10, 333:17-19, 338:19-339:19; Deihl Tr. vol. 2, 149:7-14, 162:6-15. As a consequence of high interest rates and disintermediation, many thrifts became insolvent. Beesley Tr. vol. 3, 456:15-457:2.

In an attempt to ease the negative effects of the high interest rate environment on state thrifts, regulators in California allowed its state-chartered thrifts, including Home, to issue variable-rate mortgages ("VRMs") in the late 1970s. Antoci Tr. vol. 2, 272:5-18, 273:18-19; Deihl Tr. vol. 1, 98:10-19. The interest rates for these VRMs were tied to the average cost of funds index reported by the Eleventh Federal Home Loan Bank District cost of funds index ("Eleventh District COFI") and the interest rates were adjusted semi-annually. Antoci. Tr. vol. 2, 274:4-275:5; Deihl Tr. vol. 1, 100:1-8. In the late 1970s, Home began making primarily VRM loans. Antoci. Tr. vol. 2, 273:12-15; Deihl Tr. vol. 1, 97:3-98:9, 99:8-11.

By 1981, the federal government began allowing federally-chartered thrifts to issue adjustable rate mortgages ("ARMs"), which were similar to VRMs. Antoci Tr. vol. 2, 276:8-277:2, 278:11-18; Deihl Tr. vol. 1, 102:23-104:4. The federal government's decision to allow thrifts to issue ARMs prompted Home to become a federally-chartered thrift in December of 1981. Jt. Stip. at ¶ 3; Antoci Tr. vol. 2, 276:22-277:2; *see* Deihl Tr. vol. 1, 103:24-104:1; Am. Compl. at ¶ 16; 2d Am. Compl. at ¶¶ 15, 26. And so, by late 1981, Home's loan originations were almost exclusively ARMs. Antoci Tr. vol. 2, 281:24-282:14; JX039 at KS-009473l; JX041 at KS-009655.[5]

By late 1982, interest rates had dropped by approximately two percent, from 16% to 14%, and loan originations increased industry-wide from approximately $40,000,000,000 in 1982 to approximately $90,000,000,000 in 1983. PX594 at 216, 234; Deihl Tr. vol. 1, 105:25-

---

[5] Home typically priced ARMs at a 2.5% contractual spread over the Eleventh District COFI. Antoci Tr. 279:9-18, 314:16-3125:1; PX592 at SCC0045; PX124 at KS-014987. In markets outside of California, Home offered a small premium on deposits while still obtaining funds at below the Eleventh District COFI. PX594 at 123; Kline Tr. vol. 7, 1325:14-20.

106:3; *cf*. DX204 at 117-18; PX124 at KS-014987.  Disintermediation also slowed during this period, but it continued to impact the savings and loan industry.  Grabowski Tr. vol. 4, 697:13-698:7; Hargett Tr. vol. 9, 1983:25-1984:3.

In 1983 interest rates dropped to approximately 13%, then rose to almost 14% in 1984. PX594 at 234.  Interest rates then decreased to just above 10% at the beginning of 1986.  *Id*. Industry-wide loan originations increased during the period 1983 to 1986.  *Id*. at 216.  In 1982, mortgage originations bottomed out at less than $40,000,000,000, but after 1982, mortgage originations steadily rose.  *Id*.  Industry-wide loan originations reached nearly $180,000,000,000 in 1986.  *Id*.

### C.  The Government's Response To The Savings And Loan Interest Rate Crisis

Many savings and loan institutions became insolvent during the savings and loan interest rate crisis.  PX594 at 36; Deihl Tr. vol. 1, 109:10-13; Antoci Tr. vol. 2, 342:16-343:4; Beesley Tr. vol. 3, 469:19-22.  The FSLIC, which was overseen by the Federal Home Loan Bank Board ("FHLBB"), regulated the savings and loan industry until 1989.  *See* Federal Home Loan Bank Act, 12 U.S.C. §§ 1421-1449; Glassett Tr. vol. 6, 1240:11-14; FIRREA, Pub. L. 101-73 § 401, 103 Stat. 183 (1989).[6]  As many thrifts began to fail in the 1980s, the FSLIC determined that it did not have sufficient financial resources to aide or take over many of these thrifts.  Beesley Tr. vol. 3, 454, 469:5-470:-10; Deihl Tr. vol. 1, 109:10-13.

To address this problem, the FSLIC developed several alternatives to having the government take over insolvent thrifts, including brokering agreements whereby a healthy savings and loan institution would acquire one or more failing thrifts in exchange for certain assistance from the FSLIC.  Beesley Tr. vol. 3, 463:1-4, 474:19-21, 488:19-489:3; PX570; Antoci Tr. vol. 2, 284:8-17.  These transactions relieved the FSLIC of its deposit insurance liability for the insolvent thrift.  Beesley Tr. vol. 3, 469:23-470:1.  In exchange, the FSLIC provided a package of incentives to the acquiring healthy thrift.  PX570; Beesley Tr. vol. 3, 474:1-478:16.

---

[6] In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), which abolished the FSLIC and the FHLBB and transferred the responsibility of insuring savings and loan deposits to the FDIC.  Pub. L. 101-73.  In addition, the Office of Thrift Supervision replaced the FHLBB as regulator of savings and loan institutions.  Glassett Tr. vol. 6, 1240:11-14.

During the period 1981 to 1985, the FSLIC entered into four such transactions with Home.  Jt. Stip. at ¶¶ 10-22; Deihl Tr. vol. 2, 243:22-244:1; JX070 at KS-026943; Glassett Tr. vol. 6, 1227:21-25; JX045 at KS-010084, KS010144.  A summary of the key assistance provided by the FSLIC to Home in these transactions follows.

### D.      Key Assistance In The FSLIC Mergers

#### 1.      The RAP Right

Plaintiffs allege that a key component of the government assistance provided in the FSLIC Mergers at issue in this case involves the method of accounting that Home would use to account for the intangible assets acquired in the transactions under applicable accounting principles.  JX086 at KS-050393; Antoci Tr. vol. 2, 305:10-16.  Each of the mergers at issue in this case created goodwill–an intangible asset that is created when the assets acquired in a supervisory merger are less than the liabilities acquired.  Grabowski Tr. vol. 4, 805; *see* JX102 at ¶ 11; Antoci Tr. vol. 2, 298:7-20; PX001 at I-6 (defining goodwill as "[t]he excess of the fair value of liabilities over the fair value of assets").

In this regard, plaintiffs allege that Home received "the regulatory approval and promise" to treat goodwill acquired in the FSLIC Mergers as an asset for purposes of meeting its regulatory capital requirements until such goodwill was completely amortized.  Pl. Post-Trial Br. at 100-01; *cf.* Antoci Tr. vol. 2, 298:7-20 (defining purchase method of accounting).  Plaintiffs refer to this promise as the RAP Right.  Pl. Post-Trial Br. at 99-101; Pl. Post-Trial Reply at 68-73.

A brief background on the accounting standards and regulations that applied to the savings and loan industry during the 1970s and 1980s is helpful in understanding the RAP Right.  In 1970, the Accounting Principles Board ("APB"), the precursor to the Financing Accounting Standards Board ("FASB"), issued two opinions regarding the accounting treatment of intangible assets, including goodwill.  DX204 at 8; JX102 (APB Opinion No. 16, "Business Combinations"); DX192 (APB Opinion No. 17, "Intangible Assets").  In the opinions, the APB stated that intangible assets with an indefinite useful life could generally be amortized over a period not to exceed forty years.  JX102; DX192.  In addition, the APB authorized acquirers in a business combination to use the purchase method of accounting to account for transactions such as the mergers at issue here.  JX102 at ¶ 15 ("Applying the purchase method of accounting to

business combinations effected by paying cash, distributing other assets, or incurring liabilities is not challenged."); JX035 at KS-008256; DX192.

During the 1970s and 1980s, the FHLBB also issued several memoranda providing guidance on the appropriate regulatory accounting treatment for goodwill. *See* JX102; Antoci Tr. vol. 2, 298:7-20; Vandenberg Tr. vol. 7, 1491-93. In March 1974, the FHLBB issued Memorandum R-31a, which required acquirers to amortize the goodwill resulting from the combination of thrifts over a period not to exceed ten years for regulatory accounting purposes, also known as "RAP." Vandenberg Tr. vol. 7, 1491:7-14; Beesley Tr. vol. 3, 518:16-18.

The FHLBB rescinded this memorandum and issued Memorandum R-31b in September 1981, which provided that a thrift's proposed amortization plan for goodwill and other intangible assets was acceptable if the accounting plan complied with Generally Accepted Accounting Principles ("GAAP"). JX035 at KS-008256; JX100 at CV000209. GAAP permitted thrifts to use the purchase method of accounting when accounting for business combinations, and, as a result, RAP allowed the acquiring thrift to treat the goodwill resulting from the business combination as an asset upon a diminishing basis over forty years. JX035 at KS-008256; DX204 at 8; Beesley Tr. vol. 3, 515:22-25, 516:1, 536:4-8; Vandenberg Tr. vol. 7, 1491:15-19; JX100 at CV00210 ("Detailed rules exist specifying conditions which, if met, indicate that the pooling of interest method must be used. When those conditions do not exist, the purchase method is appropriate. The nature of the business combination dictates the appropriate accounting for it. Therefore, the selection of the accounting technique is not a management option."). And so, Memorandum R-31b extended the time period that a thrift could count goodwill as an asset on its books. Beesley Tr. vol. 3, 515:22-516:1.

Memorandum R-31b provided that "[a]n application from an association requesting approval for a business combination to be accounted for by the purchase method of accounting, from which intangible assets will result, should include a description of any resulting intangible assets and the plan for their amortization." JX035 at KS-008258. And so, Memorandum R-31b required all business combinations to obtain regulatory approval for the combination, regardless of whether the entity intended to use the purchase method of accounting or a different method of accounting. *Cf. Anderson v. United States*, 344 F.3d 1343, 1356-57 (Fed. Cir. 2003) (providing that, pursuant to Memorandum R-31b, an

acquiring thrift need only submit a stipulation to the FHLBB of its intent to "use the procedures of purchase accounting and supervisory goodwill" in order to do so) (quotation omitted).

After the Securities and Exchange Commission ("SEC") issued new guidance on the appropriate accounting for goodwill created by the merger of financial institutions in late 1981, the FHLBB issued SP-24 on December 29, 1981.  JX100; Vandenberg Tr. vol. 7, 1492:8-10.  SP-24 provided that "mergers of savings and loan associations are to be accounted for in accordance with generally accepted accounting principles."  JX100 at CV-00209.  This guidance also required that applicants seeking to acquire a thrift through a merger submit to the FHLBB specific numerical data and an opinion from an independent accountant stating that "GAAP has been adhered to in their determination" to receive forty-year amortization treatment.  *Id*. at CV-00214.

Thereafter, in February 1983, the FASB issued Statement of Financial Accounting Standards ("SFAS") No. 72, which amended APB Opinion Nos. 16 and 17 and required that a portion of the goodwill resulting from acquisitions of troubled thrifts be amortized over the lives of the interest-bearing assets on an accelerated basis, instead of on a straight-line basis under GAAP.[7] JX106; Vandenberg Tr. vol. 7, 1492:21-1493:1l; DX204 at 10.  And so, SFAS No. 72 reduced the amortization period under GAAP for any goodwill created by the combination of thrifts to, at most, twenty-five years.  JX106; DX204 at 16; Hargett Tr. vol. 11, 2327:3-19.

Home accounted for the FSLIC Mergers at issue in this case using the purchase method of accounting.  JX035 at KS-008256; JX100; *see* JX102 at ¶ 15; JX106.  And so, under the purchase method of accounting, Home could treat the goodwill created by each of the FSLIC Mergers as an asset for purposes of meeting regulatory capital requirements.  JX102 at ¶ 15; JX035 at KS-008256.

---

[7] Specifically, FASB No. 72 amended GAAP to require supervisory goodwill to be amortized over "a combination of (1) the weighted-average lives of the interest-bearing assets acquired for a defined portion of the goodwill recorded, and (2) a straight-line basis over 25 years for the balance of the goodwill."  Def. Post-Trial Br. at 14; *see also* Pl. Post-Trial Reply at 73; Hargett Tr. vol. 11, 2327:3-19.

### 2.    The Branching Rights

Plaintiffs allege that another key component of the government assistance that Home received from the FSLIC is the right to open new savings and loan branches in Florida, Illinois, Missouri, New York, Ohio and Texas, after Home acquired thrifts in those states. *See* PX001 at I-1; *see also* Pl. Post-Trial Reply at 17, 20, 25, 28.  Plaintiffs refer to the right to open, acquire, and operate branches in other states as the Branching Rights.  PX001 at I-1.

A background on the history of the regulation of the savings and loan industry is also helpful in understanding the Branching Rights.  Prior to 1981, federal regulations prohibited Home and other thrifts from establishing branch offices in more than one state.  12 C.F.R. § 556.5(a)(3)(i); Deihl Tr. vol. 1, 107:24-110:16; Rinehart Tr. vol. 7, 1387:19-1388:10.  But, in September 1981, the FHLBB promulgated regulations to permit federally-chartered thrifts to open deposit-taking branches in states outside of their home state if, among other things, the thrift acquired one or more insolvent thrifts in the new state pursuant to a FSLIC supervisory merger.  12 C.F.R. § 556.5(a)(3)(ii)(a); Antoci Tr. vol. 2, 283:13-284:5.

The FHLBB provided Home with Branching Rights in the states where Home acquired insolvent thrifts, which permitted Home to open new branches in the states in which it acquired thrifts through a merger.  JX015; PX232; PX083 at KS-007965-66; PX078 at KS-007842-43. And so, plaintiffs allege that Home received the ability to acquire and operate existing branches located in these states and to open new, or *de novo,* branches in these states.  Deihl Tr. vol. 1, 124:8-18; Antoci Tr. vol. 2, 326:21-327:23; PX124 at KS-014985-86.

### E.    The FSLIC Mergers

With the aforementioned assistance from the FSLIC, Home entered into four mergers involving the acquisition of failing thrifts from 1981 to 1985.  Jt. Stip. at ¶¶ 10-22.  In each of these transactions, Home obtained, among other things, a RAP Right and at least one Branching Right.  Am. Compl. at ¶¶ 29-30, 39-40, 56-57, 71; 2d Am. Compl. at ¶¶ 28-29, 44-45, 60-61, 73-74, 84, 88.  It is undisputed in this matter that the cost to Home for this assistance is the excess of the fair market value of the liabilities of the acquired thrifts over the fair market value of these thrifts' assets.  *See* Jt. Stip. at ¶¶ 12, 15.  A summary of the four FSLIC Mergers follows.

### 1.      The Florida-Missouri Merger

In 1981, Home acquired two failing Missouri thrifts–Hamiltonian Federal Savings and Loan ("Hamiltonian") and Security Federal Savings and Loan Association ("Security")–and one failing Florida thrift–Southern Federal Savings and Loan Association ("Southern").  Jt. Stip. at ¶ 11.  In connection with this transaction, Home and the FSLIC entered into an assistance agreement, wherein Home received Branching Rights for the states of Florida and Missouri and a RAP Right regarding the accounting treatment for the goodwill created by this transaction.  *Id*. at ¶¶ 10-11; JX085.  It is undisputed that Home's purchase price−or cost basis−for the Florida-Missouri Merger was $216,759,000.[8]  PX004; PX594 at 190; Grabowski Tr. vol. 4, 820:15-17. Plaintiffs maintain that Home's cost basis in the RAP Right for this transaction is $44,713,000. Pl. Post-Trial Br. at 17, 150.  Plaintiffs further maintain that Home's cost basis in the Missouri Branching Right is $29,160,000 and that Home's cost basis in the Florida Branching Right is $142,886,000.  *Id*. at 17, 150.

### a.      The Florida-Missouri RAP Right

At the time of the Florida-Missouri Merger, the applicable federal accounting regulations permitted goodwill to be amortized for a period of up to forty years.  DX192; JX102.  In addition to the assistance agreement for this transaction, the FHLBB issued a resolution regarding, among other things, the accounting of goodwill for the Florida-Missouri Merger.  JX085; JX059 at KS-014320.  These documents are both relevant to understanding the Florida-Missouri RAP Right.

Specifically, section 13 of the Florida-Missouri Assistance Agreement provides that:

> Except as otherwise provided herein, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement or with the applicable Federal Regulations, the Agreement or said Regulations shall govern. For purposes of this section, the accounting principles and the governing regulations shall be those in effect on the

---

[8] The parties agree that the "cost to Home for the FSLIC Assistance was the excess of the aggregate liabilities of Hamiltonian, Security, and Southern over the fair market value of their assets."  Jt. Stip. at ¶ 12.  In this regard, Home assumed $927,738,000 of liabilities from these three failing thrifts.  PX004; JX039; PX594; Grabowski Tr. vol. 4, 819:19-25.  Home also received $710,979,000 of assets from the failing thrifts.  PX594; PX002; PX004; Grabowski Tr. vol. 4, 633:16-638:6, 640:21-641:25; 820:1-17.

> Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board or any successor organization of the American Institute of Certified Public Accountants respectively.

JX085 at KS-044901-02.  Section 16 of the Florida-Missouri Assistance Agreement integrated "any resolutions or letters issued contemporaneously herewith by the Federal Home Loan Bank Board. . . ."  *Id*. at KS-044903.  And so, this provision integrated FHLBB Resolution 81-803, which provides:

> That the Bank Board hereby finds that the submission of Home concerning the accounting treatment to be afforded its acquisition of Southern . . . appropriately supports the application of the purchase method of accounting for the acquisition; and that based upon such submission, and the circumstances described therein, the Bank Board hereby determines that it does not object to (1) the amount of any resulting intangible assets being first assigned to the acquired savings deposit base in the amount of .5 percent of the acquired savings balances and .05 percent of the acquired certificate balances, which will have a life of ten (10) years, and (2) any excess being assigned to goodwill and initially amortized, in accordance with generally accepted accounting principles, over forty (40) years, *provided* that Home shall furnish an analysis, accompanied by a concurring opinion from its independent accountant satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision which (a) specifically describes, as of the effective date of the Southern Merger, any premiums or discounts on assets or liabilities, or intangible assets to be recorded as a result of the Southern Merger and (b) substantiates the reasonableness of amounts assigned to any tangible or intangible assets or liabilities and the related amortization periods and methods assigned to such amounts[.]

JX059 at KS-014320.  Home subsequently provided the analysis required by the FHLBB's Resolution.  PX226.

### b.    The Florida And Missouri Branching Rights

Home also received Branching Rights in Florida and Missouri as part of the Florida-Missouri Merger.  Specifically, a FHLBB letter to Home dated January 20, 1982, provides, in relevant part, that:

> [F]uture applications of Home for approval of mergers or purchases of assets or for permission to establish or maintain branch offices in the State [sic] of Florida and Missouri shall be processed, for the purposes of a particular application, through the Supervisory Agents of the Federal Home Loan Bank Board and the Office of Industry Development as if the home office of Home were located in Florida or Missouri, respectfully.

The Office of Industry Development will not recommend denial of an application of Home (1) to establish or maintain a branch office in Florida or Missouri, or (2) to merge with another FSLIC insured institution having its home office in Florida or Missouri through merger, consolidation, or purchase of bulk assets, solely because such application is to establish a branch office, or merge with an institution having its home or other office, in a state other than that in which the home office of Home is located, provided that Home has established branch offices in Florida and Missouri pursuant to . . . the Federal Regulations.  Home has met this requirement through the [Florida and Missouri] mergers. . . .

PX232.

Home acquired thirteen branches in Florida.  PX594 at 220.  Home also opened nine additional branches in Florida in 1983, seven additional branches in Florida in 1984, and two additional branches in Florida in 1985.  *Id*.  And so, by the end of 1985, Home had thirty one branches in Florida.  *Id*.  Home also acquired seventeen existing branches in Missouri.  *Id*.  In Missouri, Home opened two additional branches in 1983, closed one branch in 1984, and opened three additional branches in 1985.  *Id.*  And so, Home operated twenty one branches in Missouri by the end of 1985.  *Id*.  In the early 1990s, Home implemented a new strategy to concentrate on the thrift industry in California.  Rinehart Tr. vol. 7, 1389:21-1390:20, 1390:24-1391:11; Kline Tr. vol. 6, 1278:12-1279:10.  As a result, Home sold all of its Florida branches by entering into branch sales agreements during 1997 and 1998.  Rinehart Tr. vol. 7, 1406:4-7, 1449:10-23; JX088; PX103 at KS-011290.

## 2.    The Illinois-Texas Merger

In 1982, Home acquired several failing thrifts located in Illinois and Texas in another FSLIC Merger.  Jt. Stip. at ¶¶ 13-14.  In the Illinois-Texas Merger, three Texas savings and loan associations merged into a fourth savings and loan known as El Centro Federal Savings and Loan Association of Dallas, Texas ("El Centro").  *Id*. at ¶ 14.  Thereafter, on January 15, 1982, El Centro, Royal Federal Savings and Loan Association of Dallas, Texas, and Hyde Park Savings and Loan Association of Chicago, Illinois merged into Home.  *Id*. at ¶¶ 13-14.

In connection with this transaction, Home entered into an assistance agreement with the FSLIC, and the FHLBB also issued a resolution and two letters, providing Home with a RAP

Right, Branching Rights, cash and other cash-equivalent assets and certain regulatory forbearances.[9]  JX005; JX015; JX030; JX084; Jt. Stip. at ¶ 15; PX001 at II-21; PX594 at 185.

It is undisputed that Home's purchase price−or cost basis−for the Illinois-Texas Merger was $285,353,000.[10]  PX004 at Ex. 2.1; Pl. Post-Trial Br. at 20.  Plaintiffs maintain that Home's cost basis in the RAP Right for this transaction is $35,154,000.  Pl. Post-Trial Br. at 21, 150.  Plaintiffs further maintain that Home's cost basis in the Illinois Branching Right is $56,432,000 and that Home's cost basis in the Texas Branching Rights is $100,838,000.  *Id.*

### a.      The Illinois-Texas RAP Right

At the time of the Illinois-Texas Merger, the applicable federal accounting regulations permitted goodwill to be amortized for a period of up to forty years.  JX035; JX102.  Home also entered into an assistance agreement with the FSLIC, and the FHLBB issued a resolution regarding, among other things, the accounting of goodwill for the Illinois-Texas Merger.  JX005; JX030.  These documents are both relevant to understanding the Illinois-Texas RAP Right.  Specifically, section 13 of the Illinois-Texas Assistance Agreement provides that:

> Except as otherwise provided herein, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement or with the applicable Federal Regulations, the Agreement or said Regulations shall govern. For purposes of this section, the accounting principles and the governing regulations shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board or any successor organization of the American Institute of Certified Public Accountants respectively. In case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with said Regulations.

---

[9] The cash-equivalent assets included cash to cover:  the negative net worth of acquired thrifts, a foregone spread guarantee relating to Hyde Park, and prepayment penalties relating to certain FHLBB advances. PX001 at II-21; *see* PX594 at 185.  Home also received "indemnification for losses on loans, real estate owned, and service corporations."  PX001 at II-21. The fair market value of the cash, cash-equivalent assets and indemnifications, as estimated by FSLIC, is $92,929,000.  PX001 at II-21; PX004; PX594.

[10] Home assumed $953,651,000 of liabilities from the acquired failing thrifts.  Jt. Stip. at ¶ 16.  Home also received $668,298,000 of assets from the six failing thrifts.  PX594 at 65; PX004 at Ex. 2.1; Grabowski Tr. vol. 4, 665:21-666:23.

JX005 at KS-002846. Section 16 of the Illinois-Texas Assistance Agreement also integrates "any resolutions or letters issued contemporaneously herewith by the Federal Home Loan Bank Board . . . ." JX005 at KS-002847-48. The FHLBB Resolution for the Illinois-Texas Merger provides in relevant part that:

> [T]he Bank Board hereby finds that the submission of Home concerning the accounting treatment to be afforded its acquisition of Hyde Park, El Centro, and Royal. . . appropriately supports the application of the purchase method of accounting for the acquisition; and that based upon such submission, and the circumstances described therein, the Bank Board hereby determines that it does not object to (1) the amount of any resulting intangible assets being first assigned to the acquired savings deposit base in the amount of .5 percent of the acquired savings balances and .05 percent of the acquired certificate balances, which will have a life of ten (10) years, and (2) any excess being assigned to goodwill and initially amortized, in accordance with generally accepted accounting principles, over forty (40) years, *provided* that Home shall furnish an analysis, accompanied by a concurring opinion from its independent accountant satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision which (a) specifically describes, as of the effective date of the Hyde Park, El Centro, and Royal Mergers, any premiums or discounts on assets or liabilities, or intangible assets to be recorded as a result of the Hyde Park, El Centro, and Royal Mergers and (b) substantiates the reasonableness of amounts assigned to any tangible or intangible assets or liabilities and the related amortization periods and methods assigned to such amounts[.]

JX030 at KS-007694. Home provided the analysis required by the aforementioned FHLBB Resolution. PX075.

### b.      The Illinois And Texas Branching Rights

Home also received Branching Rights in Illinois and Texas as part of the Illinois-Texas Merger. Specifically, in a FHLBB letter to Home dated January 20, 1982, FHLBB states that:

> Future applications of Home for approval of mergers or purchases of assets or for permission to establish or maintain branch offices in the State [sic] of Illinois and Texas shall be processed, for the purposes of a particular application, through the Supervisory Agents of the Federal Home Loan Bank Board and the Office of Industry Development as if the home office of Home were located in Illinois or Texas.

> The Office of Industry Development will not recommend denial of an application of Home (1) to establish or maintain a branch office in Illinois or Texas, or (2) to merge with another FSLIC insured institution having its home office in Illinois or Texas through merger, consolidation, or purchase of bulk assets, solely because such application is to establish a branch office, or merge with an institution having

> its home or other office, in a state other than that in which the home office of Home
> is located, provided that Home has established branch offices in Illinois and Texas
> pursuant to . . . the Federal Regulations.  Home has met this requirement through
> the [Illinois and Texas] mergers. . . .

JX015.

 With this assistance, Home acquired eight branches in Illinois.  PX594 at 115.  Home opened one additional branch in Illinois in 1983 and in 1984 and no branches in 1985.  *Id*. at 220; *see also* PX001 at III-19.  Home also acquired thirty-six branches in Texas.  PX594 at 220.  Home closed three branches in Texas in 1983 and 1984 and closed one branch in Texas in 1985.  *Id*.  And so, Home operated twenty nine branches in Texas by the close of 1985.  *Id*.  In the early 1990s, Home implemented a new strategy to concentrate on the thrift industry in California.  Rinehart Tr. vol. 7, 1389:21-1391:11; Kline Tr. vol. 6, 1278:12-1279:5.  As a result, Home sold all of its Illinois branches in a single sale in 1994.  Jt. Stip. at ¶ 24; JX082; Rinehart Tr. vol. 7, 1406:4-7, 1449:10-23; PX103 at KS-011290.

### 3. Home's Discussions With Regulators

 At the time of the Florida-Missouri Merger, Home also took steps to confirm the accounting treatment for the goodwill to be created by this transaction with the FHLBB and the SEC.  Specifically, in 1981, Home and its parent company, Ahmanson, sought assurance from the SEC that Home would be able to amortize goodwill created by the Florida-Missouri Merger over forty years.  JX107; Antoci Tr. vol. 2, 303:10-304:11; JX086; PX592.  The SEC agreed that Home could use the purchase method of accounting and amortize the goodwill resulting from the Florida-Missouri Merger, and the subsequent Illinois-Texas Merger, over forty years.[11]  JX107; Antoci Tr. vol. 2, 367:16-22.  The SEC approved Home's proposed accounting treatment for supervisory goodwill in October 1981.  JX107; Antoci Tr. vol. 2, 303:18-305:16, 373:21-24.

 Home also submitted an amortization plan for the goodwill to be created by the Florida-Missouri Merger to the FHLBB, along with a letter from Home's accountant, Peat Marwick.  PX075; PX163; Antoci Tr. vol. 2, 323:9-18.  Peat Marwick reviewed the accounting treatment that Home utilized to account for the goodwill resulting from the Florida-Missouri Merger and

---

[11] In 1982, Ahmanson recorded the amount of goodwill resulting from the Florida-Missouri Merger as $226,446,000 in its Form 10-K.  JX039 at KS-009507

determined that Home's potential profits in Missouri and Florida supported the amount of goodwill that Home reported for the Florida-Missouri Merger.  PX075; PX163.

Home also attempted to project the savings growth and market share expected in Florida, Illinois, Missouri and Texas over a five-year period.  JX086 at KS-050398-99.  In this regard, on December 14, 1981, Home sent a letter to the SEC which states that Home estimated its cost for the Florida, Illinois, Missouri and Texas Branching Rights to be $320,000,000.  *Id*. at KS-050392.  Grabowski Tr. vol. 4, 685-88; JX086 at KS-050392.  Home also provided a series of projections of its expected growth and capture of the market share in these states in a letter to the SEC.  JX086 at KS-050398-99; Antoci Tr. vol. 2, 354:12-25, 355:1-21.  These projections were based primarily upon Home's experience in expanding into Northern California during the 1970s.  Antoci Tr. vol. 2, 356:2-4; *see generally* JX086.

Home's "best case scenario" projection in this letter predicted that Home's market share in Florida, Illinois, Missouri and Texas as of December 31, 1986, would equal the increase in market share that Home achieved in Northern California over five years, plus the existing market share in the applicable state.[12]  JX086 at KS-050400; Antoci Tr. vol. 2, 365:19-24.  And so, Home predicted that it would capture 4.4%, 4.9%, 5.5% and 5.9% of the total market in Illinois, Florida, Texas and Missouri, respectively.  JX086 at KS-050398.  In addition, Home's "most probable case scenario" projection in this letter predicted that Home's market share would be 2.5%, 3%, 3.6% and 4.1% in Illinois, Florida, Texas and Missouri, respectively.  JX086 at KS-050398.  Lastly, Home's "worst case scenario" projection predicted that Home's market share would be 1.6%, 2.2%, 2.7% and 3.2% in Illinois, Florida, Texas and Missouri, respectively.  JX086 at KS-050399.

### 4.       The Century Merger

On August 10, 1984, Home acquired a failing New York thrift—Century Federal Savings and Loan Association.  Jt. Stip. at ¶ 17.  In connection with this transaction, Home entered into an assistance agreement with the FSLIC, and the FHLBB also issued a resolution providing Home with a RAP Right and a Branching Right in the State of New York.  *Id*. at ¶¶ 17-18;

---

[12] In the 1970s, California relaxed its branching regulations to allow limited expansion within the state.  JX086 at KS050392; Antoci Tr. vol. 2, 291:15-20.  Home took advantage of this opportunity and opened branches in Northern California.  Antoci Tr. vol. 2, 291:21-22.

JX009; PX078.  Home also received a $700,000,000 loan at a below market rate ("Century Favorable Financing").  JX009 at KS-003179-81, KS-003193-97.

It is undisputed that Home's purchase price−or cost basis−for the Century Merger was $205,215,000.[13]  Pl. Post-Trial Br. at 45.  Plaintiffs maintain that Home's cost basis in the Century RAP Right is $25,249,000.  *Id.* at 25, 150.  Plaintiffs further maintain that Home's cost basis in the New York Branching Right is $101,966,000.  *Id.*

### a.    The Century RAP Right

At the time of the Century Merger, the applicable federal accounting regulations permitted the goodwill created by the Century Merger to be amortized over a period not to exceed twenty-five years.  JX106 (reducing the amortization period under GAAP for any goodwill created by the combination of thrifts); Hargett Tr. vol. 11, 2327:3-23; DX204 at 25-26.  Home also entered into an Assistance Agreement with the FSLIC, and the FHLBB issued a resolution regarding, among other things, the accounting of the goodwill created by the Century Merger.  JX009; PX078.  A separate FHLBB Resolution attached to the Century Assistance Agreement also provided Home with, among other things, Branching Rights.  PX078 at KS-007842-43.  And so, Home received, among other things, a RAP Right and a New York Branching Right in connection with the Century Merger.  *See* JX009; PX078 at KS-007837, KS-007842-43.

The Century Assistance Agreement and the FHLBB Resolution are relevant to understanding the Century RAP Right.

Specifically, section 13 of the Assistance Agreement provides that:

Except as otherwise provided, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry; except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the CORPORATION, or any resolution or action of the Bank Board approving, or adopted concurrently with, this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolution or action.  If there is a conflict between such regulations and the Bank

---

[13] The parties agree that Home assumed $743,125,000 of liabilities from Century.  Jt. Stip. at ¶ 19.  Home also received $537,910,000 of assets from Century.  PX594 at 217; PX004 at Ex. 3.1; Grabowski Tr. vol. 4, 837:24-839:22.

Board's resolution or action, the Bank Board's resolution or action shall govern. For the purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified, interpreted, or amended by the Bank Board or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization to either. If there is a conflict between what is required by the FASB and what is required by the Bank Board, the Bank Board's interpretation shall govern.

JX009 at KS-003185-86.  In addition, the FHLBB Resolution provides in relevant part that:

[I]n accounting for the Merger and the acquisition of assets and liabilities of Century by Home Savings, Home Savings shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified and interpreted by applicable regulations of the Bank Board and the FSLIC; and

RESOLVED FURTHER, That Home Savings shall furnish an analysis accompanied by a concurring opinion from its independent public accountants, satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision, which (i) specifically describes as of the closing date, any intangible assets, including goodwill or the discounts and premiums arising from the acquisition to be recorded on Home Savings' consolidated books; and (ii) substantiates the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discounts and premiums and the related amortization periods and methods[.]

PX078 at KS-007837.  As it did with the Florida-Missouri and Illinois-Texas Mergers, Home sought approval from the SEC of its accounting treatment for the Century Merger. PX592.

### b.  The New York Branching Right

Home also received a Branching Right in New York as part of the Century Merger. Specifically, the FHLBB Resolution dated August 10, 1984, FHLBB provided that:

**<u>Branching and Branch Offices</u>**

RESOLVED FURTHER, That the Bank Board hereby determines that:

(1) The establishment of the offices of Century as branch offices of Home Savings will be achieved as part of a transaction in which the assets and liabilities of Century are acquired by Home Savings pursuant to an action by the FSLIC to prevent the failure of Century;

(2) The FSLIC's insurance liability or risk, including cost or potential cost to the FSLIC, will be reduced as a result of maintaining offices of Century as branches offices of Home Savings; and

> (3) The FSLIC's insurance liability and risk, including cost or potential cost to the FSLIC, resulting from the acquisition of Century's assets and liabilities by Home Savings by reason of the Merger, is substantially less than the liability or risk that would result from any other acquisition alternatives;
>
> RESOLVED FURTHER, That the maintenance of the home and branch offices of Century as branch offices of Home Savings subsequent to the Merger is hereby approved and
>
> RESOLVED Further, That Home Savings may designate the home and branch offices of Century located in New York under the name of "Century Federal Savings and Loan, a Division of Home Savings of America, F.A.A" . . . .

PX078 at KS-007842-43.  After entering into the Century Merger, Home began expanding its branch networks in New York.  Antoci Tr. vol. 2, 327:21-23.  In the early 1990s, Home implemented a new strategy to concentrate on the thrift industry in California.  Rinehart Tr. vol. 7, 1389:21-1391:11; Kline Tr. vol. 6, 1278:12-1279:10.  As a result, Home sold all of its New York branches by entering into branch sales agreements in September 1995.  Jt. Stip. at ¶ 26; JX025; Twomey Tr. vol. 4, 711:11-17.

### 5.      The Ohio Merger

Lastly, in 1985, Home acquired five failing thrifts in Ohio in a supervisory merger.  Jt. Stip. at ¶¶ 21-22.  Only one of these five failing savings and loan institutions was insured by the FSLIC.  *Id.* at ¶ 23.

In connection with this transaction, Home entered into an assistance agreement with the FSLIC, and the FHLBB issued a resolution regarding, among other things, the accounting of goodwill created by the Ohio Merger and providing Home with a Branching Right in the State of Ohio.  PX083 at KS-007965-66.  Home received a RAP Right, a Branching Right, a $200,000,000 loan with a favorable financing rate ("Ohio Favorable Financing") and certain regulatory forbearances in connection with the Ohio Merger.  Jt. Stip. at ¶ 21; PX001 at IV-17.

It is undisputed that Home's purchase price−or cost basis−for the Ohio Merger was $50,800,000.[14]  PX004 at 137; PX594 at 236; Grabowski Tr. vol. 5, 873:8-10; Pl. Post-Trial Br.

---

[14] Home assumed $461,530,000 in liabilities from the five failing Ohio thrifts.  Jt. Stip. at ¶ 22.  Home also received $410,664,000 in assets from the five failing thrifts.  PX594 at 236; PX004 at 134; Grabowski Tr. vol. 5, 872:-873:7.  The fair market value of the Favorable Financing for the Ohio Merger was $27,000,000.  Grabowski Tr. vol. 5, 889:18-890:5; PX594 at 248; PX004 at 137.

at 27.  Plaintiffs maintain that Home's cost basis in the RAP Right for this transaction is $3,870,000.  Pl. Post-Trial Br. at 28.  Plaintiffs further maintain that Home's cost basis in the Ohio Branching Right is $19,996,000.  *Id.*

### a.       The Ohio RAP Right

The Ohio Assistance Agreement and the FHLBB Resolution for this transaction are relevant in understanding the Ohio RAP Right.  Section 12 of the Assistance Agreement provides that:

> Except as otherwise provided, any computation made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the CORPORATION, or any resolution or action of the Bank Board approving, or adopted concurrently with, this Agreement, then this Agreement, such regulations or such resolution or action shall govern.

JX013 at KS-003493.  In addition, the FHLBB Resolution provides, in relevant part, that:

> RESOLVED FURTHER, That in accounting for the Acquisition and the Savings One Acquisition, Home Savings shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified and interpreted by applicable regulations of the Bank Board and the FSLIC; and
>
> RESOLVED FURTHER, That Home Savings shall furnish an analysis, accompanied by a concurring opinion from its independent public accountants, satisfactory to the Principal or other Supervisory Agent of the Bank Board, San Francisco, California ("California Supervisory Agent") and to the Office of Examinations and Supervision, which (i) specifically describes as of the closing date, any intangible assets, including goodwill or the discounts and premiums arising from the Acquisition and the Savings One Acquisition to be recorded on Home Savings' consolidated books; and (ii) substantiates the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discounts and premiums and the related amortization periods and methods[.]

PX083 at KS-007959-60.

### b.       The Ohio Branching Right

Home also received the right to open new branches in the State of Ohio in the Ohio Merger.  PX083 at KS-007965.  Specifically, the FHLBB Resolution for the Ohio Merger provides that:

**Branching and Branch Offices**

RESOLVED FURTHER, That the Bank Board hereby determines that:

(1) The establishment of the offices of Home Federal as branch offices of Home Savings will be achieved as part of a transaction in which the assets and liabilities of Home Federal are acquired by Home Savings pursuant to an action by the FSLIC to prevent the failure of Home Federal;

(2) The FSLIC's insurance liability or risk, including cost or potential cost to the FSLIC, will be reduced as a result of maintaining offices of Home Federal as branches offices of Home Savings; and

(3) No otherwise equally desirable alternative has been submitted that could be approved in accordance with § 556.5(a)(3)(ii) or (iii) of the Federal Regulations, 12 C.F.R. § 556.5(a)(ii) or (iii); and;

RESOLVED FURTHER, That the maintenance of the home and branch offices of Home Federal and the Ohio Thrifts as branch offices of Home Savings subsequent to the Acquisition and the Savings One Acquisition is hereby approved; and

RESOLVED Further, That Home Savings may designate the home and branch offices of Home federal and the Ohio Thrifts under the name of "Savings of America, a Division of Home Savings of America, F.A."; and . . . .

PX083 at KS-007965-66.

In the early 1990s, Home implemented a new strategy to concentrate on the thrift industry in California.  Rinehart Tr. vol. 7, 1389:21-1391:11; Kline Tr. vol. 6, 1278:12-1279:10. As a result, Home sold all of its Ohio branches by entering into branch sales agreements during the period 1991-1995.  Jt. Stip. at ¶ 25; JX017; JX018; JX019; JX021; JX022; JX023; JX024; JX090; JX091; JX092; PX052; PX060; PX065; PX082.

### F.    The Bowery Merger

#### 1.    The 1985 Bowery Assistance Agreement

The Bowery Savings Bank ("Bowery") was a federally-chartered mutual savings bank headquartered in New York.  Rice Tr. vol. 6, 1157:7-20; Grabowski Tr. vol. 8, 1561:25-1562:2. The Bowery's asset portfolio consisted mainly of fixed-rate home mortgages and its liabilities consisted primarily of deposits from customers.  Rice Tr. vol. 6, 1157:2-12.  And so, the high interest rate environment in the late 1970s and early 1980s caused the Bowery to experience extensive losses and capital erosion like many savings and loan institutions.  Rice Tr. vol. 6, 1157:7-20; Grabowski Tr. vol. 8, 1561:25-1562:2; PX369 at US43747.

On August 7, 1985, a group of investors organized by New York businessman Richard Ravitch ("Ravitch Group") entered into an assistance agreement with the Federal Deposit Insurance Company to acquire the Bowery through a government-assisted merger. Pursuant to that merger, the Ravitch Group−operating through an entity known as New Bank−assumed the Bowery's liabilities in exchange for certain assistance from the FDIC. JX034; Rice Tr. vol. 6, 1161:7-19, 1163:18-20. New Bank subsequently reorganized as New Bowery and later changed its name to the Bowery Savings Bank. PX377 at DR-000005, DR-000017; Rice Tr. vol. 6, 1185:17-1186:16.

Similar to the FSLIC Mergers, the FDIC entered into an agreement with New Bank to provide certain assistance to facilitate New Bank's merger with the Bowery (the "1985 Bowery Assistance Agreement"). JX034. Under the 1985 Bowery Assistance Agreement, New Bank received: (1) a $100,000,000 loan from the FDIC with a favorable interest rate (the "Bowery Favorable Financing"); (2) credit protection on certain loans and investments (the "Bowery Credit Protection"); (3) the FDIC's approval to reverse purchase accounting adjustments for purposes of calculating capital for regulatory purposes (the "1985 Bowery RAP Right"); (4) an income maintenance agreement (the "IMA"), which was intended to reduce the Bowery Savings Bank's interest rate risk for a defined asset base for up to fifteen years, (5) capital forbearance, or forbearance from exercising regulatory authority if Bowery's net worth fell below regulatory minimums, (6) net worth certificates, or the contractual right to include certain net worth certificates when computing regulatory capital, and (7) an FDIC contribution for net worth, or a contribution of cash and Treasury securities that amounted to the negative net worth of Bowery prior to the 1985 Bowery Merger. PX001 at V-7-8, V-35; JX034; JX066; Rice Tr. vol. 6, 1172:3-24, 1174:10-1177:21; JX066 at KS-022693. In exchange, the Ravitch Group infused $100,000,000 in capital into the bank, which was insolvent at the time of the transaction. Grabowski Tr. vol. 8, 1561:19-1562:14.

The 1985 Bowery RAP Right allowed the Bowery to reverse its purchase accounting adjustments for the purpose of calculating capital for regulatory purposes. JX034 at KS-008033-34; Rice Tr. vol. 6, 1174:10-1177:2. In this regard, the Bowery Assistance Agreement provides that:

> 10.1 <u>Minimum Capital Requirements</u>.  This Agreement shall constitute the commitment of Resulting Bank to adhere to a reasonable plan to meet the FDIC's

minimum capital requirements for the purposes of 12 C.F.R. 325.3, or any regulation promulgated by the FDIC in replacement thereof ("Minimum Capital Requirements"), for the duration of this Agreement.  The FDIC agrees that for the term of this Agreement, so long as Resulting Bank is in compliance with this Article 10, it shall be deemed for purposes of all rules, regulations, and policies of the FDIC to have at least the minimum required primary capital ratio and total capital ratio, or satisfied any other Minimum Capital Requirements, as may be required by the FDIC from time to time for well managed banks.

10.2 Definitions.

(a) Purchase Accounting Amounts.  For the purpose of computing Primary Capital and Total Assets, as defined in Section 10.2(b) and (d) hereof, respectively, Purchase Accounting Amounts on any date of determination shall mean the then unamortized debit or credit balance of any amounts which were recorded on the books of Resulting Bank as of the Commencement Date as a result of the application of purchase method accounting to the Merger, provided, however, that such amounts shall not include (a) amount attributable to estimated credit losses with respect to acquired assets or (b) any amounts attributable to intangible assets excluded from the definition of Primary Capital under 12 C.F.R. Section 325.2.

JX034 at KS-008033–KS-008034; Rice Tr. vol. 6, 1174:10-1177:2.

The Bowery also received an IMA, which was intended to reduce the Bowery's interest rate risk for a defined asset base for up to fifteen years.  JX034; JX066; Rice Tr. vol. 6, 1172:3-24, 1174:10-1177:22; JX066 at KS-022693.  Under the terms of the IMA, the Bowery could expect to "receive from or pay to the FDIC on a quarterly basis, income maintenance payments equal to (a) the average cost of funds of a peer group of New York savings bank [sic] less (b) a fixed rate specified in the Assistance Agreement, times the Defined Asset Base [of acquired fixed rate mortgages]."  JX066 at KS-022694.  And so, the IMA served to neutralize Bowery's interest-rate risk from long-term, fixed-rate mortgages.

In addition, the Bowery Favorable Financing consisted of a fifteen-year, $100,000,000 loan from the FDIC with a favorable interest rate.  JX034 at KS-008002-04, KS-008061; PX377 at DR-000018; Rice Tr. vol. 6, 1167:16-1168:17.  Lastly, the 1985 Bowery Assistance Agreement also provided the Bowery with credit protection on certain categories of loans and investments.  PX377 at DR000020.

The purchase price for the 1985 Bowery Merger is $644,000,000.  Grabowski Tr. vol. 8, 1570:19-21.  Plaintiffs make some adjustments to this purchase price and maintain that the adjusted purchase price for this transaction is $486,366,000.  PX596 at 36.  Plaintiffs maintain

that Home took a cost basis in the government assistance provided to the Bowery in 1985 and that Home's cost basis in the 1985 Bowery RAP Right is $189,466,000. Pl. Post-Trial Br. at 150. Plaintiffs further maintain that Home's cost basis in the Bowery Credit Protection is $14,573,000, and that Home's cost basis in the Bowery Favorable Financing is $4,500,000. *Id*.; *see also* PX596 at 36.

### 2.     The 1988 Bowery Assistance Agreement

On October 5, 1987, Ahmanson entered into an agreement with the Bowery and the Bowery's stockholders to purchase all of the Bowery's stock. *See* JX065; Glassett Tr. vol. 6, 1226. Concurrent with the negotiations for this transaction, Ahmanson and the FDIC began discussions to modify the 1985 Bowery Assistance Agreement. JX065 at KS-021348.

On January 29, 1988, the FDIC and the Bowery Savings Bank executed an agreement entitled "Amendment No. 3 to Assistance Agreement" ("1988 Bowery Assistance Agreement"). JX070. On the same date, Home acquired the outstanding stock of the Bowery in exchange for $219,000,000. Glassett Tr. vol. 6, 1246:16-20; JX045 at KS-010084, KS-010144.

The 1988 Bowery Assistance Agreement made several changes to the assistance package that the FDIC provided to the Bowery in 1985. First, the 1988 Bowery Assistance Agreement eliminated the IMA. Glassett Tr. vol. 6, 1229:7-17, 1233:21-1234:17, 1237:18-24; JX045 at KS-010110; JX070 at KS-026950-51. Second, the 1988 Bowery Assistance Agreement eliminated the 1985 Bowery RAP Right and provided Home with a new RAP Right ("1988 Bowery RAP Right"). JX070 at KS-026951-52. In this regard, the 1988 Bowery RAP Right kept the purchase accounting adjustments under the 1985 Bowery Assistance Agreement in place, but allowed the Bowery to count the goodwill created by these adjustments toward computing regulatory capital. Glassett Tr. vol. 6, 1229:7-17, 1233:21-1234:17, 1237:18-24; JX070 at KS-026951-53; JX045 at KS-010110. Lastly, the 1988 Bowery Assistance Agreement decreased the amount of assets covered by the Bowery Credit Protection by $1,500,000,000. Glassett Tr. vol. 6, 1229:15-17; JX070 at KS-026951.

### G.     Western District Of Washington And Ninth Circuit Litigation

In 2008, Washington Mutual, Inc. filed a tax refund case involving the Florida-Missouri Merger at issue in this matter before the United States District Court for the Western District of

Washington. *Washington Mut., Inc. v. United States*, No. C06–1550, 2008 WL 8422136, at *3 (W.D. Wa. Aug. 12, 2008). In that matter, Washington Mutual sought amortization and abandonment loss deductions for tax years 1990, 1992, and 1993 in relation to the Florida-Missouri Merger. *Id.* at *1. After the district court held that the Home did not acquire a tax basis in the Florida and Missouri Branching Rights or the Florida-Missouri RAP Right, plaintiff appealed the district court's decision to the United States Court of Appeals for the Ninth Circuit. *Id.*; *see Washington Mut., Inc. v. United States*, 636 F.3d 1207, 1209 (9th Cir. 2011) ("*Washington Mut. I*").

On March 3, 2011, the Ninth Circuit reversed the district court, holding that Home had a cost basis in the Florida-Missouri RAP Right and Florida and Missouri Branching Rights "equal to some part of the excess of the [ ] acquired thrifts' liabilities over the value of their assets." *Id.* at 1209. In addition, the Ninth Circuit remanded the case to the district court for a determination on whether Washington Mutual had met its burden to establish Home's cost basis in the Florida-Missouri RAP Right and Florida and Missouri Branching Rights. *Id.* at 1221.

In an opinion dated February 10, 2014, the district court held that:

> In order to determine how much Home paid for the incentive package it received from FSLIC as part of the supervisory merger, Plaintiff must establish: (1) the total value of the free failing thrifts' liabilities, and (2) the total value of their assets. The difference between these two asset values represents the "excess liability" or the "Purchase Price" that Home paid for the incentive package.

*Washington Mut., Inc. v. United States*, 996 F. Supp. 2d 1095, 1104 (W.D. Wa. 2014) ("*Washington Mut. II*"). The district court further held that, "[i]n transactions where one lump-sum purchase price is paid for a conglomeration of assets–as is the case here–the cost of each asset must be determined by apportioning the purchase price among the assets according to each asset's relative fair market value at the time of the acquisition." *Id.* Using this framework, the district court determined that Washington Mutual had failed to prove the fair market value of the Missouri Branching Right to a reasonable degree of certainty and that Home had not abandoned the Missouri Branching Right. *Id.* at 1106-20. And so, the district court concluded it was unable to allocate Home's purchase price and obtain Home's cost basis in the Florida-Missouri RAP Right and the Florida and Missouri Branching Rights. *Id.* at 1097.

Washington Mutual appealed the district court's decision and that matter is currently pending before the Ninth Circuit. *Washington Mut., Inc. v. United States*, No. 14-35289, 2014 WL 4206762 (9th Cir. Apr. 18, 2014).

### H.    Fact Witnesses

At trial, the Court heard testimony from the following fact witnesses:  Mario Antoci, Brent H. Beesley, Curt Brouwer, Richard Deihl, Tim Glassett, Verne Kline, Donald Rice, Charles Rinehart and Kevin Twomey.   A summary of the witness testimony follows.

### 1.    Testimony Of Richard Deihl

Richard Deihl was a fact witness for plaintiffs and for the government. *See* Pl. Witness List; Def. Witness List.  Mr. Deihl testified that he began working for Home as a loan agent in 1959. Deihl Tr. vol. 1, 84-85.  At the time of his retirement, Mr. Deihl was the Chief Executive Officer ("CEO") and chairman of the board at Ahmanson. *Id*. at 84.  Mr. Deihl was involved in all of the transactions at issue in this case. *Id*. at 118-22.

During the trial, Mr. Deihl testified about Home's operations during the 1970s and 1980s, the FSLIC Mergers and the Bowery Merger.  Deihl Tr. vol. 1-2.  Specifically, Mr. Deihl testified that Home was the largest thrift in the country during the 1970s and 1980s.  Deihl Tr. vol. 1, 84:8-10.  He also testified that during the late 1970s and early 1980s, interest rates rose significantly. *Id*. at 89:9-13.  In an attempt to combat the high interest rates during this period, Mr. Deihl testified that Home began offering VRMs, which were available exclusively in California. *See id*. at 97-99.  He also testified that Home's VRMs followed the Eleventh District COFI. *Id*. at 100:1-8.  After the federal government began allowing federally-chartered thrifts to offer ARMs, Mr. Deihl also testified that Home became a federally-chartered thrift and began to offer ARMs. *Id*. at 103:2-104:1.

With respect to loan demand, Mr. Deihl noted that the demand for mortgage loans dropped "dramatically" in the early 1980s. *Id*. at 104:13-24.  Nonetheless, he testified that Home's management did not believe that the public would permanently stop buying homes. *Id*. at 105:11-24.  And so, he also testified that Home expected to issue mortgage loans during the savings and loan crisis using newly obtained out-of-state deposits as a funding source. *Id*. at 114:14-24.

With regard to the Branching Rights, Mr. Deihl testified that Home targeted the savings and loan markets in Texas, Florida, New York and Ohio during its negotiations with the FSLIC. *Id*. at 115:17-24.  Mr. Deihl further testified that, after Home acquired these thrifts, Home would rename the existing branches and retrain the existing employees.  *Id*. at 122:12-126:12.  Lastly, with respect to the Bowery Merger, Mr. Deihl testified that the Bowery Merger was different than the other transactions, because, among other things, Home did not gain a Branching Right. *Id*. at 126:13-127:23.

### 2.      Testimony Of Mario Antoci

Mario Antoci was a fact witness for plaintiffs and for the government.  *See* Pl. Witness List; Def. Witness List.  Mr. Antoci served as the executive vice president and later the president of Home in the 1980s.  Antoci Tr. vol. 2, 264:14-16.

During the trial, Mr. Antoci testified about Home's acquisition of savings and loan associations located in Florida, Illinois, Missouri, New York, Ohio and Texas and the intangible assets acquired by Home in connection with those transactions.  *See generally id*. at 286-327. Specifically, Mr. Antoci testified that the rapid increase of interest rates caused the savings and loan industry to experience a significant loss in profits during the 1970s and early 1980s.  *Id*. at 271:4-273:9.  He also testified that this interest rate crisis had a negative impact on Home during the 1980s and resulted in Home paying higher interest rates on its deposit accounts than Home received on mortgage loan payments.  *Id*. at 272:5-273:9.  In this regard, Mr. Antoci testified that, by 1981, Home was probably losing money.  *Id*. at 284:6-7.  But, he further testified that Home, nonetheless, fared better than many other thrifts during the interest rate crisis because Home could conduct variable-rate mortgage lending in California.  *Id*. at 273:10-23.

With respect to the Branching Rights that Home received in connection with the FSLIC Mergers, Mr. Antoci testified that Home was interested in the opportunity to acquire thrifts in states other than California primarily to grow deposits.  *Id*. at 283:8-16.  Mr. Antoci also testified that Home's growth projections regarding the thrift's expansion into out-of-state markets was reasonable and properly based upon Home's prior growth experience in Northern California, because Home's growth in Northern California included additional acquisitions as well as savings growth.  *Id*. at 313:6-16.  Lastly, with respect to the RAP Right, Mr. Antoci testified that Home applied the purchase method of accounting and that Home amortized the goodwill on its

books as a result of these transactions over a period of forty years.  *Id*. at 298:7-25, 304:2-305:9.
In this regard, Mr. Antoci further testified that Home would not have entered into the FSLIC
Mergers if Home had not received regulatory approval for this method of accounting for
goodwill.  *Id*. at 305:10-20.

### 3.    Testimony Of Brent Beesley

Brent H. Beesley was a fact witness for plaintiffs and for the government.  *See* Pl.
Witness List; Def. Witness List.  Mr. Beesley served as the director of the FSLIC from April
1981 to May 1983.  Beesley Tr. vol. 3, 453:1-5.  Mr. Beesley was involved in the Florida-
Missouri and Illinois-Texas Mergers on behalf of the FSLIC.  *Id*. at 495:20-23.

During the trial, Mr. Beesley testified about the FSLIC's response to the interest rate
crisis.  *See*, *e.g*., *id*. at 453-56.  Specifically, Mr. Beesley testified that, in October 1979, the
Federal Reserve began increasing interest rates to combat high inflation.  *Id*. at 455:8-13.  He
also testified that this high interest rate environment, combined with the effects of
disintermediation, were devastating for the savings and loan industry, because most thrifts at the
time were making long-term fixed-rate home loans.  *Id*. at 455:21-456:14.  As a result, Mr.
Beesley testified that the thrifts insured by the FSLIC were, in general, headed toward
insolvency.  *Id*. at 456:15-457:5.

Mr. Beesley also testified that the high interest rate environment negatively impacted the
FSLIC, because the FSLIC's assets were worth less than their book value due to the FSLIC's
investment in long-term fixed-rated government bonds.  *Id*. at 457:6-13.  Mr. Beesley testified
that the FSLIC undertook a multi-tiered approach to address this problem, to include: (1)
providing a failing thrift with new capital, (2) brokering an unassisted merger with an in-state
thrift, (3) facilitating an involuntary, unassisted merger, or (4) setting up a marginally assisted in-
state merger.  *Id*. at 461, 463, 473, 475-76; PX570.

In this regard, Mr. Beesley testified that, if the FSLIC could not arrange an unassisted
interstate merger, it would attempt an assisted interstate acquisition, known as a supervisory
merger.  Beesley Tr. vol. 3, 464-65, 469-70, 481; PX570.  He also testified that, in a supervisory
merger, a healthy thrift in a different state would take on the insolvent thrift's liabilities and, in
return, receive certain incentives from the FSLIC.  Beesley Tr. vol. 3, 464:20-465:13, 469:1-
470:21.  He also noted that, in such supervisory mergers, the FSLIC would often package thrifts

in less desirable states with thrifts in more desirable states to ensure the former found merger partners. *Id*. at 490:4-10.

Lastly, with respect to the RAP Right, Mr. Beesley had the following exchange with counsel for the government regarding the accounting for supervisory mergers:

> Q. This wasn't special treatment that FSLIC was selling to individual thrifts, correct?
>
> A. We weren't selling it.  It was - - it was the interpretation that the SEC and the FASB and everybody else said was applicable in these situations, and it was helpful to us. . . . It was a very positive tool that was being applied in these situations which helped us solve problems at lower cost.
>
> Q.  So, if there was a supervisory merger, a thrift didn't have to bargain for this treatment; they got it either way.
>
> A.  I think that's right, or a voluntary treatment.  I mean, it didn't have to be supervisory to get this treatment.
>
> A.  A Federal Home Loan Bank policy?  I think they approved the accounting of the transaction when they approved the deal, but I don't think it was a special policy for Home.  They just said this – I believe that in all of these mergers, to avoid any confusion, that there was a provision that purchase accounting would apply."

*Id*. at 524:16-525:15.

### 4.      Testimony Of Tim Glassett

Tim Glassett was a fact witness for plaintiffs and for the government.  *See* Pl. Witness List; Def. Witness List.  Mr. Glassett worked at Ahmanson from 1985 to 1998, serving as the vice president and corporate counsel, and later as the first vice president and assistant general counsel of Ahmanson.  Glassett Tr. vol. 6, 1225:7-19.  In 1990, Mr. Glassett also served as the corporate secretary to the board of directors for Home, and from 1992 to 1993, he served on the board of directors of the Bowery Savings Bank.  *Id*. at 1225:7-1226:3.

Mr. Glassett testified about the Bowery Merger.  In this regard, Mr. Glassett testified that Ahmanson's purchase of Bowery was contingent upon amendments being made to the 1985 Bowery Assistance Agreement.  *Id*. at 1227:10-12.  He also testified that, among other changes, the 1988 Bowery Assistance Agreement reduced the Bowery Credit Protection by $1,500,000,000, and modified the Bowery RAP Right to allow Bowery to treat goodwill as capital.  *Id*. at 1229:7-17; 1231:2-1237:1.  He also noted that, after entering into the 1988 Bowery Assistance Agreement, the Bowery included goodwill as an asset in capital, consistent

with the 1988 RAP Right, and that the Bowery amortized goodwill over twenty years.  *Id*. at 1238:13-23.  Lastly, with respect to the Bowery IMA, Mr. Glassett testified that the 1988 Bowery Assistance Agreement eliminated the IMA based upon the advice of Salomon Brothers. *Id*. at 1237:18-1238:5.

### 5.      Testimony Of Verne Kline

Verne Kline was a fact witness for plaintiffs and for the government.  *See* Pl. Witness List; Def. Witness List.  Mr. Kline worked for Home most recently from 1985 to 1997.  Kline Tr. vol. 6, 1274:18-19.

Mr. Kline testified about Home's decision in the early 1990s to sell the thrifts that Home had acquired outside of California.  Specifically, Mr. Kline testified that Home's strategy changed "180 degrees," from acquiring thrifts in new markets to withdrawing from all markets except California.  *Id*. at 1278:12-18.  He also testified that this change in strategy was a business decision for Home, and that Home did not intend to ever re-enter the markets that it exited.  Kline Tr. vol. 7, 1318:13-1319:19, 1330:2-18.

With respect to the covenants not to compete in Home's branch sale agreements, Mr. Kline also testified that the covenants not to compete were a typical feature of the branch sale agreements, and that Home did not feel strongly about the terms of the covenants not to compete.  Kline Tr. vol. 6, 1284:17-1285:4.  Mr. Kline also testified that most of Home's covenants not to compete allowed Home to continue its lending business in the specified area. *Id*. at 1289:1-1290:17.

### 6.      Testimony of Curt Brouwer

Curt Brouwer was a fact witness for plaintiffs and for the government.  *See* Pl. Witness List; Def. Witness List.  Mr. Brouwer is the Director of Tax for the WMI Liquidating Trust, the holding company for Washington Mutual Bank.  Brouwer Tr. vol. 7, 1356:23-1257:14.  From 2005 to 2008, he served as the director of corporate tax for Washington Mutual Bank.  *Id*. at 1357:15-23.  In that position, Mr. Brouwer was responsible for the tax operations of Washington Mutual Bank, including preparing tax returns.  *Id*. at 1358:4-7.

During the trial, Mr. Brouwer testified about Home's Internal Revenue Service ("IRS") tax refund claim.  *See id*. at 1369-73.  In this regard, Mr. Brouwer testified that, in 1993,

Ahmanson filed an informal claim with the IRS exam team to take a deduction for the abandonment of branches in Missouri.  *Id*. at 1369:5-22.  He also testified that the IRS denied that claim and, thereafter, Ahmanson requested early consideration of the denial of its claim.  *Id*. at 1371-72; DX069.  Mr. Brouwer further testified that Ahmanson submitted similar tax refund claims to the IRS when it sold Home's other out-of-state branches.  Brouwer Tr. vol. 7, 1372:1-1373:10.

With respect to the Branching Rights at issue in this litigation, Mr. Brouwer testified that Home did not take a tax deduction for the cost of the Branching Right during the 1980s.  *Id*. at 1376:12-14.  In this regard, he testified that "[b]ranching rights, under the tax law in existence at the time, would have been considered an asset with an indeterminate life, and the tax law would not allow you to take an amortization deduction."  *Id*. at 1376:15-18.  And so, he testified that Home claimed the amortization deduction in the years that they sold the last branch in each state.  *Id*. at 1377:11-13.  Lastly, with respect to the RAP Right, Mr. Brouwer testified that Home first claimed a deduction for the RAP Right in the early 1990s.  *Id*. at 1378:5-11.  With respect to the 1988 Bowery RAP Right, Mr. Brouwer testified that Home assumed a fourteen-year amortization period for the Bowery RAP Right from 1985 to 1988 and that the 1988 Bowery Assistance Agreement allowed the Bowery to count goodwill toward capital over a twenty-year period.  *Id*. at 1383.

### 7.    Testimony of Charles Rinehart

Charles Rinehart was a fact witness for plaintiffs and for the government.  *See* Pl. Witness List; Def. Witness List.  Mr. Rinehart worked at Ahmanson and Home from 1989 until the late 1990s.  Rinehart Tr. vol. 7, 1386:11-16.  Mr. Rinehart began as president of both companies and, in the mid-1990s, he became chairman and CEO of both companies.  *Id*. at 1386:17-22.

During the trial, Mr. Rinehart testified about Home's business strategy during the 1990s.  In this regard, Mr. Rinehart testified that, in the 1990s, Home's management decided to concentrate it branches in certain areas, so Home subsequently exited many states.  *Id*. at 1389:21-1394:2.  He also testified that, in so doing, Home sold deposits for which it was paying higher deposit rates and then Home bought branches in California, where it paid lower deposit rates.  *Id*. at 1394:3-24.  In addition, Mr. Rinehart testified that Home did not intend to reopen

any deposit-taking branches in any of the states it exited.  *Id*. at 1397:12-1401:22.  Lastly, with respect to the covenants not to compete contained in Home's branch sale agreements, Mr. Rinehart testified that covenants not to compete are common, and that Home did not plan to return to any of the states it exited.  *Id*. at 1407:4-1408:19.

### 8.    Testimony of Donald Rice

Donald Rice was a fact witness for plaintiffs and for the government.  *See* Pl. Witness List; Def. Witness List.  Mr. Rice served as vice chairman of Bowery Savings Bank from 1985 to 1988.  Rice Tr. vol. 6, 1185:13-16.

Mr. Rice testified about the Bowery Merger.  In this regard, Mr. Rice testified that under the 1985 Bowery Assistance Agreement, the FDIC provided the Ravitch Group with, among other items: (1) a loan of $100,000,000 in cash at a favorable rate, (2) the IMA, and (3) the Bowery RAP Right, wherein Bowery was able to ignore the purchase accounting adjustment and count goodwill toward total capital and primary capital when relevant.  *Id*. at 1167:16-1177:2.  He further testified that the Ravitch Group became interested in selling Bowery in or around 1987, and that Home emerged as a potential buyer.  *Id*. at 1188.  With respect to the Bowery Merger, Mr. Rice testified that the 1985 Bowery Assistance Agreement required that the FDIC approve the sale of the Bowery to Home.  *Id*. at 1189:11-14.  He also testified that the Ravitch Group was not involved in the negotiations between the FDIC and Home.  *Id*. at 1190:16-22.

### 9.    Testimony of Kevin Twomey

Kevin Twomey was a fact witness for plaintiffs and the government.  *See* Pl. Witness List; Def. Witness List.  Mr. Twomey served as the executive vice president and chief financial officer for Ahmanson from June 1993 to October 1998.  Twomey Tr. vol. 4, 703:23-704:21.

During the trial, Mr. Twomey testified about Home's decision to sell its thrifts located in Illinois, Texas, New York and Florida during the 1990s.  *See id*. at 710:20-717:8.  In this regard, Mr. Twomey testified that during the 1990s, credit problems had driven down the value of California thrifts to the point that "nobody wanted to be there."  *Id*. at 706:5-9.  And so, he testified that Home took advantage of this by selling thrifts located outside of California while inexpensively acquiring new thrifts within California.  *Id*. at 706:10-14.

With respect to the Branching Rights, Mr. Twomey also testified that Home viewed the sales of its branches as an "an irrevocable move."  *Id*. at 714:16-20.  In this regard, he testified that:

> [T]he reason [Home] pursued the sales in the first place was to sell [the thrifts] for good premiums in states where [Home] didn't have the ability to compete very effectively . . . The idea of coming back in, I mean, just would have been, in my view, crazy.

*Id*. at 714:22-715:2.  In addition, Mr. Twomey testified that Home had no reason to retain Branching Rights after it sold its branches in these states.  *Id*. at 717:20-23.

### I.      Expert Witnesses

The Court also heard testimony from the following expert witnesses:  Roger Grabowski, Joe A. Hargett, Curtis R. Kimball and Catherine Vandenberg.

### 1.      Expert Testimony Of Roger Grabowski

During the trial, plaintiffs offered Roger Grabowski as their valuation expert.  Pre-Trial Conference Tr. at 25, Feb. 9, 2016; *see also* Grabowski Tr. vol. 3, 543.  Mr. Grabowski currently serves as a Managing Director at Duff & Phelps, LLC, and he is an Accredited Senior Appraiser and Fellow of the American Society of Appraisers.  PX001 at App. D.  He has previously served in senior positions in Standard and Poor's Corporate Value Consulting practice and at PricewaterhouseCoopers, LLP, Price Waterhouse, Valtec Associates and American Valuation Consultants.  *Id*.; Grabowski Tr. vol. 3, 545.  The Court determined that Mr. Grabowski was qualified to testify as an expert with respect to valuation, pursuant to Federal Rule of Evidence 702.  Final Pre-Trial Order at 4, Feb. 10, 2016.

During his trial testimony, Mr. Grabowski analyzed the Supervisory Mergers at issue in this case and he expressed an opinion about the fair market value of the items of government assistance provided to Home in each of those transactions.  *See generally* Grabowski Tr. vol. 4, 5, 6, 8, 13.  To accomplish this, Mr. Grabowski developed a valuation model (the "Grabowski Model") to determine the value of these assets.  *See* Grabowski Tr. vol. 3, 615.

### a.      Overview Of The Valuation Methodology

To determine Home's cost basis in the government assistance that Home received in the Supervisory Mergers, the Grabowski Model first determined the fair market value of each item

of assistance.  PX594 at 44.  The Grabowski Model defines fair market value as "[t]he price at which property would exchange hands between a hypothetical willing buyer and a willing seller."  PX594 at 44.  The Grabowski Model also characterizes a hypothetical willing buyer from the Supervisory Mergers at issue in this case to be a thrift that is large, sophisticated and well-capitalized and, therefore, able to utilize interstate branching rights.  Grabowski Tr. vol. 3, 616:8-619:10; PX594 at 44-46.  To that end, the Grabowski Model identifies guideline thrifts that met the criteria for a hypothetical willing buyer.[15]  Grabowski Tr. vol. 3, 620:9-621:7; PX594 at 46-47.

To determine the fair market value of the Branching Rights and RAP Rights that Home received in each of the Supervisory Mergers, the Grabowski Model uses an income approach, whereby value is estimated based upon the "present value of expected economic benefits (income) that the subject asset can be expected to generate over its remaining useful life."  PX001 at I-12.  Mr. Grabowski testified that to value the Branching Rights at issue in this case, the Grabowski Model projects cash flow until cash flow reaches a steady state–namely, "a period of normalized growth and profitability that is expected to persist in the future"–and then discounts the cash flow to present value.  *Id.*; Grabowski Tr. vol. 3, 555:2-6, 557:1-560:8; PX594 at 13-14.  Mr. Grabowski acknowledged during his testimony that loan demand "declined significantly" during 1980 and 1981 from loan demand during the 1970s.  Grabowski Tr. vol. 5, 949:3-18; PX001 at II-30, VI-20; *see also* PX594 at 216.  Nonetheless, the Grabowski Model assumes that loan demand would keep pace with any amount of deposit growth.  PX001 at II-30.

To value the RAP Rights, Mr. Grabowski also testified that the Grabowski Model estimates the present value of the costs avoided by owning the RAP Rights.  PX001 at I-37.  Specifically, Mr. Grabowski testified that he estimated the cost associated with raising and maintaining replacement capital to maintain the hypothetical willing buyer's pre-merger capital level.  *Id.*

---

[15] The guideline thrifts for the Florida-Missouri and Illinois-Texas Mergers are H.F. Ahmanson, Financial Federation, First Charter Financial, Gibraltar Financial, Golden West Financial, Great Western Financial, and Imperial.  Grabowski Tr. vol. 3, 621:3-7; PX594 at 47.  Mr. Grabowski testified that the list of guideline companies changed for the Century and Ohio Mergers.  Grabowski Tr. vol. 3, 621:12-14.

Lastly, the Grabowski Model uses a discount rate "to determine what future cash flow is worth today." PX594 at 15; Grabowski Tr. vol. 3, 561:3-562:4.  To that end, Mr. Grabowski testified that he accounts for real interest rates, the expected inflation, and risk when calculating the discount rates for each transaction.  Grabowski Tr. vol. 3, 566-67, 569:7-22; PX594 at 19-21. To do so, the Grabowski Model uses a risk-free rate–the yield on twenty-year U.S. Treasury securities as of the valuation date–as an interest rate.  *See, e.g.,* PX001 at A-2, Exs. 2.10, 3.8, 4.8, 5.13.  In addition, Mr. Grabowski projected inflation by evaluating the yield curve.  And so he assumed that the market expected inflation rates stay between 7% and 11% for the foreseeable future.  PX001 at I-5, I-29; PX594 at 28; Grabowski Tr. vol. 3, 581-82, 609-12.

### b.    The Illinois-Texas Merger

Because the FSLIC Mergers are fundamentally similar in nature, Mr. Grabowski's testimony at trial focused upon his valuation of the assistance that Home received in the Illinois-Texas Merger.  Grabowski Tr. vol. 3, 596:22-597:1.  In this regard, Mr. Grabowski testified that he valued the purchase price for the government assistance provided in the Illinois-Texas Merger to be $285,353,000.[16]  PX594 at 65; Grabowski Tr. vol. 4, 666:23-25.  He also testified that he allocated this purchase price, based upon the determined fair market value of each item of government assistance, to determine Home's cost basis in each item of assistance.  Grabowski Tr. vol. 4, 815:12-22.

### i.    The Illinois-Texas RAP Right

The Grabowski Model describes the Illinois-Texas RAP Right as "the contractual right that allowed Home to record accounting goodwill created in [each] transaction."  Grabowski Tr. vol. 4, 805:11-13; *see also* PX594 at 169-70.  Mr. Grabowski testified that he determined that the fair market value of the Illinois-Texas RAP Right to be $38,000,000.  PX594 at 185.  Mr. Grabowski further testified that he determined Home's cost basis in the Illinois-Texas RAP Right to be $35,154,000.  *Id.*

---

[16] To determine this purchase price, Mr. Grabowski primarily used the stated values of the liabilities and assets for the thrifts acquired in this transaction, as reported in Home's SEC 10-K filings.  Grabowski Tr. vol. 3, 615:1-6, 627:22-642:8; PX594 at 64-65.

In this regard, Mr. Grabowski testified that he based his valuation of the RAP Right upon the premise that Home needed a contract with the government in order to count the goodwill created by the FSLIC Mergers for regulatory capital purposes and for Home to use a forty-year amortization period to amortize such goodwill. Grabowski Tr. vol. 4, 805:1-807:22. And so, Mr. Grabowski testified that he determined the value of the RAP Right for all of the Supervisory Mergers to be the equivalent of the cost that a hypothetical willing buyer would avoid by receiving a RAP Right instead of having to raise and preserve capital to meet the regulatory capital requirement. *Id.*; PX594 at 174; PX001 at I-37.

Mr. Grabowski also testified that, to determine the value of the Illinois-Texas RAP Right in particular, he first calculated the value of the projected balance of the goodwill created by the Illinois-Texas Merger over forty years and then calculated the after-tax cost of selling preferred stock to investors to raise capital. Grabowski Tr. vol. 4, 808:1-809:19; PX594 at 174-76; PX001 at I-37-38. PX594 at 180; Grabowski Tr. vol. 4, 812:8-9. Lastly, Mr. Grabowski testified that he reduced this amount by the after-tax yield on assets in which such capital would be invested and then discounted such costs. PX594 at 175.

### ii. The Illinois And Texas Branching Rights

With respect to the Branching Rights, Mr. Grabowski also testified that he determined the fair market value of the Illinois and Texas Branching Rights to be $61,000,000 and $109,000,000, respectively. Grabowski Tr. vol. 4, 824; PX594 at 185. In this regard, Mr. Grabowski testified that he determined Home's cost basis to be $56,432,000 for the Illinois Branching Right and $100,838,000 for the Texas Branching Right. PX594 at 147-49, 185.

To value the Branching Rights, Mr. Grabowski testified that he projected how much deposit growth a hypothetical willing buyer could have expected to achieve after acquiring branching rights. Grabowski Tr. vol. 4, 697:7-10.[17] In this regard, he also testified that he projected three items: (1) the number of branches that a hypothetical willing buyer would have opened after receiving branching rights; (2) the amount of deposits per branch that a hypothetical

---

[17] In this regard, Mr. Grabowski testified that the value of these Branching Rights derives from Home's ability to acquire new deposits and depositors in the new market. Grabowski Tr. vol. 4, 670:25-671:2. Mr. Grabowski also testified that Home could use the customer deposits from such a new market to issue loans in states where it had a pre-existing foothold. *Id.* at 673:9-23.

willing buyer would expect to achieve; and (3) the timing that would be required for a hypothetical willing buyer to obtain its projected share of the overall market in the relevant state. PX594 at 96.  Mr. Grabowski also testified that he then applied a discount rate to determine the present value for the Branching Rights.  *See*, *e.g*., Grabowski Tr. vol. 3, 555:2-6, 557:13-15.

With respect to the Illinois Branching Right, Mr. Grabowski testified that he compared the population density in Northern California to the population density in Illinois to value the Illinois Branching Rights.  PX594 at 99, 102-03.  Based upon this comparison, Mr. Grabowski also testified that he then projected the number of branches that the hypothetical willing buyer would have opened in Illinois based upon the number of branches that Home opened in Northern California, in proportion to the relative population density in Northern California and Illinois. *Id*. at 99.

Based upon Home's Northern California experience, and his comparison of the market shares of other large thrifts in Illinois, Mr. Grabowski testified that he projected that a hypothetical willing buyer would increase its market share in Illinois from 0.4% to 2.54% in 1986, and to 5.71% by year fifteen.  *Id*. at 104-09.

With respect to the number of branches projected to be acquired in Illinois, Mr. Grabowski also testified that he projected that a hypothetical willing buyer would have opened twenty four additional branches between 1981 and 1992.  PX594 at 101.  And so, Mr. Grabowski testified that a hypothetical willing buyer would have operated thirty-two branches in Illinois by 1993.  *Id*. at 99, 101; Grabowski Tr. vol. 4, 768:14-17.

With respect to the projections for the amount of deposits per branch that a hypothetical willing buyer would expect to achieve, Mr. Grabowski testified that he reviewed the history of deposit growth in the savings and loan industry to get a framework for deposit growth in the state.  Grabowski Tr. vol. 4, 768-69; PX594 at 90.  In addition, Mr. Grabowski testified that he also examined the number of branches and the deposits per branch for competitors in the relevant state to ascertain how much of the market the hypothetical willing buyer could capture. *Id*. at 95, 98.  With respect to Illinois, Mr. Grabowski projected that a hypothetical willing buyer would reach deposits per branch of $70,000,000.  *Id*. at 97-98; Grabowski Tr. vol. 4, 768-69.  In discussing his deposits per branch projection, Mr. Grabowski testified that:

> We used the same ramp-up assumptions, five years for new branches, four years for the acquired branches, to get up there. . . . [W]e extracted for Northern California, how long it took and how long Home management said that it should take to get up there.

Grabowski Tr. vol. 4, 800:21-25.

Mr. Grabowski also acknowledged during his testimony that he relied upon Home's Northern California experience to determine when the hypothetical willing buyer's deposit growth would reach a steady state. Grabowski Tr. vol. 4, 767:21-769:25 ("used the Northern California [experience] as a proxy for the ramp-up period"). In this regard, Mr. Grabowski also acknowledged that Home's Northern California growth "happened when deposit growth was really going fast." *Id*. at 769:12-13. And so, to account for the changes in economic environment during the early 1980s, Mr. Grabowski testified that he adjusted Home's deposit growth in Northern California to reflect real, as opposed to inflation-adjusted, growth. PX001 at I-28 n.23.[18]

Mr. Grabowski testified that he used the same valuation methodology to value the Texas Branching Right and that he determined the fair market value of the Texas Branching Right to be $109,000,000. PX594 at 167; Grabowski Tr. vol. 4, 799:1-9. Specifically, with respect to the projected number of branches that a hypothetical willing buyer would open in Texas, Mr. Grabowski testified that Home initially acquired thirty-six branches and that he projected that a hypothetical willing buyer would open another thirty-six branches in Texas between 1983 and 1992. Grabowski Tr. vol. 4, 801:1-15; PX594 at 155-56. Mr. Grabowski also testified that he projected that a hypothetical willing buyer's market share in Texas would increase from 1.22% to 4.05% in five years, and to 6.47% in fifteen years. Grabowski Tr. vol. 4, 801:24-802:2; PX594 at 157, 160. As was the case in Illinois, Mr. Grabowski testified that he projected that a

---

[18] The Grabowski Model assumes that all deposits would be invested in mortgages–ARMs, specifically– and that a spread on new loans of 2.5% was appropriate. Grabowski Tr. vol. 4, 776:19-777:12; PX594 at 117-23. In addition, the discount rate for the Illinois-Texas Merger accounts for inflation, the real risk-free interest rate and a risk premium, which consists of an equity risk premium, an industry risk factor (or beta), and a size premium. PX594 at 21, 139. In this instance, the Grabowski Model used an equity risk premium of 5%–similar to the risk premium for investment in the stock market, an industry risk factor of 1.47%, and a size premium of 1.37%. *Id*. at 139-40; Grabowski Tr. vol. 4, 787:2-791:14. The size premium, which represents the incremental return not captured by beta that an investor required given the size of the investment, is 1.37%. PX594 at 145; Grabowski Tr. vol. 4, 794:1-4.

hypothetical willing buyer would reach a steady state by year fourteen.  PX594 at 158.  And so, Mr. Grabowski testified that he projected that a hypothetical willing buyer would eventually achieve $27,500,000 in deposits per branch in Texas.  *Id.* at 153; Grabowski Tr. vol. 4, 800:14-15.[19]

Mr. Grabowski testified that after determining the fair market values of the Illinois and Texas Branching Rights and the Illinois-Texas RAP Right, he allocated the purchase price for the FSLIC assistance in the Illinois-Texas Merger, based upon each asset's percentage of the total fair market value of the assets, to determine Home's cost basis in these assets.  Grabowski Tr. vol. 4, 814:12-815:24; PX594 at 185.  And so, Mr. Grabowski testified that he determined Home's cost basis in the Illinois Branching Right to be $56,432,000, Home's cost basis in the Texas Branching Right to be $100,838,000, and Home's cost basis in the Illinois-Texas RAP Right to be $35,154,000.  PX594 at 185.

Lastly, Mr. Grabowski testified that he performed two sensitivity analyses for the Illinois-Texas Merger, to address concerns that loan demand would be lower than he assumed and that deposit growth would not increase at the rate that he projected.  Grabowski Tr. vol. 4, 828:25-831:10; PX594 at 185-86.  These analyses provide alternative calculations of the fair market values of the Illinois and Texas Branching Rights and Illinois-Texas RAP Right and Home's cost basis in the RAP Right and Illinois and Texas Branching Rights.[20]  PX594 at 185-86.

---

[19] The acquired Texas thrifts had approximately $10,000,000 in deposits per branch, whereas all Texas thrifts had average deposits per branch of $18,700,000.  PX594 at 153. The largest Texas thrift had $48,000,000 in deposits per branch, and the average thrift had $30,000,000 in deposits per branch.  *Id.* at 153-54.  In addition, Texas's population was 394 people per square mile, a relatively low population density.  *Id.* at 153.  Mr. Grabowski also testified that Home received three other assets from the FSLIC as part of the Illinois-Texas Merger, namely, cash payments, loan and real estate indemnifications, and regulatory capital forbearance.  PX594 at 183.  Mr. Grabowski testified that the Grabowski Model subtracted the value of these items of assistance from the total purchase price before allocating the remaining purchase price among the RAP Right and Branching Rights.  Grabowski Tr. vol. 4, 813:11-14:11; PX594 at 185.

[20] Under the first sensitivity analysis, Mr. Grabowski testified that he assumed that a hypothetical willing buyer would only receive 50% of the deposits that he projected during the first two years after the merger.  *Id.* at 186; Grabowski Tr. vol. 4, 829:2-5.  And so, Mr. Grabowski testified that Home's cost basis in the Illinois Branching Right would decrease from $56,432,000 to $55,413,000; Home's cost basis in the Texas Branching Right would decrease from $100,838,000 to $98,280,000; and Home's cost basis in the Illinois-Texas RAP Right would increase from $35,154,000 to $39,730,000 under this scenario.  PX594 at 186.

### c.     The Florida-Missouri Merger

Mr. Grabowski testified that the economic conditions during the Florida-Missouri Merger were similar to the economic conditions during the Illinois-Texas Merger.  Grabowski Tr. vol. 4, 819; PX594 at 189.  He also testified that the purchase price for the government assistance that Home received in the Florida-Missouri Merger is $216,759.00.  PX594 at 190; Grabowski Tr. vol. 4, 819:19-820:17.  In addition, Mr. Grabowski testified that he determined the fair market value of the Florida-Missouri RAP Right to be $46,000,000, the fair market value of the Florida Branching Right to be $147,000,000, and the fair market value of the Missouri Branching Right to be $30,000,000.  Grabowski Tr. vol. 4, 824:6-828:17; PX594 at 199, 204-06.  To that end, Mr. Grabowski determined Home's cost basis in the Florida-Missouri RAP Right to be $44,713,000, Home's cost basis in the Missouri Branching Right to be $29,160,000, and Home's cost basis in the Florida Branching Right to be $142,886,000.  PX594 at 207; PX004 at Ex. I.

### i.     The Florida-Missouri RAP Right

With respect to the valuation of the Florida-Missouri RAP Right, Mr. Grabowski testified that he utilized the same methodology as discussed above for the Illinois-Texas Merger.  PX594 at 206; Grabowski Tr. vol. 4, 828:6-24.  Mr. Grabowski further testified that he determined that the Florida-Missouri Merger created $263,000,000 of goodwill, to be amortized over 40 years.  PX594 at 206; Grabowski Tr. vol. 4, 828:6-8.

### ii.     The Florida And Missouri Branching Rights

To value the Florida and Missouri Branching Rights, Mr. Grabowski testified that he again utilized the same methodology as discussed above for the Illinois-Texas Merger.  Grabowski Tr. vol. 4, 818:7-8; PX594 at 96.  With respect to the Florida Branching Right, Mr. Grabowski testified that he projected that a hypothetical willing buyer would open thirty *de novo* branches in Florida, resulting in the operation of forty-three branches in Florida.  PX594 at 199;

---

Under the second sensitivity analysis, Mr. Grabowski testified that he assumed that a hypothetical willing buyer would invest half of its deposits in ARMs and the other half in Treasury bills for the first two years after the Illinois-Texas Merger.  *Id.* at 187; Grabowski Tr. vol. 4, 829:17-19.  He testified that Home's cost basis in the Illinois Branching Right would decrease from $56,432,000 to $55,701,000; Home's cost basis in the Texas Branching Right would decrease from $100,838,000 to $100,072,000 and Home's cost basis in the Illinois-Texas RAP Right would increase from $35,154,000 to $39,651,000 under this scenario.  PX594 at 187.

Grabowski Tr. vol. 4, 823:7-8.  With respect to the Missouri Branching Right, Mr. Grabowski also projected that a hypothetical willing buyer would add eight *de novo* branches in Missouri, resulting in the operation of twenty-five branches in Missouri.  Grabowski Tr. vol. 4, 823:4-6; PX594 at 199.

With respect to the amount of deposits per branch that a hypothetical willing buyer could have expected in Florida, Mr. Grabowski testified that he projected that a hypothetical willing buyer would have $60,000,000 in deposits per branch in Florida after approximately four years.  PX594 at 196-97; Grabowski Tr. vol. 4, 822:11-16.

Mr. Grabowski also testified that he reviewed Home's experience in Northern California and the experience of other large thrifts in the Florida market to estimate market share.  PX594 at 195-99.  Specifically, Mr. Grabowski testified that he projected that a hypothetical willing buyer's market share in Florida would increase from 1.03% at the time of acquisition to 2.88% after five years and, ultimately, to 5.61%.  *Id.*

With respect to the amount of deposits per branch the hypothetical willing buyer could have expected in Missouri, Mr. Grabowski also testified that he projected that a hypothetical willing buyer's deposits per branch would increase to $34,000,000 per branch over approximately four years.  Grabowski Tr. vol. 4, 800:21-25, 821:5-9; PX594 at 193.  Mr. Grabowski also testified that he projected that Home's market share in Missouri would increase from 1.84% to 5.31% after five years and, ultimately, to 6.5%.  PX594 at 193, 199.

After determining the fair market values of the Florida and Missouri Branching Rights and the Florida-Missouri RAP Right, Mr. Grabowski testified that he allocated the purchase price for the Illinois-Texas Merger among these assets to determine Home's cost basis.  *See* PX594 at 207.  And so, Mr. Grabowski testified that he determined Home's cost basis in the Missouri Branching Right to be $29,160,000, Home's cost basis in the Florida Branching Right to be $142,886,000, and Home's cost basis in the Florida-Missouri RAP Right to be $44,713,000.[21]  *Id.*

---

[21] Mr. Grabowski testified that he performed the same two sensitivity analyses for the Florida-Missouri Merger that he performed for the Illinois-Texas Merger.  Grabowski Tr. vol. 4, 828:25-830:10; PX594 at 208-09.  Home's cost basis in the Missouri Branching Right decreased from $29,160,000 to $25,399,000; Home's cost basis in the Florida Branching Right increased from $142,886,000 to $143,561,000; and Home's cost basis in the Florida-Missouri RAP Right increased from $44,713,000 to $50,799,000 under

### d.      The Century Merger

Mr. Grabowski testified that he utilized the same methodology discussed above to value the government assistance that Home received in the Century Merger.  *See* Grabowski Tr. vol. 4, 840-41.  Mr. Grabowski also testified, however, that the economic conditions had changed and that mortgage originations had increased by the time of the Century Merger.  *Id.* at 834:6-835:23.  In this regard, Mr. Grabowski testified that interest rates peaked in late 1981 and trended downward after 1982.[22]  Grabowski Tr. vol. 5, 934:14-22; PX594 at 214.

### i.      The Century RAP Right

With respect to the valuation of the Century RAP Right, Mr. Grabowski testified that he determined that the Century Merger created goodwill in the amount of $127,000,000, to be amortized over forty years.  PX594 at 230.  Mr. Grabowski also testified that he reduced the amount of the goodwill by the tax benefit received from the favorable financing for the Century Merger, which he valued to be $78,000,000.  Grabowski Tr. vol. 4, 854:16-21; PX594 at 230-31.  Mr. Grabowski also testified that he then calculated the costs avoided by having the Century RAP Right–the difference between the cost of replacement capital and the after-tax return on mortgages–and then discounted such costs.  PX594 at 230.  And so, Mr. Grabowski testified that he determined the fair market value of the Century RAP Right to be $26,000,000.  *Id.*; Grabowski Tr. vol. 4, 854:5.

### ii.      The New York Branching Right

To value the New York Branching Right, Mr. Grabowski testified that he followed the same valuation methodology discussed above.  *See* PX001 at I-26 to I-34.  In this regard, Mr. Grabowski testified that he examined data from the Florida-Missouri and Illinois-Texas Mergers—in addition to data about Home's Northern California experience in the 1970s—to project the number of branches that a hypothetical willing buyer would expect to open.

---

the first sensitivity analysis.  *Id.*  Home's cost basis in the Missouri Branching Right decreased from $29,160,000 to $26,325,000; Home's cost basis in the Florida Branching Right increased from $142,886,000 to $144,785,000; and Home's cost basis in the Florida-Missouri RAP Right increased from $44,713,000 to $52,649,000 under the second sensitivity analysis.  *Id.*

[22] Specifically, Mr. Grabowski testified that interest rates declined from approximately 16.5% at the time of the Illinois-Texas Merger, to approximately 14% at the time of the Century Merger on August 10, 1984.  PX594 at 215; Grabowski Tr. vol. 5, 870:3-24.

Grabowski Tr. vol. 4, 843:4-846:21; PX594 at 220.  Mr. Grabowski also testified that his projections for branch openings in Texas were not as similar to Home's actual branch openings, due to an oil crisis that impacted Texas during the early 1980s.  Grabowski Tr. vol. 4, 844:6-23. And so, Mr. Grabowski testified that he projected that a hypothetical willing buyer would open thirteen additional branches in New York, for a total of twenty-nine branches in New York in 1996.  Grabowski Tr. vol. 4, 846:4-847:2; PX594 at 221, 224.

With respect to his projection for the amount of deposits per branch, Mr. Grabowski testified that he projected that a hypothetical willing buyer would increase its productivity in acquired and *de novo* branches to $85,000,000 in deposits per branch in New York in four or five years.  PX594 at 219, 221-22; Grabowski Tr. vol. 4, 841:9-18, 847:4-7.

In addition, Mr. Grabowski testified that he reviewed Home's experience in Northern California and the experience in other large thrifts in New York to estimate a hypothetical willing buyer's market share.  PX594 at 88, 238, 242.  Specifically, Mr. Grabowski testified that he projected that a hypothetical willing buyer's market share in New York would increase from 0.55% to 1.26% after five years, and to 2.04% by year fifteen.  *Id.*; Grabowski Tr. vol. 4, 847:24-848:1.  And so, after discounting his valuation to present value using a discount rate of 24%, Mr. Grabowski determined the fair market value of the New York Branching Right to be $105,000,000.  PX594 at 225, 228-29.  Mr. Grabowski further testified that he determined Home's cost basis for the New York Branching Right to be $101,966,000 and Home's cost basis for the Century RAP Right to be $25,249,000.  Grabowski Tr. vol. 4, 855:1-12; PX594 at 232.

### e.    The Ohio Merger

Mr. Grabowski valued the FSLIC assistance provided in the Ohio Merger using the same valuation methodology discussed above.  Grabowski Tr. vol. 5, 871:1-5.  Mr. Grabowski testified that he determined the purchase price for the Ohio Merger to be $50,800,000.  PX 594 at 236.[23]  He also testified that he determined the fair market value of the Ohio Branching Right to be $31,000,000 and the fair market value of the Ohio RAP Right to be $6,000,000.  *Id.* at 246-

---

[23] Mr. Grabowski further testified that, because the Ohio Merger differed from the other three FSLIC Mergers, he subtracted $9,500,000 from the net assets of the acquired thrifts when he calculated the purchase price.  Grabowski Tr. vol. 5, 871:6-12; PX594 at 235.  After determining Home's purchase price for the Ohio Merger to be $50,800,000, Mr. Grabowski reduced this amount by the value of the  favorable financing that Home received in this merger, resulting in a purchase price of $23,866,000.  *Id.* at 249.

47; Grabowski Tr. vol. 5, 888:11-889:15.  And so, Mr. Grabowski further determined Home's cost basis in the Ohio Branching Right to be $19,996,000 and Home's cost basis in the Ohio RAP Right to be $3,870,000.  PX594 at 249; *see* Grabowski Tr. vol. 5, 890:22-891:1.

### i.        The Ohio RAP Right

With respect to the valuation of the Ohio RAP Right, Mr. Grabowski testified that he determined that the Ohio Merger created goodwill in the amount of $32,700,000, to be amortized over 40 years.  Grabowski Tr. vol. 5, 888:24-889:1.  Mr. Grabowski also testified that he reduced this amount by the tax benefit realized on the favorable financing for the Ohio Merger. Grabowski Tr. vol. 5, 889:1-4.  In addition, Mr. Grabowski testified that he calculated the costs avoided by owning the Ohio RAP Right–the difference between the cost of replacement capital and the after-tax return on mortgages–and then discounted such costs.  PX594 at 247.  He also testified that he used a discount rate of 22% to value the Ohio RAP Right.  *Id.*; Grabowski Tr. vol. 5, 888:7-889:15.  And so, Grabowski testified that he determined the fair market value of the Ohio RAP Right to be $6,000,000.  Grabowski Tr. vol. 5, 889:14-15.

### ii.       The Ohio Branching Right

To value the Ohio Branching Right, Mr. Grabowski testified that, in addition to data about Home's Northern California expansion, he also examined data from the Florida-Missouri and Illinois-Texas Mergers.  *Id.* at 843:4-7, 877:3-8; PX594 at 220.  With respect to the number of branches that a hypothetical willing buyer could expect to open in Ohio, Mr. Grabowski testified that he projected that a hypothetical willing buyer would open six branches in Ohio, resulting in twenty nine branches in Ohio by year twelve.  Grabowski Tr. vol. 5, 879:13-23.

With respect to the amount of deposits per branch, Mr. Grabowski also testified that he projected that a hypothetical willing buyer would increase its deposits per branch to $30,000,000 by year five for *de novo* branches and by year four for acquired branches.  PX594 at 238; Grabowski Tr. vol. 5, 876:1-20.  Mr. Grabowski also testified that he projected that a hypothetical willing buyer's market share would increase from the 0.98% acquired to 1.78% in year five, to 2.1% by year twelve.  Grabowski Tr. vol. 5, 880:21-24; PX594 at 239-41.  And so, Mr. Grabowski testified that he determined the fair market value of the Ohio Branching Right to be $31,000,000.  PX594 at 242; Grabowski Tr. vol. 5, 881:7-8.

Lastly, Mr. Grabowski testified that he allocated the purchase price, as adjusted to account for the cash-like government assistance that Home also received in the Ohio Merger, between the Ohio Branching Right and the RAP Right. PX594 at 235, 248-49. And so, Mr. Grabowski testified that he determined Home's cost basis in the Ohio Branching Right to be $19,996,000 and Home's cost basis in the Ohio RAP Right to be $3,870,000. *Id*. at 249; Grabowski Tr. vol. 5, 890:6-891:1.

### f.       The Bowery Merger

Mr. Grabowski testified that he approached the valuation of the 1985 Bowery Merger in the same manner as the valuation of the FSLIC Mergers. PX596 at 5. In this regard, Mr. Grabowski testified that he subtracted Bowery's assets from its liabilities and, thus, determined the purchase price for the government assistance that the Ravitch Group received from the FDIC in 1985 to be $644,371,000. *Id*. at 5, 8; Grabowski Tr. vol. 8, 1570:19-21. Mr. Grabowski also testified that he calculated the fair market value of this government assistance and then allocated the purchase price among the items of government assistance, to determine the Ravitch Group's cost basis in each item of assistance. PX596 at 36; Grabowski Tr. vol. 8, 1570:13-21.

### i.       The 1985 Bowery RAP Right

With respect to the valuation of the Bowery RAP Rights, Mr. Grabowski testified that he was tasked with valuing the Bowery RAP Right that the Ravitch Group received in 1985. Grabowski Tr. vol. 8, 1560:3-1561:5. Mr. Grabowski also testified that the 1985 Bowery RAP Right allowed the Bowery to reverse the purchase accounting adjustments made under GAAP for purposes of computing regulatory capital. *Id*. at 1575:2-12. He also testified that the 1985 Bowery RAP Right had a similar effect on regulatory capital as the RAP Rights Home received in the FSLIC Mergers. PX596 at 11; Grabowski Tr. vol. 8, 1574:15-17.

To value the 1985 Bowery RAP Right, Mr. Grabowski testified that he estimated the cost savings from having to raise capital by issuing preferred stock. Grabowski Tr. vol. 8, 1574:24-1575:1; PX596 at 12. In addition, Mr. Grabowski testified that he used a 14-year amortization period to value the 1985 Bowery RAP Right. Grabowski Tr. vol. 8, 1575:2-12. Mr. Grabowski also testified that he used a discount rate of 20% to calculate the present value of the 1985 Bowery RAP Right. PX001 at V-23; Grabowski Tr. vol. 8, 1576:22. And so, Mr. Grabowski

testified that he determined the fair market value of the 1985 Bowery RAP Right to be $208,000,000.  Grabowski Tr. vol. 8, 1577:7-8; PX596 at 13.

### ii.        The Income Maintenance Agreement

Mr. Grabowski also testified that he valued the Bowery IMA.  In this regard, Mr. Grabowski testified that the Bowery IMA did not "match anything that was available on the marketplace."  Grabowski Tr. vol. 8, 1629:6-7; PX596 at 60.  Mr. Grabowski also testified that the IMA was not akin to an interest rate swap.  PX596 at 61; Grabowski Tr. vol. 8, 1634:16-1635:2, 1636:8-1637:14.  And so, Mr. Grabowski testified that he determined the fair market value of the IMA to be $240,000,000.  PX596 at 36.

### iii.       Other Assistance

Mr. Grabowski also testified that he valued the other government assistance that the Ravitch Group received in 1985.  Grabowski Tr. vol. 8, 1598:24-1600:19.  In this regard, Mr. Grabowski testified that he determined the fair market value of the Bowery net worth certificates to be $39,000,000.  PX596 at 36; Grabowski Tr. vol. 8, 1599:1-10.  Mr. Grabowski also testified that he determined the fair market value of the Bowery Favorable Financing, Treasury bills, certain receivables, capital forbearances, and credit protection to be $4,500,000, $170,255,000, $40,250,000, $31,000,000, and $16,000,000, respectively.  Grabowski Tr. vol. 8, 1574:1-12; PX596 at 36.  To determine the Ravitch Group's cost basis in the government assistance provided in the 1985 Bowery Merger, Mr. Grabowski testified that he allocated the adjusted purchase price of $486,366,000 among the 1985 Bowery RAP Right, the IMA, the capital forbearance, the net worth certificates and the credit protection.  PX596 at 36; Grabowski Tr. vol. 8, 1600:21-1601:22.  And so, Mr. Grabowski testified that he determined Home's cost basis in the Bowery RAP Right to be $189,446,000 and Home's cost basis in the Bowery Credit Protection to be $14,573,000.[24]  PX596 at 36.

---

[24] Plaintiffs claim that "the 1985 Bowery Supervisory Merger, not Home's 1988 acquisition, gave rise to Bowery's cost basis in the Bowery RAP Right, the Bowery Credit Protection, and the Bowery Favorable Financing."  Pl. Post-Trial Br. at 125.

### 2.      Expert Testimony Of Joe A. Hargett

During the trial, the government offered Joe A. Hargett as its expert on financial and regulatory accounting in the savings and loan industry; the accounting standards used in the savings and loan industry, including GAAP accounting; the regulations applicable to savings and loan associations, including capital regulations that apply to savings and loan associations; and the financial analysis of savings and loan associations.  Joint Status Report, Feb. 12, 2016; Hargett Tr. vol. 9, 1759: 1-10, 1772:1-6.  Mr. Hargett testified about the following topics during his expert testimony: (1) deposit projections for the Florida-Missouri and Illinois-Texas Mergers; (2) actual accounting for the Florida-Missouri and Illinois-Texas Mergers; (3) the Century and Ohio Mergers; and (4) the Bowery Merger.  Hargett Tr. vol. 9, 1774:18-1775:16.

During his testimony, Mr. Hargett testified that Mr. Grabowski's fair market value determinations for the Branching Rights in each of the FSLIC Mergers are unreliable. Specifically, Mr. Hargett testified that:  (1) Mr. Grabowski's deposit growth projections vary significantly with what actually occurred after the FSLIC Mergers and with Home's own contemporaneous projections; (2) Mr. Grabowski improperly relied upon Home's Northern California data to value the Branching Rights; and (3) Mr. Grabowski improperly assumed that loan demand would keep pace with any amount of deposit growth to value the Branching Rights. *See generally* Hargett Tr. vol. 9, 10.

With regard to Mr. Grabowski's deposit growth projections, Mr. Hargett testified that when comparing the Grabowski Model's projected deposits in Texas, Illinois, Florida and Missouri after the first year of each acquisition with Home's actual deposits, the deposit growth projections differ by more than $150,000,000.  DX228 at 31, Hargett Tr. vol. 9, 1939:4-12.  He also testified that Mr. Grabowski's reliance upon Home's Northern California experience to value the Branching Rights was improper because of the vast differences between the U.S. economy in the 1970s and the 1980s.  *Id*. at 2007:24-2008:16, 2030:11-20, 2035:13-2036:9; DX228 at 113.

Mr. Hargett also testified that Mr. Grabowski's valuation of the Branching Rights is flawed, because the Grabowski Model improperly assumes that loan demand will keep pace with any amount of deposit growth.  Hargett Tr. vol. 10, 2039:18-2051:24; DX228 at 124-127.  In this regard, Mr. Hargett testified that this flaw is magnified because Mr. Grabowski assumes that

interest rates will stay at 1981 and 1982 levels.  Hargett Tr. vol. 10, 2052:18-2053:25; *see also* Hargett Tr. vol. 9, 1965:1-1966:10.  And so, Mr. Hargett opined that Mr. Grabowski should have either assumed a decline in interest rates after December 1981/January 1982, or used a loan-driven model to value the Branching Rights.  *Id*. at 2045:2-23, 2052:18-2053:25.

Mr. Hargett also testified that Mr. Grabowski's valuations of the RAP Rights for the Supervisory Mergers are unreliable.  Hargett Tr. vol. 9, 1903:1-1904:17.  In this regard, Mr. Hargett testified that, at the time of the FSLIC Mergers, thrifts had the right to record goodwill on their books as an asset.  *Id*.; JX107.  And so, Mr. Hargett further testified that the critical question at the time was not whether goodwill was an asset that could be recorded on a thrift's books but, rather, how a company should amortize such goodwill.  Hargett Tr. vol. 9, 1903:1-1904:17; Hargett Tr. vol. 10, 2070:3-2071:25, 2079:4-6.

Specifically, with respect to the Florida-Missouri Merger and the Illinois-Texas Merger, Mr. Hargett testified that, at the time Home entered into these transactions, the only issue to be resolved with respect to Home's accounting of goodwill was the length of time over which Home could amortize goodwill.  Hargett Tr. vol. 10, 2070:18-23, 2079:4-6.  Mr. Hargett testified that RAP accounting followed GAAP and that, under GAAP, goodwill could be amortized over forty years.  *Id*. at 2097:1-9, 2112; DX192 at 6.  And so, Mr. Hargett opined that the FHLBB's Resolutions regarding the accounting treatment for goodwill for the FSLIC Mergers are important only because these resolutions confirmed that Home could amortize the goodwill created by these mergers over forty years.  Hargett Tr. vol. 10, 2097:1-9, 2112; DX192 at 6.  Mr. Hargett further testified that the chance that the accounting treatment for goodwill would change−thereby requiring Home to amortize goodwill over a period of less than forty years between 1981 and 1986−was remote.  Hargett Tr. vol. 10, 2125-29; DX228 at 182-189.  And so, he opined that the possibility that a regulatory or accounting change would require Home to amortize goodwill over a period less than forty years was 2% for the Florida-Missouri Merger and 5% for the Illinois-Texas Merger.  Hargett Tr. vol. 10, 2126:19-2127:7; DX228 at 189.[25]

---

[25] With respect to the Bowery Merger, Mr. Hargett testified that the IMA was an extremely valuable asset and that the IMA functioned as an interest rate swap with a declining balance.  Hargett Tr. vol. 9, 1783:2-5, 1811:23-24, 1816:5-1817:25; DX228 at 214.

### 3.      Expert Testimony of Curtis Kimball

During the trial, the government offered Curtis Kimball as its expert on valuation.  Final
Pre-Trial Order, Feb. 10, 2016.  Mr. Kimball is the managing director of Willamette
Management Associates.  DX226 at 1, 12.  Mr. Kimball offered an opinion that the plaintiffs'
valuation of the Branching Rights and RAP Rights are unreliable.  *See* DX201 at 56-57.

### a.      The FSLIC Mergers

With respect to Mr. Grabowski's valuation of the Branching Rights, Mr. Kimball offered
several opinions critical of the valuation of this asset.  First, Mr. Kimball opined that Mr.
Grabowski's hypothetical willing buyer is too similar to Home, to be a reliable input for valuing
the Branching Right, because, among other things, the Grabowski Model assumes that a
hypothetical willing buyer will exclusively use ARMs and make loans in California.  Kimball Tr.
vol. 11, 2437:8-2438:1.

Second, Mr. Kimball testified that Mr Grabowski's valuations for the Branching Rights
are also unreliable because the deposit-driven model that Mr. Grabowski uses to value this asset
is inappropriate.  *Id*. at 2439:3-21.

Mr. Kimball further testified that a hypothetical willing buyer would need to capture very
large shares in the new markets to attain the deposit growth that Mr. Grabowski projects.  *Id*. at
2445:1-2446:24.

Mr. Kimball also criticized the Grabowski Model's use of Home's Northern California
data to value the Branching Rights.  *Id*. at 2459:13-2461:3; DX226 at 47.  In this regard, Mr.
Kimball testified that he disagrees with Mr. Grabowski's projection for real deposits per branch,
and he testified that the equity risk premium and the size premium that Mr. Grabowski uses for
the discount rate should have been higher.  Kimball Tr. vol. 11, 2467:23-2469:13, 2491; DX226
at 48.[26]

---

[26] Specifically, Mr. Kimball testified that the 5.0% equity risk premium is too low relative to what
hypothetical willing buyers and sellers utilized at the time of the transaction dates.  DX226 at 48; Kimball
Tr. vol. 11, 2468:1-2469:13.  Mr. Kimball also testified that the Grabowski Model is flawed because the
model fails to include an investment-specific risk premium for the Branching Rights.  Kimball Tr. vol. 11,
2469:1-2470:10.  In addition, Mr. Kimball testified that Mr. Grabowski should use the "unadjusted equity
risk premium because it takes into account a troubled period of time like the Great Depression."  *Id*. at
2470:11-2471:2.  Lastly, Mr. Kimball testified that the Grabowski Model's sensitivity analyses for the

Mr. Kimball also testified that Mr. Grabowski's valuation of the RAP Right is unreliable. *Id*. at 2485:8-9; DX226 at 61-65. In this regard, Mr. Kimball testified that he considers the ability to amortize goodwill over forty years to be a nonsupervisory benefit in the Illinois-Texas and Florida-Missouri Mergers, because Home did not need the RAP Right to use this amortization period. Kimball Tr. vol. 12, 2530:5-2531:8. And so, Mr. Kimball opined that the RAP Right for these transactions provides no additional benefit to Home. Kimball Tr. vol. 11, 2486:2-7.

In addition, Mr. Kimball testified that, in the Century and Ohio Mergers, Home received a supervisory benefit with the RAP Right because GAAP provided for only a twenty-five-year amortization period. DX226 at 63. And so, he opined that the Century and Ohio RAP Rights provided a larger benefit to Home. *Id*.; Kimball Tr. vol. 12, 2531:3-15, 2533:13-2534:6. Given this, Mr. Kimball opined that the RAP Rights "are essentially an insurance contract to prevent future or retroactive revisions to the long-term amortization of goodwill for regulatory reserve purposes." Kimball Tr. vol. 11, 2486:24-2488:11. For this reason, Mr. Kimball opined that Mr. Grabowski overestimated the value of the Century and Ohio RAP Rights. *Id*. at 2501, 2531:3-15, 2533:13-2534:6; DX201 at 57.

### b.     The Bowery Merger

Lastly, with regard to the Bowery Merger, Mr. Kimball testified that among other things, "I don't see any appraisal rationale . . . to explain why it's appropriate to use the earlier date [1985] for the valuation. . . ." Kimball Tr. vol. 11, 2430:5-9. And so, Mr. Kimball concluded that the Court should not rely on Mr. Grabowski's analysis.[27]

### 4.     Expert Testimony of Catherine Vandenberg

Plaintiffs offered Catherine Vandenberg as their expert witness on the banking industry, including savings and loan associations, and on matters involving financial analysis and regulation of savings and loan associations. Joint Status Report, Feb. 12, 2016. During her

---

Branching Rights valuations "indicate how volatile the Grabowski analysis is on branching rights." Kimball Tr. vol. 12, 2584:2-3. Mr. Kimball further testified "that the sensitivity erodes the credibility of the Grabowski analysis." *Id*. at 2584:3-5; *see* DX226 at 170.

[27] Mr. Kimball also testified that he found several major problems with Mr. Grabowski's valuation of the 1985 Bowery RAP Right.

testimony, Ms. Vandenberg testified about the relationship between loan demand and deposit growth and the likelihood of regulatory changes relating to accounting for goodwill.[28] Vandenberg Tr. vol. 7, 1483:3-9.

First, with respect to loan demand and how loan demand impacts the valuation of the Branching Rights, Ms. Vandenberg testified that Mr. Hargett's opinion that thrifts considered loan demand first and identified a funding source second is "inconsistent with the essence of financial intermediation." *Id*. at 1483:21-1484:3. Ms. Vandenberg also testified that when there is a mismatch between inflows and outflows, a depository institution would "develop alternative funding sources and alternative investment opportunities." *Id*. at 1484:4-10. Ms. Vandenberg also testified that thrifts would want to foster deposit growth even in periods of slow loan demand for various reasons, including: (1) the opportunity for liability substitution–replacing higher cost sources of funds with lower cost deposits; (2) increasing the value of a thrift's deposit base by expanding its geographic market; or (3) increasing the thrift's concentration in its existing market. *Id*. at 1484:15-1485:24. Lastly, with respect to the valuation of the RAP Rights for the FSLIC Mergers, Ms. Vandenberg also testified that the likelihood of a regulatory change with regard to the amortization period for goodwill was much higher than Mr. Hargett suggested in his testimony. *Id*. at 1490:23-1491:4.

### J.    Procedural Background

The trial in this matter was held in Washington, DC on February 16, 2016, to March 4, 2016. *See generally* Tr. vol. 1-14. During trial, the Court heard testimony from Mario Antoci, Brent Beesley, Curt Brouwer, Richard Deihl, Tim Glassett, Verne Kline, Donald Rice, Charles Rinehart, Kevin Twomey, Roger Grabowski, Joe Hargett, Curtis Kimball and Catherine Vandenberg, and received documentary evidence. *Id*. On March 7, 2016, the Court issued a Post-Trial Order setting forth the schedule for post-trial briefs and the submission of a redacted version of the slide deck presentation of Joe A. Hargett. Post-Trial Order, March 7, 2016.

---

[28] In addition, Ms. Vandenberg testified that RAP capital was defined differently in the Bowery Merger than in the supervisory acquisitions and that goodwill was not deducted from RAP capital. Vandenberg Tr. vol. 7, at 1496:20-1497:24. However, Ms. Vandenberg testified that when Home acquired Bowery in 1988, the RAP capital was redefined in a way that conformed with the treatment in the other supervisory mergers. *Id*.

On April 5, 2016, the parties provided the Court with copies of the admitted exhibits.  On April 26, 2016, the government filed a redacted version of Mr. Hargett's slide deck presentation. *See* Notice, April 26, 2016.  On May 10, 2016, the Court issued an Order regarding redactions to the trial transcript with respect to Mr. Hargett's testimony.  *See* Order, May 10, 2016.  On May 13, 2016, redacted versions of volumes 9 and 10 of the trial transcript were filed with the Court. *See* Tr. vol. 9; Tr. vol. 10.

The parties have submitted post-trial briefs, and the Court held closing argument on November 7, 2016.

## III.    STANDARDS FOR DECISION

### A.  Jurisdiction And Tax Refund Claims

Under the Tucker Act, the United States Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a) (2006); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005).  The Tucker Act does not, however, create a substantive cause of action. Rather, plaintiffs must identify a separate source of substantive law that creates the right to money damages to come within the jurisdictional reach and the waiver of that act.  *Fisher*, 402 F.3d at 1172 (citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983); *United States v. Testan*, 424 U.S. 392, 398 (1976)).  Title 26, United States Code, section 7422(a) provides the money-mandating source of law for bringing a tax refund claim in this Court.  *Dumont v. United States*, 85 Fed. Cl. 425, 427–28 (2009).  And so, a taxpayer may bring an action in this Court to recover any internal revenue tax erroneously or illegally assessed or collected, provided that the taxpayer first duly files a claim for a refund with the Internal Revenue Service.  I.R.C. § 7422(a); *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4 (2008); *Dumont*, 85 Fed. Cl. at 427–28.

In this *de novo* tax refund case, plaintiffs bear the burden to prove, by a preponderance of the evidence, that they are entitled to the tax deductions at issue in this case and the correct amount of the tax refund due.  *United States v. Janis*, 428 U.S. 433, 440 (1976) (holding that the taxpayer bears the burden to prove erroneous nature of assessment as well as amount taxpayer is entitled to recover); *Charron v. United States*, 200 F.3d 785, 792 (Fed. Cir. 1999) (holding that, in a tax

refund suit, taxpayers were required to prove not only excludability of items from taxable income, but also the amount); *Danville Plywood Corp. v. United States*, 899 F.2d 3, 7-8 (Fed. Cir. 1990) (holding that after a taxpayer overcomes presumption of correctness, it must still carry the ultimate burden of proof); *Cook v. United States*, 46 Fed. Cl. 110, 114–117 (2000) (same). "It is well established that a tax assessment is presumptively correct." *Arrington v. United States*, No. 96-5079, 1997 WL 101091, at *4 (Fed. Cir. Mar. 7, 1997).  And so, plaintiffs will not recover in a tax refund case if they cannot prove the amount of the refund due.  *See Janis*, 428 U.S. at 440; *Taylor v. Comm'r*, 70 F.2d 619, 620 (2d Cir. 1934), *aff'd*, 293 U.S. 507 (1935) (explaining that, in a refund suit, if taxpayer fails to prove the amount due, taxpayer may not recover everything owed to him "even though we know that the tax is too high"); *see also Int'l Paper Co. v. United States*, 36 Fed. Cl. 313, 322 (1996) (citing *Janis*, 428 U.S. at 440) (holding that the plaintiff, in order to recover, must prove "the precise dollar amount of the refund to which it is entitled"); *Sara Lee Corp. & Subs. v. United States*, 29 Fed. Cl. 330, 334 (1993) ("[P]laintiff then must prove the exact dollar amount of the alleged overpayment to which it claims a refund.") (citations omitted).

　　　　To establish the amount of refund due in this case, plaintiffs must establish Home's cost basis in the intangible assets at issue in this case to a "reasonable degree of certainty."  *See Washington Mut. II*, 996 F. Supp. 2d at 1102.[29]  To do so, plaintiffs must put forward sufficient evidence for the Court to make a "reasonable or rational approximation" of the value of these assets.  *Union Pac. R.R. v. United States*, 524 F.2d 1343, 1383 (Ct. Cl. 1975) ("Asset appraisal, therefore, requires a reasonable or rational approximation . . . to adduce a reasonably accurate value . . . ."); *see also Meredith Broadcasting Co. v. United States*, 405 F.2d 1214, 1231 (Ct. Cl. 1968); *Kraft, Inc. v. United States*, 30 Fed. Cl. 739, 795 (1994).  The Court is not, however, required to make an estimation of the value when evidence is lacking.  Rather, plaintiffs must put forward sufficiently reliable evidence to provide the Court with a basis to determine the reasonably accurate value.  *See, e.g.*, *Keiner-Williams Stamping Co. v. United States*, 30 F. Supp. 807, 808 (Ct. Cl. 1940) (per curiam) (upholding denial of taxpayer's refund claim for

---

[29] Pursuant to section 1012 of the Internal Revenue Code, "[t]he basis of property shall be the cost of such property . . . ." I.R.C. § 1012.  The "cost of such property" is the "cost to the taxpayer." *Amergen Energy v. United States*, 779 F.3d 1368, 1372 (Fed. Cir. 2015); *Detroit Edison Co. v. Comm'r*, 319 U.S. 98, 102 (1943).

depreciation deductions where plaintiff failed to put forward sufficient evidence "for the court to determine with any certainty what the value [of the depreciable assets] really was"); *Trigon Ins. Co. v. United States*, 215 F. Supp. 2d 687, 738 (E.D. Va. 2002) (holding that the plaintiff must put forward sufficient evidence for the Court to determine a "reasonably accurate value"); *cf. Krapf v. United States*, 977 F.2d 1454, 1463 (Fed. Cir. 1992) ("While the Claims Court has discretion in choosing a method of evaluation and some leeway in determining the amount of fair market value [of the intangible asset], the court correctly held it has no discretion to make a finding of the value of an asset where there is *no* evidence to support it.").

### B. The Doctrine Of Collateral Estoppel

Because parties to this action have previously litigated similar tax refund claims in the United States Court of Appeals for the Ninth Circuit and the United States District Court for the Western District of Washington, the doctrine of collateral estoppel is also pertinent to this case. The doctrine of collateral estoppel protects litigants from the burden of relitigating an identical issue with the same party and promotes judicial economy by preventing needless litigation. *Parklane Hosiery, Inc. v. Shore*, 439 U.S. 322, 331 (1979); *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 328-329 (1971).  A party asking the court to apply collateral estoppel must establish that:

> (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003) (quoting *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998)); *see also Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000).

Collateral estoppel may be used defensively or offensively.  *Parklane Hosiery*, 439 U.S. at 326.  Offensive collateral estoppel–when a previous case precludes a defendant from litigating an issue in its defense–may require "a stronger showing that the prior opportunity to litigate was adequate . . . ."  *Id.* at 331 n.16 (citation omitted).  The United States Supreme Court has held that courts should refrain from applying offensive collateral estoppel out of fairness to the

defendant if:  (1) plaintiff could have easily joined the earlier action, or (2) where application of offensive collateral estoppel would be unfair to the defendant.  *Id*. at 322-23.  Application of offensive collateral estoppel would be unfair to the defendant if:  (1) the defendant did not have an incentive to fully litigate in the previous litigation; (2) the defendant did not have a full chance to litigate the issues due to procedural disadvantages in the previous litigation; or (3) there exist inconsistent judgments on record.  *Id*. at 323.

In addition, the United States Court of Appeals for the Federal Circuit has held that application of offensive collateral estoppel also poses the danger of giving multiple plaintiffs a "no lose incentive" to wait and take advantage of a ruling against the same defendant.  *Dana*, 342 F.3d. at 1325-26 (citation omitted).  Thus, "offensive collateral estoppel must be applied with circumspection, even when the legal requirements for applying collateral estoppel are satisfied."  *Id*. at 1326.  And so, where the application of offensive collateral estoppel would be unfair to a defendant, the Court should not allow the use of offensive collateral estoppel. *Parklane Hosiery*, 439 U.S. at 322; *see also Dana,* 342 F.3d. at 1325-26.

### C.  Framework For Determining Home's Cost Basis In The Government Assistance

The United States Court of Appeals for the Ninth Circuit and the United States District Court for the Western District of Washington have both addressed how to determine Home's cost basis in the intangible assets at issue in this case, in prior litigation involving the same parties and issues.  Specifically, the Ninth Circuit held that Home's "cost basis in the branching rights and the RAP rights [is] equal to *some part* of the total amount of" Home's purchase price, or the excess of the acquired liabilities minus the acquired assets.  *Washington Mut. I*, 636 F.3d at 1219 (emphasis existing).  During the remand of that case to the United States District Court for the Western District of Washington, the district court also held that "[i]n transactions where one lump-sum purchase price is paid for a conglomeration of assets . . . the cost of each asset must be determined by apportioning the purchase price among the assets according to each asset's relative fair market value at the time of the acquisition."  *Washington Mut. II.*, 996 F. Supp. 2d at 1104 (citing *Bixby v. Comm'r*, 58 T.C. 757, 785 (1972)).

Under this legal framework, plaintiffs must do three things to establish the amount of Home's cost basis in the intangible assets at issue in this case.  First, plaintiffs must establish the total value of the assets of the acquired thrifts for each transaction.  Second, plaintiffs must establish the

total value of the liabilities of the acquired thrifts for each transaction.  And finally, plaintiffs must establish the fair market value of each intangible asset at issue in this case at the time of the relevant acquisition.  *Washington Mut. II*, 996 F. Supp. 2d at 1104; *see also Washington Mut. I*, 636 F.3d at 1219  (stating that the Branching Rights and RAP Rights were "equal to *some part* of the total amount  of that excess liability").

## IV.  LEGAL ANALYSIS

### A. Preliminary Matters

#### 1.  The Court Adopts The Ninth Circuit's Framework For Determining Cost Basis

In this case, the Court must determine whether plaintiffs have met their burden to show that they are entitled to tax refunds for tax years 1991, 1994, 1995 and 1998.  The question of whether Home took a cost basis in the assets acquired through the Supervisory Mergers has been previously addressed to a significant extent by the United States Court of Appeals for the Ninth Circuit in *Washington Mutual, Inc. v. United States*.  636 F.3d at 1209, 1219.  In that case, the Ninth Circuit considered the Florida-Missouri Merger and held that Home took a cost basis in the Florida and Missouri Branching Rights and Florida-Missouri RAP Right "equal to some part of the acquired thrifts' excess of liabilities over the value of their assets."  *Id*. at 1221.  The Ninth Circuit also held that Home's cost basis−or purchase price−for the government assistance provided in that transaction is the excess of the acquired thrifts' liabilities over the value of the acquired thrifts' assets.  *Id.* at 1219.

Although the present litigation involves several transactions that have not been specifically addressed by the Ninth Circuit, the many similarities between the transactions at issue in this case and the transaction at issue in the Ninth Circuit litigation make it appropriate to apply the doctrine of collateral estoppel with respect to two issues presented in this litigation: (1) whether Home took a cost basis in the government assistance provide in the Supervisory Mergers; and (2) if so, how such a cost basis should be determined.  *Washington Mut. I*, 636 F.3d at 1209; *Arkla, Inc. v. United States*, 37 F.3d 621, 623 (Fed. Cir. 1994) (holding that the doctrine

of collateral estoppel precludes a party from "relitigating any issues that were actually and necessarily determined by a court of competent jurisdiction in the prior suit").[30]

It is well established that for the doctrine of collateral estoppel to apply here, plaintiffs must establish that: "'(1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.'" *Dana*, 342 F.3d at 1323 (quoting *Pleming,* 142 F.3d at 1359); *see also Arkla, Inc.*, 37 F.3d at 623 ("Affording a litigant more than one full and fair opportunity for judicial resolution of the same issue results in an untenable misallocation of resources."). The evidentiary record demonstrates that plaintiffs have done so here.

First, the issue of whether Home took a cost basis in the government assistance provided in the Supervisory Mergers in this case is identical to the issue previously litigated in, and decided by, the Ninth Circuit. *See* Pl. Post-Trial Br. at 35; Def. Post-Trial Br. at 24-25; *Washington Mut. I*, 636 F.3d at 1209, 1219. Second, there is no dispute that this issue was actually litigated during the prior proceeding. In addition, the Ninth Circuit's holding that Home took a cost basis in these assets was a critical and necessary part of the Ninth Circuit's decision in that case. *See Washington Mut. I*, 636 F.3d at 1209, 1219. Lastly, the government was a party to that prior litigation and there is no dispute that the government had a full and fair opportunity to litigate this issue in that prior proceeding. *Id.*; *see* Def. Pre-Trial Br. at 36-38; *see generally* Def. Post-Trial Br. And so, the prerequisites for applying the doctrine of collateral estoppel have been met.

It is also appropriate to apply the Ninth Circuit's prior holding with respect to Home's cost basis to all of the Supervisory Mergers at issue in this case. The evidentiary record shows that the factual differences between the Florida-Missouri Merger, which is also at issue in this

---

[30] Because plaintiffs seek to preclude the government from relitigating issues that the Ninth Circuit previously resolved in their favor, the Court considers whether it is appropriate to apply the doctrine of offensive collateral estoppel. *Arkla, Inc.*, 37 F.3d at 623*; see also Parklane Hosiery*, 439 U.S. at 322-23 (holding that the Court should decline to apply offensive collateral estoppel if its application would be unfair to a defendant).

case, and the Illinois-Texas, Century, Ohio and Bowery Mergers, do not alter the issues relevant to determining Home's cost basis in the government assistance acquired in these Supervisory Mergers.  *See Washington Mut. I*, 636 F.3d at 1219.  And so, the Court adopts and follows the Ninth Circuit's prior holdings with respect to whether Home took a cost basis in the government assistance provided in the Supervisory Mergers and how that cost basis should be determined to resolve plaintiffs' tax refund claims.

### 2.   The Purchase Price For The FSLIC Mergers Is Undisputed

The evidentiary record also establishes that the purchase price that Home paid for each of the FSLIC Mergers is not in genuine dispute.[31]  In this regard, plaintiffs allege that the purchase price that Home paid−and therefore the cost basis that Home obtained−for the assistance provided in the Florida-Missouri Merger is $216,759,000.[32]  Pl. Post-Trial Br. at 43.  Plaintiffs further allege that the purchase price for the Illinois-Texas Merger is $285,353,000, $205,215,000 for the Century Merger, and $50,800,000 for the Ohio Merger.  *Id*.  The government has not disputed any of these calculations in this litigation.  *See generally* Tr.; *cf*. Def. Post-Trial Br. at 16 ("The overall purchase cost of the supervisory merges therefore equals the value of the liabilities of the thrifts that Home assumed as part of the transactions as set forth in the Merger Agreement and the related Assistance Agreement").  And so, the Court concludes that plaintiffs have established Home's cost basis in the packages of government assistance provided in the Supervisory Mergers.

---

[31] Plaintiffs' tax refund claim related to the Bowery Merger raises additional legal and factual issues regarding how to determine Home's cost basis in assets acquired in that transaction.  The Court addresses those issues in part C of the Legal Analysis section of this Memorandum Opinion and Order.

[32] Plaintiffs include the table reproduced below in their post-trial brief, which shows the calculation of the purchase price for each of the FSLIC Mergers.  *See* Pl. Post-Trial Br. at 43, Table 1-R.

| Transaction | Thrift Liabilities Assumed | Value of Thrift Assets | Purchase Price for FSLIC Assistance |
|---|---|---|---|
| Florida-Missouri | $927.7 million | $710.9 million | $216.8 million |
| Illinois-Texas | $953.7 million | $668.3 million | $285.4 million |
| Century | $743.1 million | $537.9 million | $205.2 million |
| Ohio | $461.5 million | $410.7 million | $50.8 million |

Given this, the central issue to be resolved by the Court in this litigation is whether plaintiffs can establish the amount of the purchase price for each of the FSLIC Mergers that should be allocated to each specific item of assistance provided to Home−including the RAP Rights and Branching Rights−to determine Home's cost basis in these assets.  *See Washington Mut. II*, 996 F. Supp. 2d at 1104; *see also Washington Mut. I*, 636 F.3d at 1219.  As discussed above, to do so, plaintiffs must put forward sufficient evidence for the Court to make a "reasonable or rational approximation" of the value of those assets.  *Union Pac. R.R.*, 524 F.2d at 1383; *see also Meredith Broadcasting Co.*, 405 F.2d at 1231; *Kraft, Inc.*, 30 Fed. Cl. at 795.  For the reasons discussed below, the evidentiary record demonstrates that plaintiffs have not done so here.

**B.  Plaintiffs Have Not Established Home's Cost Basis In The RAP Rights And Branching Rights Because The Valuations For This Assistance Are Unreliable**

**1.  Plaintiffs' RAP Right Valuations Are Unreliable**

To determine whether plaintiffs' fair market value determinations for the RAP Rights received in the FSLIC Mergers are reliable, the Court must first determine the nature of the government assistance provided by these intangible assets.  On this question, the parties disagree.  Plaintiffs allege that the RAP Right provided Home with the "contractual approval" to treat the goodwill created by each of the FSLIC Mergers as an asset for regulatory accounting purposes.  *See* Pl. Post-Trial Br. at 99.  To support this characterization, plaintiffs further allege that Home needed the approval of government regulators to use the purchase method of accounting to account for the FSLIC Mergers and, thus, to treat the goodwill created by these transactions as an asset upon a diminishing basis over forty years.  *See, e.g.*, *id.* at 100; *see also* PX001 at I-6; Grabowski Tr. vol. 4, 805; PX594 at 169-70.

The government has a different point of view.  Specifically with respect to the Florida-Missouri and Illinois-Texas RAP Rights, the government argues that Home did not receive, nor require, contractual approval from federal regulators to use the purchase method of accounting to account for these mergers−or to treat the goodwill created by these mergers as an asset upon a diminishing basis over forty years−because the accounting regulations at the time already allowed Home to do so.  *See* Def. Post-Trial Br. at 111, 114-16.  And so, the government argues that the RAP Rights that Home acquired in the Florida-Missouri and Illinois-Texas Mergers

guaranteed that Home could continue to amortize the goodwill created by these mergers over a period of up to forty years, notwithstanding any adverse changes in the future to the regulations that govern the amortization period for goodwill. *See, e.g.*, Def. Post-Trial Br. at 6, 11, 114.

The government similarly argues that Home did not receive, nor require, contractual approval from federal regulators to use the purchase method of accounting to account for the Century and Ohio Mergers in the Century RAP Right and the Ohio RAP Right, because the accounting regulations at the time of these mergers also already allowed Home to do so. *See* Def. Post-Trial Br. at 111, 114-16. But, the government acknowledges that the applicable accounting regulations at the time of these mergers only allowed Home to amortize the goodwill for a period of up to twenty-five years. *Id*. at 14, 116-17. And so, the government maintains that the nature of the Century RAP Right and the Ohio RAP Right is the guarantee that Home could amortize the goodwill created by these mergers over a forty-year period, notwithstanding the existing accounting regulations, and any adverse changes in the federal regulations that govern the amortization period for goodwill in the future. *Id*. at 14-15, 111; Kimball Tr. vol. 11, 2486:15-2487:2.

For the reasons discussed below, the Court agrees that the nature of the RAP Right is a guarantee that Home could amortize the goodwill created by FSLIC Mergers over a period of up to forty years, notwithstanding any adverse regulations regarding the amortization period for goodwill. Because plaintiffs mischaracterize the nature of the RAP Right, their fair market value determinations for this intangible asset are unreliable

### a. The Florida-Missouri and Illinois-Texas RAP Rights Insure Against Adverse Regulatory Changes For The Accounting Of Goodwill

First, a plain reading of the assistance agreements and FHLBB Resolutions for the Florida-Missouri and Illinois-Texas Mergers, and the accounting regulations in place at time of these mergers, demonstrates that the RAP Rights that Home received in the Florida-Missouri and Illinois-Texas Mergers provided Home with a guarantee against future, adverse regulatory changes with respect to the accounting treatment for goodwill. In this regard, the FHLBB issued nearly identical resolutions for the Florida-Missouri and Illinois-Texas Mergers and these resolutions provide, in relevant part, that:

> [T]he Bank Board hereby finds that the submission of Home concerning the accounting treatment to be afforded its acquisition of [the acquired thrifts] . . . *appropriately supports the application of the purchase method of accounting for the acquisition*; and that based upon such submission, and the circumstances described therein, *the Bank Board hereby determines that it does not object to* (1) the amount of any resulting intangible assets being first assigned to the acquired savings deposit base in the amount of .5 percent of the acquired savings balances and .05 percent of the acquired certificate balances, which will have a life of ten (10) years, and *(2) any excess being assigned to goodwill and initially amortized, in accordance with generally accepted accounting principles, over forty (40) years* . . . .

JX059 at KS-014320 (emphasis supplied); JX030 at KS-007694; s*ee also* JX085 at KS-044903 (Florida-Missouri Assistance Agreement at § 16); JX005 at KS-002847-48 (Illinois-Texas Assistance Agreement at § 16, providing that "[t]his Agreement . . . constitutes the entire agreement between the parties . . . excepting only . . . any resolutions or letters issued contemporaneously herewith by the Federal Home Loan Bank Board . . . .").

The plain language of these resolutions clearly demonstrates that the FHLBB found Home's use of the purchase method of accounting to account for the Florida-Missouri and Illinois-Texas Mergers to be appropriate.  JX059 at KS-014320; JX030 at KS-007694.  But, the FHLBB's resolutions must also be read within the context of the accounting regulations in place at the time of the mergers to understand the RAP Right.

It is without dispute that the accounting regulations in place at the time of the Florida-Missouri and Illinois-Texas Mergers required that Home use the purchase method of accounting to account for business combinations like the mergers at issue here.  JX035; JX100; JX102 at ¶ 15; DX192; Pl. Pre-Trial Br. at 14 ("In accounting for supervisory mergers, the acquirer was required to use the purchase method of accounting"); Def. Post-Trial Br. at 14.  Specifically, at the time, APB Opinion No. 16 required acquirers in a business combination, like the mergers at issue here, to use the purchase method of accounting to account for such transactions.  JX102 at ¶ 15.  Memorandum R-31b also required at the time that acquirers account for the goodwill created by such a merger in accordance with generally accepted accounting principles, or GAAP.  JX035 at KS-008256; Beesley Tr. vol. 3, 537:5-21.

In addition, another accounting regulation in place at the time−SP-24–also required that "mergers of savings and loan associations are to be accounted for in accordance with generally

accepted accounting principles." JX100 at CV-00209. And so, at the time of the Florida-Missouri and Illinois-Texas Mergers, the existing regulatory accounting principles required that Home follow GAAP to account for these transactions. GAAP required that Home use the purchase method of accounting to account for the FSLIC Mergers. *Id.*

In light of the regulatory accounting principles that were in place at the time that Home entered into the Florida-Missouri and Illinois-Texas Mergers, the Court reads the FHLBB resolutions for these mergers to simply confirm that the use of the purchase method of accounting is appropriate for these transactions. JX059 at KS-014320; JX030 at KS-007694; *see also* Pl. Pre-Trial Br. at 14 ("In accounting for supervisory mergers, the acquirer was required to use the purchase method of accounting for both RAP purposes and under generally accepted accounting principles."). And so, the text of the FHLBB's resolution, and the evidence before the Court about the regulatory environment at the time of these mergers, simply do not substantiate plaintiffs' claim that Home needed the approval of federal regulators to use the purchase method of accounting to account for these mergers, or that the FHLBB provided such approval.

The accounting regulations in place at the time of the Florida-Missouri and Illinois-Texas Mergers also demonstrate that Home did not need the approval of the FHLBB to treat the goodwill created by these mergers as an intangible asset─or to amortize such goodwill over a 40-year period─as plaintiffs suggest. Again, there is no dispute in this case that the accounting regulations in place at the time required that Home account for these mergers in accordance with GAAP and that GAAP allowed Home to treat goodwill as an intangible asset and to amortize that goodwill over a period of forty years. JX102 at ¶ 11, 90; DX192 at ¶¶ 27-31; JX035 at KS-008256; Def. Post-Trial Br. at 112; Pl. Post-Trial Br. at 100 (recognizing that Memorandum R-31b provided "that the goodwill resulting from thrift combinations could be amortized for periods of up to forty years as provided under GAAP"). Given this, the record evidence demonstrates that Home did not need, nor receive, contractual approval from federal regulators to treat the goodwill created by these transactions as an asset, or to amortize the goodwill created by these mergers over a period of forty years.

Rather, Home received in the Florida-Missouri and Illinois-Texas RAP Rights the right to *continue* to amortize the goodwill created by these mergers over a period of forty years if the

regulations governing the amortization period for goodwill changed in the future. And so, plaintiffs misstate the nature of the Florida-Missouri and Illinois-Texas RAP Rights.

Plaintiffs' contention that federal regulators approved Home's accounting treatment for the goodwill created by these mergers is also belied by the plain text of the FHLBB's resolutions. As shown above, the resolutions state that the FHLBB "*does not object* to . . . any excess being assigned to goodwill and initially amortized, in accordance with generally accepted accounting principles, over forty (40) years . . . ." JX059 at KS-014320 (Florida-Missouri FHLBB Resolution) (emphasis supplied); JX030 at KS-007694 (same language in Illinois-Texas FHLBB Resolution). The FHLBB does not state that it approves of Homes accounting. And so, again, the evidentiary record before the Court demonstrates that Home did not require, nor receive, contractual approval to treat the goodwill created by the mergers as an asset to be amortized over forty years. Instead, Home received the right to continue to amortize the goodwill created by the Florida-Missouri and Illinois-Texas Mergers over a period of forty years, if the regulations governing the amortization period for goodwill changed in the future.[33]

### b. The Century and Ohio RAP Rights Similarly Guarantee That Home Could Amortize Goodwill Over A Fort-Year Period

The evidence also shows that the nature of the Century and Ohio RAP Rights is quite similar to the Florida-Missouri and Illinois-Texas RAP Rights. The FHLBB Resolutions for the Century and Ohio Mergers provide, in relevant part, that:

> RESOLVED FURTHER, That in accounting for the Merger and the acquisition of assets and liabilities of Century by Home Savings, Home Savings shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified and interpreted by applicable regulations of the Bank Board and the FSLIC; and

> RESOLVED FURTHER, That Home Savings shall furnish an analysis, accompanied by a concurring opinion from its independent public accountants, satisfactory to the Principal or other Supervisory Agent and to the Office of

---

[33] Memorandum R-31b provides that "[a]n application from an association requesting approval for a business combination to be accounted for by the purchase method of accounting, from which intangible assets will result, should include a description of any resulting intangible assets and the plan for their amortization." JX035 at KS-008258. This language requires all business combinations to obtain regulatory approval, regardless of whether the entity intends to use the purchase method of accounting or a different method of accounting. *See Anderson*, 344 F.3d at 1356-57; *Fifth Third Bank of Western Ohio v. United States*, 52 Fed. Cl. 264, 273 n.14 (2002).

Examinations and Supervision, which (i) specifically describes as of the closing date, any intangible assets, including goodwill or the discounts and premiums arising from the acquisition to be recorded on Home Savings' consolidated books; and (ii) substantiates the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discounts and premiums and the related amortization periods and methods[.]

PX078 at KS-007837 (Century FHLBB Resolution); PX083 at KS-007959-60 (similar language in Ohio FHLBB Resolution); *see also* JX013 at KS-003493; JX009 at KS-003185-86.

The regulatory environment at the time of the Century and Ohio Mergers is also pertinent to understanding the nature of the Century and Ohio RAP Rights. In this regard, it is undisputed that the accounting regulations in place at the time of the Century and Ohio Mergers continued to allow Home to use the purchase method of accounting to account for these mergers and, thus, to treat goodwill as an intangible asset. *See* JX102 at ¶ 11; JX035; PX595 at 18; Pl. Pre-Trial Br. at 14.

The accounting regulations, however, changed with respect to the amortization period for the goodwill created by these mergers. At the time of these mergers, FASB No. 72 required that goodwill be amortized over a period not to exceed twenty-five years. *See* JX106 (reducing the amortization period under GAAP for any goodwill created by the combination of thrifts); *see also* Vandenberg Tr. vol. 7, 1492:21-1493:7; DX204 at 9-10; Pl. Post-Trial Reply at 73. It is undisputed that the Century and Ohio RAP Rights, nonetheless, allowed Home to amortize the goodwill created by these mergers over forty years. Pl. Post-Trial Reply at 73-74; Def. Post-Trial Br. at 116-17. And so, in addition to guaranteeing that Home could amortize the goodwill created by these transactions over forty years, notwithstanding adverse regulatory changes in the future, the Century and Ohio RAP Rights also allowed Home to amortize the goodwill created by these mergers for fifteen years longer than was permitted under the existing accounting regulations. *See* Pl. Post-Trial Reply at 73-74; Def. Post-Trial Br. at 116-17. Given this, the Court concludes that Home received in the Century and Ohio RAP Rights the right to amortize the goodwill created by these mergers over a forty-year period─instead of the twenty-five-year amortization period prescribed by the accounting regulations in place at the time─as well as the right to continue to do so if the regulations governing the amortization period for goodwill changed in the future.

### c. Given The Nature Of The RAP
### Rights, Plaintiffs' Valuations Are Unreliable

Because the nature of the Florida-Missouri and Illinois-Texas RAP Rights is a guarantee that Home could continue to amortize the goodwill created by these two mergers over a period of forty years even if the regulations governing the amortization period for goodwill were to change in the future, plaintiffs have not put forward reliable fair market value determinations for these intangible assets. Mr. Grabowski testified at trial that he valued the RAP Rights by assuming that a hypothetical willing buyer could not record the goodwill created by the FSLIC Mergers as an intangible asset without acquiring the RAP Rights. Grabowski Tr. vol. 4, 807:6-808:4. Mr. Grabowski also testified that he based his valuation of the RAP Rights upon the premise that Home needed contractual approval from federal regulators to count the goodwill created by the FSLIC Mergers as an asset in the regulatory capital calculation, and to amortize the goodwill over a forty-year period. *Id*. at 807:17-22.

Mr. Grabowski's assumptions in valuing the RAP Rights are, however, inconsistent with the true nature of the Florida-Missouri and Illinois-Texas RAP Rights and the evidence. As discussed above, Home did not require, nor receive, contractual approval from federal regulators to use the purchase method of accounting, or to treat goodwill as an intangible asset in connection with the FSLIC Mergers, as Mr. Grabowski assumes. Nor did Home need, or receive, contractual approval from federal regulators to amortize the goodwill created by these mergers over a period of forty years, as Mr. Grabowski also assumes. And so, plaintiffs' misplaced assumptions about the nature of the Florida-Missouri and Illinois-Texas RAP Rights undermine plaintiffs' fair market value determinations for the RAP Rights. As a result, plaintiffs have not put forward a reasonable or rational approximation of the value of the Florida-Missouri and Illinois-Texas RAP Rights.[34]

Plaintiffs' fair market value determinations for the Century and Ohio RAP Rights are equally unsound. Again, the evidentiary record demonstrates that Home did not require, nor receive, contractual approval from federal regulators to use the purchase method of accounting, or to treat goodwill as an intangible asset in connection with these mergers, as Mr. Grabowski

---

[34] This same deficiency is present in the valuation of the Bowery RAP Right, but the Court does not address this issue due to other concerns with the Bowery valuations addressed later in this opinion.

assumes.  It is undisputed, however, that Home did need, and did receive, approval from federal regulators to amortize the goodwill created by these two mergers over forty years, instead of the twenty-five years allowed under the accounting regulations in place at the time.  *See* Pl. Post-Trial Reply at 73-74; Def. Post-Trial Br. at 129-30.  Given this, plaintiffs' assumptions in valuing the Century and Ohio RAP Rights are not consistent with the nature of these assets.  And so, again, plaintiffs have not put forward reliable fair market value determinations for the Century and Ohio RAP Rights.

Because plaintiffs have not provided a reasonable approximation of the value of the RAP Rights that Home acquired in the FSLIC Mergers, they have not established Home's cost basis in these assets to a reasonable degree of certainty.

### 2. Plaintiffs Have Not Established Home's Cost Basis In The Branching Rights Because The Valuations For These Assets Are Unreliable

Plaintiffs' fair market value determinations for the Branching Rights are similarly unsound.  Plaintiffs maintain in this action that they are entitled to a tax refund because Home may take an abandonment loss deduction in the amount of Home's cost basis in the Branching Rights in Florida, Illinois, New York and Ohio.  I.R.C. § 165; Am. Compl. at ¶¶ 84-85, 87, 99, 101, 128; 2d Am. Compl. at ¶ 101.  To succeed upon this tax refund claim, plaintiffs must first put forward sufficient evidence for the Court to make a "reasonable or rational approximation" of the value of the Florida, Illinois, New York and Ohio Branching Rights in order to determine Home's cost basis in these intangible assets.  *Union Pac. R.R.*, 524 F.2d at 1383; *see also Meredith Broadcasting Co.*, 405 F.2d at 1231; *Kraft, Inc.*, 30 Fed. Cl. at 795.  For the reasons discussed below, the evidentiary record demonstrates that plaintiffs have not done so in this case.

### a. The Unreliability Of The RAP Right Valuations Casts Doubt Upon Plaintiffs' Cost Basis Determinations For The Branching Rights

As an initial matter, the deficiencies discussed above with respect to the plaintiffs' fair market value determination for the RAP Rights also call into doubt plaintiffs' determinations regarding Home's costs basis in the Branching Rights.  As Mr. Grabowski testified at trial, plaintiffs allocate the purchase price for each of the FSLIC Mergers−based upon the determined fair market value of each item of government assistance provided in those mergers−to determine

Home's cost basis in the Branching Rights, RAP Right and other government assistance. Grabowski Tr. vol. 3, 554:18-21.  Given this, plaintiffs' determination with respect to Home's cost basis for all of the items of government assistance that Home received in each of the FSLIC Mergers is unsound, if their fair market value determination for the RAP Rights are unsound.[35] Tr. vol. 15, 2965-66.  And so, for this reason alone, the Court must also conclude that plaintiffs have not established Home's cost basis in the Branching Rights.

Notwithstanding this fundamental concern with plaintiffs' determination of Home's cost basis in the Branching Rights, the evidence also shows plaintiffs have not established Home's cost basis in the Branching Rights because their fair market value determinations for this asset do not constitute a "reasonable or rational approximation" of the value of these assets.  *Union Pac. R.R.*, 524 F.2d at 1383.  In particular, plaintiffs' valuations for the Florida, Illinois, Missouri and Texas Branching Rights are at odds with the economic and industry-specific realities at the time of the Illinois-Texas and Florida-Missouri Mergers.  In addition, plaintiffs' valuations of the Branching Rights for all of the FSLIC Mergers are also unreliable, because plaintiffs inappropriately rely upon Home's Northern California experience to value the Branching Rights and plaintiffs do not adequately account for the regulatory hurdles of opening *de novo* branches in projecting deposit growth to value the Branching Rights.  And so, for the reasons discussed below, plaintiffs fair market value determinations for the Branching Rights are unreliable.

---

[35] During closing arguments, plaintiffs argued that the Court has several options short of dismissing their claim if the Court concludes that plaintiffs' fair market value determinations for the RAP Rights are unreliable.  Tr. vol. 15, 2965-66.  Specifically, plaintiffs argue that the Court may determine on its own the fair market values for the RAP Rights, based upon the insurance theory that the government advances in this case and the evidence presented at trial.  Alternatively, plaintiffs argue that the Court should accept their current fair market value determinations for the Branching Rights, because the value of the Branching Rights would necessarily increase if the Court adopts the government's point of view regarding the nature of the RAP Rights.  Tr. vol. 15, 2964:1-3, 2964:5-2965:7, 2966:7-2968:24.  But, plaintiffs' burden in this case is not to establish a minimum value for the Branching Rights.  Rather it is to provide sufficient evidence for the Court to make a reasonable approximation of the value of these intangible assets.

**b. The Valuations For The Florida, Illinois,
Missouri And Texas Branching Rights Are
Unreasonable Given The Undisputed Economic Conditions**

The evidentiary record shows that plaintiffs' valuations for the Florida, Illinois, Missouri and Texas Branching Rights are at odds with undisputed economic and industry-specific realities at the time of the Illinois-Texas and Florida-Missouri Mergers.  To value the Branching Rights, Mr. Grabowski testified that he projected the amount of deposit growth that a hypothetical willing buyer could have expected to achieve after acquiring the Branching Rights.  Grabowski Tr. vol. 4, 697:7-699:14.  To accomplish this, he projected, in particular: (1) the number of branches that a hypothetical willing buyer would have opened after receiving branching rights; (2) the amount of deposits per branch that a hypothetical willing buyer would expect to achieve; and (3) the timing for a hypothetical willing buyer to obtain its projected share of the overall market in the relevant state.  PX001 at I-26; *see*, *e.g*., PX594 at 96.  And so, Mr. Grabowski's projections for deposit growth are central to plaintiffs' fair market value determinations for the Branching Rights.  *See*, *e.g*., PX001 at I-29-30.

Mr. Grabowski testified that he also makes several assumptions to project deposit growth and value the Branching Rights.  Specifically, Mr. Grabowski testified that he valued the Branching Rights by, among other things, assuming that the high interest rates of the early 1980s would remain in place for the foreseeable future.  PX594 at 26, 28.  Mr. Grabowski also testified that he assumed that a hypothetical willing buyer for the FSLIC Mergers would experience significant growth in deposits after acquiring new thrifts through these mergers, and that the demand for new mortgage loans would keep pace with such significant deposit growth.  PX001 at I-26, II-30; PX594 at 93-94.  These assumptions are unsupported by the evidence and undermine plaintiffs' fair market value determination for several reasons.

First, Mr. Grabowski's assumption that the hypothetical willing buyer would achieve significant deposit growth in the high interest rate environment of the early 1980s is belied by the undisputed evidence regarding the dire economic and industry-specific conditions at the time of the Florida-Missouri and Illinois-Texas Mergers.  It is undisputed that at the time that Home entered into these mergers, interest rates had peaked at historic highs.  PX594 at 27.  Several witnesses also acknowledged during their trial testimony that these high interest rates during this time period had a devastating effect upon the savings and loan industry.  Beesley Tr. vol. 3,

455:14-22; Deihl Tr. vol. 1, 90:6-15; Antoci Tr. vol. 2, 271:6-272:13.  The evidence also shows that loan demand was at a historic low during this period.  PX594 at 216.  In 1982, industry-wide mortgage originations bottomed out at less than $40,000,000,000.  *Id*.  In contrast, prior to the interest rate crisis, mortgage originations had not fallen below $40,000,000,000 since 1975.  *Id*. Given these undisputed facts, Mr. Grabowski's assumption that a hypothetical willing buyer for the Illinois-Texas and Florida-Missouri Mergers would achieve the significant deposit growth projected in the model is simply not supported by the evidence.

Indeed, as the government observes in its post-trial briefs, it would be unreasonable to assume that a hypothetical willing buyer would achieve the deposit growth projected in the Grabowski Model, absent a meaningful decline in interest rates.  Def. Post-Trial Br. at 41.  But, as discussed above, Mr. Grabowski assumes that interest rates would remain at historic highs in valuing the Branching Rights.  PX594 at 26, 28.  And so, this questionable assumption renders his fair market value determinations for the Florida, Illinois, Missouri and Texas Branching Rights unreliable.

Mr. Grabowski's assumption that significant deposit growth would occur following the Illinois-Texas and Florida-Missouri Mergers is also unsubstantiated by the evidence.  The evidence shows that disintermediation had a negative impact upon deposits during this period. Indeed, several witnesses testified at trial that, at the time of these mergers, thrifts were experiencing the adverse effects of disintermediation—and that many thrifts became insolvent due to disintermediation and high interest rates.  Beesley Tr. vol. 3, 456:6-457:5; Antoci Tr. vol. 2, 312:8-10, 333:17-19, 338:19-339:19; Deihl Tr. vol. 2, 149:7-22, 162:6-15.  To obtain the significant deposit growth that the Grabowski Model projects, a hypothetical willing buyer would need to not only avoid the well-documented adverse impact of disintermediation, but also to persuade a significant number of the depositors who were still willing to deposit their funds into a savings and loan institution to deposit these funds in a new thrift.  The witness testimony and evidence in this case simply do not support such a scenario occurring on the scale necessary to support Mr. Grabowski's significant deposit growth projections.

The evidence also does not support Mr. Grabowski's assumption that there would be sufficient demand for now home loans to accommodate the significant deposit growth projected by his valuation model.  Rather, if interest rates remained high—as the Grabowski Model

assumes—the evidence shows that the demand for home loans would decline.  *See* Deihl Tr. vol. 1, 104:13-24; Beesley Tr. vol. 3, 507:12-16; Antoci Tr. vol. 2, 334:10-14.  As discussed above, the evidence presented at trial also shows that loan demand was at a historic low at the time of the Illinois-Texas and Florida-Missouri Mergers.  PX594 at 216.  As the government's financial and regulatory accounting expert, Joe Hargett, testified at trial, "to infer that twenty years into the future loan demand will always be able to be fulfilled by deposits or, in other words, whatever deposits we can raise we can turn it into loans, is a nonsensical conclusion" under these circumstances.[36]  Hargett Tr. vol. 10, 2042:11-15.

The Court is also unpersuaded by plaintiffs' argument that the Grabowski Model adequately addresses the aforementioned concerns regarding plaintiffs' deposit growth projections through the Grabowski Model's sensitivity analyses.  *See* PX594 at 186-87, 208-09. Mr. Grabowski testified that he performed two sensitivity analyses for the Illinois-Texas and Florida-Missouri Mergers to address concerns that loan demand would be lower than his valuation model assumes and that deposit growth would not increase at the rate projected by the model.  *Id.*; Grabowski Tr. vol. 4, 829-30; PX594 at 185-86.  But, Mr. Grabowski's sensitivity analyses makes adjustments for lower loan demand and slower deposit growth only during the first two years after the Illinois-Texas and Florida-Missouri Mergers.  The assumptions in the Grabowski Model regarding high interest rates and loan demand apply, however, to all of the years covered by the valuation model.  PX594 at 26, 28, 186-87, 208-09; Grabowski Tr. vol. 4, 829:1-830:9.[37]  And so, plaintiffs have not demonstrated how these sensitivity analyses provide the Court with reliable fair market value determinations for the Branching Rights.

---

[36] Plaintiffs' banking industry expert, Catherine Vandenberg, testified that she disagreed with Mr. Hargett's analysis, because a thrift could "develop alternative funding sources and alternative investment opportunities" for additional deposit growth during periods of slow loan demand.  Vandenberg Tr. vol. 7, 1484:9-10.  But, Ms. Vandenberg's expert testimony on this point does not directly address, or resolve, the Court's concerns that the demand for new mortgage loans could not realistically keep pace with Mr. Grabowski's projection for significant deposit growth.  *See* Hargett Tr. vol. 10, 2045, 2052-53.

[37] Mr. Grabowski also does not explain why he chose to assume a 50% reduction in deposit growth and loan demand in performing the two sensitivity analyses.  Grabowski Tr. vol. 4, 829-30; PX594 at 186-87, 208-09.

Because plaintiffs' fair market value determinations for these intangible assets are unsound, plaintiffs have not established Home's cost basis in the Florida, Illinois, Missouri and Texas Branching Rights to a reasonable degree of certainty.

### c. The Valuations For The New York And Ohio Branching Rights Are Also Unreasonable

While the evidence shows that the economic and industry-specific conditions impacting the savings and loan industry improved by the time of the Century and Ohio Mergers, plaintiffs' fair market value determinations for the New York and Ohio Branching Rights are, nonetheless, unreliable for three reasons. First, as is the case with the Illinois-Texas and Florida-Missouri Branching Rights, the deposit growth projections that plaintiffs rely upon to value the New York and Ohio Branching Rights are unsupported by the evidence, given the economic realities at the time of the Century and Ohio Mergers. Second, the evidence also shows that plaintiffs inappropriately rely upon Home's experience expanding into Northern California during the 1970s to project deposit growth and to value the Branching Rights. Lastly, the plaintiffs fail to adequately account for the regulatory hurdles that a hypothetical willing buyer would have encountered in opening *de novo* branches in projecting deposit growth. The Court addresses each of these issues below.

### i. The Deposit Growth Projections For The New York And Ohio Branching Rights Are Unsupported By The Economic Realities

First, the Grabowski Model's deposit growth projections for the New York and Ohio Branching Rights are not supported by the evidence, given the economic realities at the time of these two mergers. The parties agree—and the evidence shows—that the economic and industry-specific conditions facing savings and loan institutions improved by the time of the Century and Ohio Mergers in the mid-1980s. PX594 at 27; Deihl Tr. vol. 2, 172:20-173:6 (testifying that industry-wide mortgage originations rose after 1982). But, the parties also acknowledge—and the evidence shows—that interest rates remained high during this period. PX594 at 27 (interest rates ranged between 13% and 14% in 1983 and 1984 and decreased modestly to around 10% in 1986).

Disintermediation also continued to be a significant problem for the savings and loan industry at the time of the Century and Ohio Mergers. In this regard, the parties do not dispute

that the thrift industry continued to experience the adverse effect of disintermediation in 1984 and 1985.  PX001 at C-2, C-14; Kimball Tr. vol. 11, 2482:23-2483:7

In this challenging environment, Mr. Grabowski projects that a hypothetical willing buyer would more than double its deposits per branch−from $40,000,000 to $85,000,000 in deposits per branch−in the four years after acquiring the New York Branching Right.  PX001 at Ex. 3.5 at 6; Grabowski Tr. vol. 4, 800:21-25; PX594 at 219.  He also projects that a hypothetical willing buyer would almost double its deposits per branch−from $17,500,000 to $30,000,000 per branch−in four years after acquiring the Ohio Branching Rights.  PX001 at Ex. 4.5 at 6; PX594 at 238; Grabowski Tr. vol. 5, 876:1-878:10.  As discussed above, to obtain such significant deposit growth, many depositors in New York and Ohio would have to not only forego other investment opportunities, but to redeposit their funds into a new savings and loan institution.

Despite the modest improvements in the economic and industry-specific conditions during the mid-1980s, the evidence simply does not demonstrate that such a scenario was probable, or even possible, at the time of the Century and Ohio Mergers.  And so, the Court finds the deposit growth that Mr. Grabowski projects to be difficult to reconcile with the evidence.

### ii.   The Grabowski Model's Significant Reliance Upon Home's Northern California Experience Is Inappropriate

Even if the economic and industry-specific conditions at the time of the Century and Ohio Mergers could accommodate the considerable deposit growth that plaintiffs project, the evidentiary record also shows that plaintiffs' significant reliance upon data regarding Home's previous experience expanding into the Northern California market to project deposit growth is inappropriate and renders their valuations unreliable.[38]  In this regard, Mr. Grabowski testified that he relied upon Home's Northern California experience to project three metrics related to deposit growth:  (1) the number of branches a hypothetical willing buyer could have expected to open; (2) the increase in deposits per branch for acquired and *de novo* branches; and (3) the timing of the ramp up for new and existing branches.  PX001 at I-28.  His reliance upon this data

---

[38] This concern is also present in the Grabowski Model's valuation of the Florida, Illinois, Missouri and Texas Branching Rights and also undermines the integrity of plaintiffs' fair market value determinations for those Branching Rights.

undermines plaintiffs' fair market value determinations for the Branching Rights for three reasons.

First, the Northern California data utilized in the Grabowski Model is Home-specific and this data does not take into account potential differences between Home and a hypothetical willing buyer.  Contrary to plaintiffs' contentions in their post-trial briefs, the evidence makes clear that plaintiffs rely heavily upon Home's Northern California experience to project deposit growth and, thus, to value the Branching Rights.  *See, e.g.,* Pl. Post-Trial Br. at 60; *see also* PX001 at I-28; *see also* Grabowski Tr. vol. 4, 800:21-25.[39]  The evidence also makes clear that such a heavy reliance upon Home's Northern California experience is inappropriate, because this data reflects Home's experience and not necessarily the experience of a hypothetical willing buyer.  Although Mr. Grabowski testified at trial that he determined the fair market value of the Branching Rights by viewing these assets from the perspective of a hypothetical willing buyer, the data regarding Home's Northern California experience provides only the perspective of Home.  PX001 at I-14; Grabowski Tr. vol. 4, 753:11-12.  And so, the use of this data does not comport with plaintiffs' own valuation methodology for determining the fair market value of the Branching Rights.

Plaintiffs' reliance upon data regarding Home's Northern California experience is also out of place, because the economic conditions at the time when Home expanded into Northern California differ significantly from the economic conditions at the time of the FSLIC Mergers. In this regard, the evidence shows that, when Home expanded into Northern California in the mid-1970s, interest rates remained well below 10%.  *See* PX594 at 27.  But, at the time of the Century and Ohio Mergers, interest rates ranged between 12% and 14%.  *Id.*  Several witnesses testified at trial that higher interest rates adversely impacted the savings and loan industry. Beesley Tr. vol. 3, 455:14-22; Deihl Tr. vol. 1, 90:6-15; Antoci Tr. vol. 2, 271:6-272:13.  Given

---

[39] To determine the number of branches that a hypothetical willing buyer would have expected to open, the Grabowski Model compares Home's growth in Northern California and the population density in Northern California to the new state's population.  PX001 at I-27 to I-28, II-26 to II-27, III-19 to III-20; PX002 at VI-19 to VI-21; VI-29 to VI-30; PX594 at 88, 97, 99-101.  The Grabowski Model also considered Home's Northern California experience to project the deposits per branch.  *See* PX001 at I-31; PX594 at 88, 97.  In addition, the Grabowski Model relies upon Home's Northern California experience to determine the timing of the ramp up for new branches and existing branches.  *See*, *e.g.,* PX594 at 88, 103, 155; Grabowski Tr. vol. 4, 753:11-22; Pl. Post-Trial Br. at 60.

this, Home's performance during its expansion into Northern California in the 1970s is not a reasonable starting point for projecting how a hypothetical willing buyer would perform after expanding into new markets in the 1980s.[40]

Plaintiff's reliance upon data regarding Home's Northern California experience is also inappropriate because Home's intrastate expansion into new markets in California is not comparable to the interstate expansion into a new market in a new state that occurred with the FSLIC Mergers. Indeed, plaintiffs have put forward no evidence to show that a hypothetical willing buyer could have replicated Home's experience expanding into Northern California with respect to the FSLIC Mergers. And so, plaintiffs have not demonstrated that a hypothetical willing buyer would have expected to achieve the same level of deposit growth that Home experienced in Northern California.[41]

In addition, plaintiffs' contention that the Court should overlook the many concerns with the use of data pertaining to Home's Northern California experience to value the Branching Rights because better data is not available is unavailing. Pl. Post-Trial Reply at 45-46. The absence of more reliable data regarding how a hypothetical willing buyer would perform after expanding into a new savings and loan market does not relieve plaintiffs of their burden to show that their fair market value determinations are sound. And so, plaintiffs have not met their burden to provide the Court with sufficient evidence to make a reasonable approximation of the value of the Branching Rights.

---

[40] Plaintiffs argue generally that the discount rates in the Grabowski Model account for, among other things, the economic differences between the 1970s and 1980s. Pl. Post-Trial Br. at 89. But, plaintiffs do not explain how the discount rates account for the many differences between the economic environment facing the thrift industry in the 1970s and the 1980s, or for the differences between Home's expansion within California and the expansion into an entirely new state.

[41] Mr. Grabowski considered other state-specific factors, as well as Home's actual performance in Florida, Illinois, Missouri and Texas, to value the New York and Ohio Branching Rights. But, these factors do not overcome the Court's concerns with plaintiffs' significant reliance upon data pertaining to Home's Northern California experience. *See, e.g.*, Grabowski Tr. vol. 3, 596-97; PX594 at 89-98; PX001 at I-28, I-30, III-19, IV-21; Grabowski Tr. vol. 4, 843-46; PX594 at 220.

### iii. The Grabowski Model Does Not Adequately Account For The Regulatory Process For Opening A *De Novo* Branch

Lastly, plaintiffs' fair market value determinations for the Branching Rights are also problematic because the Grabowski Model's deposit growth projections do not adequately account for the regulatory hurdles that a hypothetical willing buyer would encounter in seeking to open *de novo* branches in a new state. In this regard, Mr. Grabowski testified that he projected deposit growth by, among other things, assuming that a hypothetical willing buyer would open *de novo* branches in new states and that such a buyer would not acquire any additional existing branches. Pl. Post-Trial Reply at 49-50; Grabowski Tr. vol. 4, 768:6-7. Mr. Antoci testified during trial that there was a lengthy regulatory process associated with obtaining the approval of federal regulators to open *de novo* branches. Antoci Tr. vol. 2, 358:17-360:15. He also testified that the process for acquiring such approval would typically take a year to a year and a half to complete. *Id*. at 360:3-6. Mr. Grabowski projected, however, that a hypothetical willing buyer would open thirteen *de novo* branches in New York over a ten-year period. Grabowski Tr. vol. 4, 846:4-847:23; PX594 at 221, 224. Such a rate of growth is difficult to accept, given the time period that plaintiffs' own witness acknowledges would be needed to obtain regulatory approval to open these new branches. *See* Antoci Tr. vol. 2, 358:14-360:15. And so, the Court cannot reconcile this projection with the evidence.[42]

In sum, the evidence presented in this case makes clear that the economic and industry-specific conditions impacting the savings and loan industry at the time of the FSLIC Mergers would not support the significant deposit growth that plaintiffs project in order to value the Branching Rights. The evidentiary record also makes clear that, even if such growth were possible, plaintiffs have inappropriately relied upon Home's experience expanding into Northern California and that plaintiffs have also failed to sufficiently account for the regulatory hurdles that a hypothetical willing buyer would encounter in opening *de novo* branches in valuing the Branching Rights. And so, for all of these reasons, plaintiffs have not put forward reliable fair

---

[42] Mr. Grabowski projected that a hypothetical willing buyer would open six *de novo* branches in Ohio over a ten-year period. *See* PX001 at Ex. 4.5 at 8. Although this projection is not as problematic as Mr. Grabowski's projected rate of growth in New York, plaintiffs still have not made clear how this projection accounts for the regulatory hurdles in place during the relevant period.

market value determinations for the Branching Rights, nor have they established Home's cost basis in these intangible assets.[43]

### C. Plaintiffs' Have Not Established Home's Cost Basis In The Bowery Assets

The evidentiary record also demonstrates that plaintiffs have not established Home's cost basis in the assets that Home acquired in the Bowery Merger.  In this regard, plaintiffs allege that Home took a cost basis in the government assistance that the FDIC provided to the Bowery Savings Bank in 1985.  *See*, *e.g*., Pl. Post-Trial Br. at 124.  Plaintiffs further allege that they have reliably determined the fair market value of the intangible assets that make up this assistance and that they have determined Home's cost basis in these assets to a reasonable degree of certainty. *Id*. at 127-43.

The evidence presented in this matter demonstrates, however, that Home did not take a basis in the assets that comprise the government assistance provided to the Bowery in 1985.  And so, for the reasons discussed below, plaintiffs have not met their burden to establish Home's cost basis in the assets that Home acquired in the Bowery Merger.

### 1. The Evidence Shows That The Government Assistance Provided To The Bowery Materially Changed Prior To The Bowery Merger

As an initial matter, the undisputed evidence in this case demonstrates that the Bowery and the FDIC materially changed the government assistance provided to the Bowery prior to Home's acquisition of the savings bank in 1988.  In this regard, it is without dispute that, on October 5, 1987, Ahmanson entered into an agreement with the Bowery and the Bowery's stockholders to purchase all of the bank's stock subject to certain conditions precedent, including that changes would be made to the 1985 Bowery Assistance Agreement.  JX065; Glassett Tr. vol. 6, 1246:16-20.  It is also without dispute that, on January 29, 1988, the FDIC and the Bowery Savings Bank executed an agreement entitled "Amendment to Assistance Agreement," which made several changes to the government's assistance and that, thereafter, Home acquired the outstanding stock of the Bowery on the same date.  JX070; Antoci Tr. vol. 3, 416:4-19; Glassett Tr. vol. 6, 1246:16-20; JX045 at KS-010084, KS-010144.

---

[43] Because the Court concludes that plaintiffs' valuations for the Branching Rights are unreliable, the Court does not reach the remaining issues raised by the parties regarding the Branching Rights.

And so, the question presented here is whether these changes alter the nature and character of the government assistance that Home acquired in the Bowery Merger. For the reasons discussed below, the Court concludes that they do.

First, the evidence demonstrates that the 1988 Bowery Assistance Agreement made several changes to the assistance package that the FDIC originally provided to the Bowery in 1985. *See* JX070. For example, this agreement eliminates the IMA, a key item of government assistance. JX070 at KS-026950-51; Glassett Tr. vol. 6, 1237:22-24; JX045 at KS-010110. The 1988 Bowery Assistance Agreement also eliminates the 1985 Bowery RAP Right, which allowed the Bowery to reverse its purchase accounting adjustments for the purpose of calculating capital for regulatory purposes. JX070 at KS-026950-53; Pl. Post-Trial Br. at 121. The agreement also replaces the 1985 Bowery RAP Right with a new RAP Right, which allowed the Bowery to count the goodwill arising out of the Bowery Merger toward regulatory capital. JX070 at KS-026950-53; Pl. Post-Trial Br. at 121; Glassett Tr. vol. 6, 1233:21-1236:25; JX045 at KS-010110. In addition, the amortization period for the Bowery RAP Right also increased from fourteen years to twenty years under the 1988 Bowery Assistance Agreement. JX045 at KS-010144; Glassett Tr. vol. 6, 1238:13-23; PX002 at Ex. 5.07 at 4. And so, the evidentiary record makes clear that the 1988 Bowery Assistance Agreement eliminated, or significantly altered, several of the assets included in the 1985 Bowery Assistance Agreement.

### 2. The Bowery Disposed Of The Assets In The 1985 Bowery Assistance Agreement

The evidence also makes clear that the Bowery disposed of the government assistance provided in the 1985 Bowery Assistance Agreement, prior to Home's acquisition of the Bowery in 1988, resulting in a realization event under the Internal Revenue Code. In this regard, the Internal Revenue Code's realization requirement is set forth in I.R.C. § 1001(a), which provides, in pertinent part, that:

> The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

I.R.C. § 1001(a); *see also Cottage Sav. Ass'n v. C.I.R.,* 499 U.S. 554, 559 (1991); *Russian Recovery Fund Ltd. v. United States,* 122 Fed. Cl. 600, 614 (2015). Treasury Regulation 1.1001-1(a) also provides, in pertinent part, that:

> Except as otherwise provided . . . the gain or loss realized from the conversion of property into cash, or from the exchange of property for other property differing materially either in kind or in extent, is treated as income or as loss sustained.

Treas. Reg. § 1.1001-1(a). The Supreme Court has also held that an exchange of property under section 1001 "gives rise to a realization event so long as the exchanged properties are 'materially different'−that is, so long as they embody legally distinct entitlements." *Cottage Sav.*, 499 U.S. at 566. And so, a realization event occurs if there has been an exchange of property "differing materially" in kind.

A plain reading of the 1985 and 1988 Bowery Assistance Agreements makes clear that these two agreements are materially different. As discussed above, the 1988 Bowery Assistance Agreement completely eliminates the Bowery IMA−a key piece of government assistance under the 1985 Bowery Assistance Agreement. Glassett Tr. vol. 6, 1237:18-24; JX070 at KS-026950-51. In addition, at a minimum, the mechanics of the Bowery RAP Right materially differ under the two agreements.[44] JX070 at KS-026950-53; Glassett Tr. vol. 6, 1233:21-1234:17; JX045 at KS-010110; Pl. Post-Trial Br. at 121. The fourteen-year amortization period for the Bowery RAP Right under the 1985 Bowery Assistance Agreement also changed to a twenty-year amortization period under the 1988 Bowery Assistance Agreement. JX045 at KS-010144; Glassett Tr. vol. 6, 1238:13-23; PX002 at Ex. 5.07 at 4; Pl. Post-Trial Br. at 148.

It is also without dispute that the amounts of goodwill created by the 1985 and 1988 Bowery Assistance Agreements differ significantly. The 1985 Bowery acquisition by the Ravitch Group created approximately $635,000,000 in goodwill. PX002 at Ex. 5.07 at 4; DX205 at 94. By comparison, Home's 1988 acquisition of the Bowery created $183,000,000 in goodwill. JX045 at KS-010144; DX205 at Ex. 18-1. And so, the many differences between the government assistance provided in the 1985 and 1988 Bowery Assistance Agreements

---

[44] It is also without dispute that the 1988 Bowery Assistance Agreement decreased the amount of assets covered by the Bowery Credit Protection by $1,500,000,000 and that the Bowery was solvent in 1988, which was not the case when the Ravitch Group acquired the Bowery in 1985. Glassett Tr. vol. 6, 1229:7-17, 1237:18-24; JX070 at KS-026950; Pl. Post-Trial Br. at 121; Def. Post-Trial Br. at 135.

demonstrate that these agreements "embody legally distinct entitlements and that a realization event occurred when the Bowery entered into the 1988 Bowery Assistance Agreement." *Cottage Sav.*, 499 U.S. at 566.

The Court is also not persuaded by the arguments that plaintiffs advance to show that there has been no realization event in this case. First, plaintiffs' contention that there has been no realization event because the 1988 Bowery Assistance Agreements is styled as an "amendment" to the original agreement is unsubstantiated by the evidence. Pl. Post-Trial Br. at 125-26. As demonstrated above, the substance of the 1988 Bowery Assistance Agreement makes clear that this agreement eliminates, or materially alters, a number of the intangible assets provided under the 1985 Bowery Assistance Agreement. And so, the fact that the agreement is styled as an amendment does not preclude the Court from finding that a realization event has occurred.

Plaintiffs' contention that no realization event has occurred because the RAP Rights in the two assistance agreements are simply "two way of getting to the same result" is equally misguided. Pl. Post-Trial Reply at 93; *see also* Pl. Post-Trial Reply at 87; Glassett Tr. vol. 6, 1234:18-22, 1236:18-25. Even if the Court were to accept plaintiffs' characterization of the two Bowery RAP Rights, there are many other differences in the government assistance provided in the two agreements. As the government argued during its closing argument, any one of these differences could make the execution of the 1988 Bowery Assistance Agreement a realization event.[45] Tr. vol. 15, 3019:6-16. And so, again, the evidence demonstrates that a realization event has occurred.

### 3. The Bowery Assets Are Not Of "Like Kind"

For many of the same reasons, the evidence also shows that the execution of the 1988 Bowery Assistance Agreement did not involve a section 1031 like-kind exchange that would allow the Bowery to defer recognition of a gain or loss. Under section 1031 of the Internal Revenue Code, a taxpayer may defer recognition of a gain or loss from qualifying exchanges of

---

[45] The Court would have to ignore the evidence presented at trial showing that the Bowery was a solvent bank at the time that the FDIC and the Bowery executed the 1988 Bowery Assistance Agreement. The Bowery's improved financial condition most certainly had an impact on the nature and character of the 1988 Bowery RAP Right, which, again, was to help the Bowery meet its regulatory capital requirements.

like-kind property.  I.R.C. § 1031; *see also Deseret Mgmt. Corp. v. United States*, 112 Fed. Cl. 438, 447 (2013).  A like-kind exchange occurs if property "held for productive use in a trade or business or for investment . . . is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."  I.R.C. § 1031(a)(1)*; 3 Michael D. Houser, Mertens Law of Federal Income Taxation § 20B:1 (2009) ("Mertens"); see also Ocmulgee Fields, Inc. v. Comm'r of Internal Revenue,* 613 F.3d 1360, 1364 (11th Cir. 2010); *Morton v. United States,* 98 Fed. Cl. 596, 603 (2011).

The question of whether intangible personal property is of a like kind generally depends upon the nature and character of the intangible asset and the underlying property to which the intangible asset relates.  Treas. Reg. § 1.1031(a)-1(b); Mertens at § 20B:1; *see also Deseret Mgmt. Corp.*, 112 Fed. Cl. at 447.  And so, section 1031 identifies certain types of property that are ineligible for like-kind treatment, including "choses in action," which involve the right to receive or recover money or other consideration or property.  *See* I.R.C. § 1031(a)(2)(F); Mertens at §§ 20B:1, 20B:19.

Although plaintiffs maintain that the 1985 and 1988 Bowery RAP Rights are of like kind under section 1031, the evidence shows that these intangible assets are not of the same nature and character.  Pl. Post-Trial Reply at 94-95.  As discussed above, the 1988 Bowery Assistance Agreement eliminates and replaces the 1985 Bowery RAP Right with a new RAP Right.  This agreement also changes the amortization period for the Bowery RAP Right.  The nature and character of the Bowery RAP Right also changed under the 1988 Bowery Assistance Agreement because of the change in the financial condition of the Bowery in 1988.[46]  The evidence shows that, although previously insolvent and failing, the Bowery was solvent at the time that Home acquired the bank in 1988.  And so, the evidence demonstrates that the 1985 and 1988 Bowery RAP Rights are not of a like kind as contemplated by section 1031.  I.R.C. § 1031.

---

[46] The government's argument that the Bowery RAP Right is ineligible for "like-kind" treatment coverage because this asset is a chose in action under I.R.C. § 1031(a)(2)(F) is less persuasive.  As plaintiffs point out in their post-trial brief, the Bowery RAP Right was a valuable intangible asset to Home before Home commenced its *Winstar*-related litigation.  Pl. Post-Trial Reply at 95-96.  And so, it is not clear that the Bowery RAP Right involves a chose in action, as the government suggests.  *See* Tr. vol. 15, 3019-20.

### 4.   Plaintiffs Valued The Wrong Assets

Because the Court concludes that the Bowery disposed of the government assistance provided in the 1985 Bowery Assistance Agreement before Home acquired the bank in the Bowery Merger, the Court must also conclude that plaintiffs have valued the wrong assets to establish Home's cost basis in the government assistance Home received in the Bowery Merger. Plaintiffs have put forward fair market value determinations for the government assistance that the Bowery received in 1985.  Grabowski Tr. vol. 8, 1560:1-1561:6.  But, as discussed above, the evidence in this matter shows that Home did not actually acquire this assistance.  And so, plaintiffs have not met their burden to establish Home's cost basis in the assets that Home actually acquired through the Bowery Merger.[47]

### D.  The Court Grants-In-Part Plaintiffs' Motion To Strike

As a final matter, plaintiffs have moved to strike certain portions of the government's post-trial brief and the appendix attached thereto, because these materials contain new analysis by the government's valuation expert and certain industry reports and treatises that were not admitted into evidence during trial.  *See generally* Mot. to Strike.  The Court typically "view[s] motions to strike with disfavor and rarely grants them." *Fisherman's Harvest, Inc. v. United States,* 74 Fed. Cl. 681, 690 (2006).  The Court is also mindful that Rule 201 of the Federal Rules of Evidence also allows the Court to take judicial notice of adjudicative facts that are "not subject to reasonable dispute," because the facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  And so, the Court will not grant plaintiffs' motion to strike unless plaintiffs can demonstrate "prejudice or confusion." *See Impresa Construzioni Geom. Domenico Garufi v. United States,* 61 Fed. Cl. 175, 177 (2004), *appeal voluntarily dismissed,* 125 F. App'x 310 (Fed. Cir. 2005).

A review of the documents that plaintiffs seek to strike demonstrates that these documents contain, for the most part, undisputed factual matters of public record regarding the savings and loan industry and the national economy.  Specifically, the Bernstein Research report, Bureau of Labor Statistics report and two treatises included in the government's appendix

---

[47] Because the Court concludes that plaintiffs valued the wrong assets to establish Home's cost basis in the government assistance that Home received in the Bowery Merger, the Court does not reach the remaining issues raised by the parties regarding the Bowery Merger.

contain factual information and data that are not subject to reasonable dispute, because this information can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  And so, the Court denies plaintiffs' motion to strike with respect to these documents.

The new analysis provided by the government's valuation expert is, however, more problematic.  As plaintiffs argue in their motion to strike, plaintiffs have not had the opportunity to respond to this analysis, nor to cross-examine the government's expert witness with respect to this analysis.  Consideration of the new analysis under such circumstances would prejudice plaintiffs.  And so, the Court grants plaintiffs' motion to strike this expert analysis.

## V.    CONCLUSION

In sum, the extensive evidentiary record in this matter demonstrates that plaintiffs have not shown, by a preponderance of the evidence, that their fair market value determinations for the RAP Rights, Branching Rights and the other intangible assets that Home acquired through the Supervisory Mergers are reliable.  While plaintiffs need not determine the value of these assets to an absolute certainty, they must put forward sufficient evidence for the Court to make a "reasonable or rational approximation" of the assets' values.  *Union Pac. R.R.*, 524 F.2d at 1383; *see also Meredith Broadcasting Co.*, 405 F.2d at 1231; *Kraft, Inc.*, 30 Fed. Cl. at 795.  Because plaintiffs have not done so in this case, they similarly have not established Home's cost basis in these assets to a reasonable degree of certainty for the purpose of pursuing their tax refund claim.

And so, for the foregoing reasons, the Court:

1. **GRANTS-IN-PART** plaintiffs' motion to strike.  The Clerk shall **STRIKE** pages 98 to 103 of the second appendix to the government's post-trial brief (docket entry no. 326); and

2. **DISMISSES** the complaints **WITH PREJUDICE.**

No costs.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge